IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHELLY PARKER, et al., | ) | Case No. 03-CV-0213-EGS |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES** |
| v. | ) | **IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION TO** |
| DISTRICT OF COLUMBIA, et al., | ) | **DISMISS THE COMPLAINT** |
| | ) | **[FED. R. CIV. P. 12(b)(6)]** |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**COME NOW** the Plaintiffs, Shelly Parker, Dick Anthony Heller, Tom G. Palmer, Gillian

St. Lawrence, Tracey Ambeau, and George Lyon, by and through undersigned counsel, and

submit their Memorandum in Opposition to Defendants' Motion to Dismiss.

Dated: March 14, 2003

Respectfully Submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Day, LLC
Robert A. Levy (D.C. Bar No. 447137)
Gene Healy (D.C. Bar No. 468839)
Clark M. Neily, III (D.C. Bar No. 475926)
1717 K Street, N.W., Suite 600
Washington, D.C. 20036
Phone: 202.550.8777
Fax:    202.318.4512

By: _____
Alan Gura

Attorneys for Plaintiffs

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . 3

ARGUMENT. . . . . . . . . . . 5

I.    THE SUPREME COURT'S DECISION IN *UNITED STATES V. MILLER*
      DID NOT ADOPT A "COLLECTIVE RIGHTS" VIEW OF THE
      SECOND AMENDMENT.  TO THE CONTRARY, *MILLER* SUPPORTS
      INTERPRETING THE SECOND AMENDMENT AS ANY OTHER
      INDIVIDUAL RIGHT. . . . . . . . 5

II.   THE DISTRICT OF COLUMBIA CIRCUIT READS *MILLER* TO
      ESTABLISH A TEST QUALIFYING SPECIFIC FIREARMS OR
      EXAMINING WHETHER A CHALLENGED RULE IMPAIRS THE
      EFFECTIVENESS OF THE MILITIA, IMPLICITLY ADOPTING
      THE INDIVIDUAL RIGHTS MODEL OF THE SECOND AMENDMENT.    10

III.  NONE OF THE CASES CITED BY DEFENDANTS IN SUPPORT
      OF THE COLLECTIVE RIGHTS VIEW CONTAIN ANY
      MEANINGFUL ANALYSIS OF THE SECOND AMENDMENT. .    .    13

IV.   THE SECOND AMENDMENT TO THE UNITED STATES
      CONSTITUTION PROTECTS AN INDIVIDUAL'S RIGHT
      TO KEEP AND BEAR ARMS, EVEN WHILE NOT ENGAGED
      IN STATE SERVICE. . . . . . . . 20

      A.    The Supreme Court Has Not Explicitly Decided Whether
            The Second Amendment Protects An Individual or "Collective"
            Right, But Has Repeatedly Suggested The Amendment Secures
            An Individual Right. . . . . . . 21

      B.    The Framers Clearly Intended That The Second Amendment
            Guarantee An Individual Right To Keep And Bear Arms. .    24

i

C.    <u>The Text Of The Second Amendment Plainly Establishes That Individuals Have A Right To Keep And Bear Arms Independent Of State Service.</u>   .    .    .    .    .    .    .    30

    1.    <u>The Second Amendment's Preamble Does Not Limit The Rights Protected In The Operative Clause</u>.    .    .    30

    2.    <u>To The Extent The Preamble Serves As An Operative Guide, It Does Not Limit The Rights Of The People, As "Militia" Is Practically Synonymous With "People."</u>.    .    .    .    .    34

    3.    <u>The People Protected By The Second Amendment Are The Same People Protected Throughout The Bill Of Rights</u>.    .    .    .    .    .    35

    4.    <u>"The Right To Keep And Bear Arms" Is The Right To Privately Possess And Carry Ordinary Firearms</u>.    .    .    36

CONCLUSION.    .    .    .    .    .    .    .    .    38

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const. pmbl. .   .   .   .   .   .   .   .   .   .   31

U.S. Const. art. I, sec. 8, cl. 1 .   .   .   .   .   .   .   .   31

U.S. Const. art. I, sec. 8, cl. 2 .   .   .   .   .   .   .   .   31

U.S. Const. art. I, sec. 8, cl. 8 .   .   .   .   .   .   .   .   31, 32

U.S. Const. art. I, sec. 8, cl. 12.   .   .   .   .   .   .   .   25

U.S. Const. art. I, sec. 8, cl. 15.   .   .   .   .   .   .   .   5

U.S. Const. art. I, sec. 8, cl. 16.   .   .   .   .   .   .   .   5, 18, 20, 36

U.S. Const. art. I, sec. 10, cl. 3.   .   .   .   .   .   .   20, 36

U.S. Const. art. III.   .   .   .   .   .   .   .   .   19

U.S. Const. amend. I. .   .   .   .   .   .   .   .   .   36

U.S. Const. amend. II.   .   .   .   .   .   .   .   .   passim

U.S. Const. amend. IV.   .   .   .   .   .   .   .   .   36

U.S. Const. amend. V.   .   .   .   .   .   .   .   .   8

U.S. Const. amend. IX.   .   .   .   .   .   .   .   .   4, 33

U.S. Const. amend. X.   .   .   .   .   .   .   .   .   36

## CASES

Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954).   .   .   35

Burton v. Sills, 53 N.J. 86 (N.J. 1968).   .   .   .   .   .   3, 9, 10

Duncan v. Louisiana, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).   .   23

iii

Eldred v. Ashcroft, ___ U.S. ___, 123 S. Ct. 769,
      154 L. Ed. 2d 682 (2003).   .    .    .    .    .    .    31, 32, 33, 34

Eldred v. Reno, 345 U.S. App. D.C. 89; 239 F.3d 372 (D.C. Cir. 2001).   .    .    32

Feist Publications, Inc. v. Rural Telephone Service Co.,
      499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).   .    .    .    33

Fraternal Order of Police v. United States ("FOP I"),
      332 U.S. App. D.C. 49, 152 F.3d 998 (D.C. Cir. 1998).   .    .    .    11

* Fraternal Order of Police v. United States ("FOP II"),
      335 U.S. App. D.C. 359, 173 F.3d 898 (D.C. Cir.),
      cert. denied, 528 U.S. 928, 120 S. Ct. 324,
      145 L. Ed. 2d 253 (1999).   .    .    .    .    .    3, 10, 11, 12

Gillespie v. City of Indianapolis, 185 F.3d 693 (7th Cir. 1999),
      cert. denied, 528 U.S. 1116, 120 S. Ct. 9341, 145 L. Ed. 2d 813 (2000).   .    15

Graham v. John Deere Co. of Kansas City, 383 U.S. 1,
      586 S. Ct. 684, 15 L. Ed. 2d 545 (1966).   .    .    .    .    .    33, 34

Hickman v. Block, 81 F.3d 98 (9th Cir.), cert. denied,
      519 U.S. 912, 117 S. Ct. 276, 136 L. Ed. 2d 199 (1996).   .    .    .    17

Jacobson v. Massachusetts, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905).   .    31

Kasler v. Lockyer, 23 Cal.4th 472 (2000),
      cert. denied, 531 U.S. 1149, 121 S. Ct. 1090,148 L. Ed. 2d 964 (2001).   .    24

Lewis v. United States, 445 U.S. 55, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980).   .    3, 9

Lopez v. United States, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995).   .    33

Love v. Pepersack, 47 F.3d 120 (4th Cir.),
      cert. denied, 516 U.S. 813, 116 S. Ct. 64, 133 L. Ed. 2d 27 (1995).   .    .    14

M.A.P. v. Ryan, 285 A.2d 310 (D.C. 1971).   .    .    .    .    .    .    19

Moore v. City of East Cleveland,
      431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977).   .    .    .    24

Muscarello v. United States,
    524 U.S. 125, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (1998).    .      .      .      37

New York Trust Co. v. Eisner, 256 U.S. 345, 41 S. Ct. 506, 65 L. Ed. 963 (1921). .    24

Nordyke v. King, ___ F.3d ___,
    2003 U.S. App. LEXIS 2911 (9th Cir., Feb. 18, 2003).    .     .     .    8, 37

Palko v. Connecticut, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937).    .     16

Patton v. United States,
    281 U.S. 276, 50 S. Ct. 253, 74 L. Ed. 854 (1930),
    overruled on other grounds, Williams v. Florida,
    399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970).    .     .     .    22

Perpich v. Dept. of Defense,
    496 U.S. 334, 110 S. Ct. 2418, 110 L. Ed. 2d 312 (1990).    .     .     .    7

Planned Parenthood v. Casey,
    505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)    .     .     .    24

Poe v. Ullman, 367 U.S. 497, 543, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961) .     .    24

Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997)  .    9

Sandidge v. United States, 520 A.2d 1057 (D.C.),
    cert. denied, 484 U.S. 868, 108 S. Ct. 193, 98 L. Ed. 2d 145 (1987).    .    19, 20

Schnapper v. Foley, 215 U.S. App. D.C. 59, 667 F.2d 102, 112 (D.C. Cir. 1981). .    32

Scott v. Sandford, 60 U.S. (19 How.) 393, 417, 15 L. Ed. 691, 705 (1856) .     .    23

Silveira v. Lockyer, 312 F.3d 1052 (9th Cir. 2002).    .     .     .     .    17, 34

Staples v. United States,
    511 U.S. 600, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994).    .     .     .    24

State v. Delgado, 298 Ore. 395, 692 P.2d 610 (Ore. 1984) . .     .     .    16

Stevens v. United States, 440 F.2d 144 (6th Cir. 1971),
    overruled, United States v. Bass, 404 U.S. 336, 92 S. Ct. 515,
    30 L. Ed. 2d 488 (1971).    .    .    .    .    .    .    14

Thomas v. Members of City Council, 730 F.2d 41 (1st Cir. 1984) (per curiam).     .     13

United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1875) .     .     .     .     16, 21

* United States v. Emerson, 270 F.3d 203 (5th Cir. 2001),
     cert. denied, ___ U.S. ___, 122 S. Ct. 2362,
     153 L. Ed. 2d 184 (2002).     .     .     .     4, 6, 7, 10, 13, 21, 22, 24, 27, 30, 36, 37

United States v. Graves, 554 F.2d 65 (3d Cir. 1977).     .     .     .     .     13

United States v. Hale, 978 F.2d 1016 (8th Cir. 1992),
     cert. denied, 507 U.S. 997, 113 S. Ct. 1614, 123 L. Ed. 2d 174 (1993).     17, 18

United States v. McCreary, 455 F.2d 647 (6th Cir. 1972).     .     .     .     .     14

* United States v. Miller, 307 U.S. 174, 59 S. Ct. 816,
     83 L. Ed. 1206 (1939).     .     3, 5, 6, 7, 8, 9, 10, 11, 17, 18, 20, 21, 35, 36, 37

United States v. Nelson, 859 F.2d 1318 (8th Cir. 1988).     .     .     .     15, 16, 17

United States v. Oakes, 564 F.2d 384 (10th Cir. 1977),
     cert. denied, 435 U.S. 926, 98 S. Ct. 1493, 55 L. Ed. 2d 521 (1978).     .     17

United States v. South-Eastern Underwriters Ass'n,
     322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944).     .     .     .     34

United States v. Toner, 728 F.2d 115 (2d Cir. 1984).     .     .     .     .     13

* United States v. Verdugo-Urquidez,
     494 U.S. 259, 110 S. Ct. 1056,  108 L. Ed. 2d 222 (1990).     .     .     21, 22, 35

United States v. Virginia, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996).     35

United States v. Wilson, 456 F.2d 1042 (6th Cir. 1972).     .     .     .     .     14

United States v. Wright, 117 F.3d 1265 (11th Cir.),
     cert. denied, 522 U.S. 1007, 118 S. Ct. 584, 139 L. Ed. 2d 422 (1997).     .     18

<u>STATUTES AND RULES</u>

10 U.S.C. § 311.     .     .     .     .     .     .     .     .     .     8

10 U.S.C. § 312(a)(3).     .     .     .     .     .     .     .     .     8

Fed. R. Civ. P. 12(c). .        .        .        .        .        .        .        .        .        1

## SCHOLARSHIP

Amar, The Bill of Rights (1998).        .        .        .        .        .        .        .        8

Cottrol and Diamond,
        *The Second Amendment: Toward an Afro-Americanist Reconsideration,*
        80 Geo. L.J. 309 (1991).        .        .        .        .        .        .        .        23

Halbrook, That Every Man Be Armed:
        The Evolution of a Constitutional Right (1984).        .        .        .        .        29

Halbrook, *The Freedmen's Bureau Act and the*
        *Conundrum Over Whether the Fourteenth Amendment*
        *Incorporates the Second Amendment,*
        29 N. Kentucky L.R., No. 4, 683-703 (2002) .        .        .        .        .        23

Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment,*
         82 Mich. L. Rev. 204 (1983).        .        .        .        .        .        .        28

Rawle,  A View of the Constitution of the
        United States of America (Da Capo Press 1970) (2d ed. 1829).        .        .        29

St. George Tucker, Blackstone's Commentaries:
        with Notes of Reference, to the Constitution and Laws,
        of the Federal Government of the United States; and of the
        Commonwealth of Virginia, (1803). .        .        .        .        .        .        29

Story, Commentaries on the Constitution, (1833).. .        .        .        .        .        20

Story, A Familiar Exposition of the Constitution of the United States, (1842).        .        29

Tribe, American Constitutional Law, (3d ed. 2000). .        .        .        .        .        19

Young, The Origin of the Second Amendment (2nd ed. 1995).        .        .        .        28

## OTHER AUTHORITY

Jonathan Elliot, The Debates in the Several State Conventions
        on the Adoption of the Federal Constitution (2d ed., 1836). .        .        .        26, 27

The Antifederalist Papers, 75 (M. Borden, ed. 1965).        .        .        .        .        25

The Federalist No. 29 (Alexander Hamilton)
    (G. Carey, J. McClellan eds. 1990).  .      .      .      .      .      25, 26

The Federalist No. 46 (James Madison)
    (G. Carey, J. McClellan eds. 1990).  .      .      .      .      .      .      26

Papers of James Madison (C. Hobson et al., eds. 1979).    .      .      .      .      27

 The Complete Bill of Rights:
    The Drafts, Debates, Sources, and Origins (N. Cogan, ed., 1997).  .      .      28

*Opposition to Petition for Certiorari in* United States v. Emerson, No. 01-8780,
    http://www.usdoj.gov/osg/ briefs/2001/0responses/2001-8780.resp.pdf.  .      20

*Memorandum From The Attorney General To All United States Attorneys,*
    *Re:* United States v. Emerson, Nov. 9, 2001,
    http://www.usdoj.gov/osg/ briefs/2001/0responses/2001-8780.resp.pdf.  .      20

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

### PRELIMINARY STATEMENT

The parties apparently agree the Court should proceed directly to the overriding substantive issue at hand: whether the Second Amendment guarantees an individual right to keep and bear arms.  Defendants raise no procedural or jurisdictional issues, nor do they aver evidence that would contradict any of plaintiffs' allegations and thus convert the motion to one for summary judgment.[1]   Defendants do not even suggest that the challenged laws would survive constitutional scrutiny if the Second Amendment secures individual rights.

Rather, defendants premise their motion on a single incorrect assertion: that the Second Amendment, unlike every other provision of the Bill of Rights, should be read as granting "rights" to the states, rather than to the "people" ordinarily thought to enjoy "rights" throughout the Constitution.

In support of this theory, defendants mischaracterize Supreme Court precedent, and suggest an opinion of the New Jersey Supreme Court is that of the United States Supreme Court.  Moreover, defendants do not mention adverse decisions from other states, misrepresent D.C. Circuit precedent as supportive of their claim when in fact it is adverse, and overstate the holdings of those circuits which have agreed with the "collective rights" notions.  Defendants also neglect to offer any sort of analysis of the Second Amendment's text or history that would support their conclusory dismissal of plaintiffs' fundamental rights.

---

[1]Defendants erroneously style their motion as one for judgment on the pleadings in their proposed order, but Fed. R. Civ. P. 12(c) is not available at this stage, as the pleadings are not closed.

1

In the interest of efficiency, plaintiffs will not here recount the entirety of their arguments, presented in their motion for summary judgment filed concurrently this day, conclusively establishing that the Second Amendment secures individual rights clearly violated by defendants' challenged practices.  To the extent not repeated in the text of this memorandum, those arguments are adopted and incorporated as though fully set forth herein.  However, to the extent some of those arguments directly address the defects of defendants' motion, they are included here as well.

## <u>STATEMENT OF FACTS</u>

Plaintiffs' allegations, which for purposes of this motion must be assumed to be true, are illuminated further in plaintiffs' motion for summary judgment and the accompanying declarations.  The allegations establish that plaintiffs intend to keep handguns and other functional firearms within their homes, but are restrained by defendants' "active enforcement" of laws criminalizing such possession.  (Complaint, ¶¶ 1, 2, 3, 4, 5, 6.)   Plaintiffs Heller, Palmer, and Lyon already own guns which they keep out of state due to defendants' laws.  (Complaint, ¶¶ 2, 3, 6.)  Plaintiff Heller is, in fact, a Special Police Officer of defendant District of Columbia who is permitted a handgun on the job, but faces fine and imprisonment if he were to have a handgun at home.  (Complaint, ¶ 2.)  Mr. Heller sought lawfully to register a handgun for home possession, but was refused.  <u>Id.</u>  Plaintiff St. Lawrence lawfully owns a registered shotgun, but cannot render it functional due to the defendants' laws.  (Complaint, ¶ 4.)

It bears repeating that defendants do not contest these factual allegations.  Certainly, defendants do not challenge the allegations that they are actively enforcing the cited laws, and do not suggest that plaintiffs' fears of prosecution are not well-founded.

2

## SUMMARY OF ARGUMENT

Defendants's assertion that the Supreme Court held the Second Amendment secures a "collective right" of the states in United States v. Miller, 307 U.S. 174, 59 S. Ct. 816, 83 L.Ed. 1206 (1939), is demonstrably false. Like the cases that share this interpretation of Miller, defendants fail to cite extensive portions of the opinion that render the claim impossible. Plaintiffs rely on the *complete* opinion, as did, apparently, the D.C. Circuit in its recent interpretation of Miller – also misrepresented by defendants – in Fraternal Order of Police v. United States ("FOP II"), 335 U.S. App. D.C. 359, 173 F.3d 898 (D.C. Cir.), cert. denied, 528 U.S. 928, 120 S. Ct. 324, 145 L. Ed. 2d 253 (1999).

Plaintiffs were surprised to learn that "[T]he Supreme Court has twice reaffirmed its holding in Miller." (Def. Motion, p. 3.)[2] The Supreme Court did accurately describe Miller once, in a parenthetical cite in a footnote in Lewis v. United States, 445 U.S. 55, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980), but the holding described in Lewis is not what defendants suggest. Miller has never again been revisited by the Supreme Court. As decisions of the *United States* Supreme Court are not published in the Atlantic Reporter, defendants reference to the New Jersey case of Burton v. Sills, 248 A.2d 521 (N.J. 1968), or their characterization of this as a decision of the United States Supreme Court, is not persuasive.

Defendants statements that "federal appellate courts have consistently rejected the argument that the Second Amendment guarantees an individual right," Motion, p. 4, is incorrect. The first circuit that gave careful consideration to a Second Amendment argument, as opposed to summarily rejecting the argument without analysis, found that the Second Amendment secures

_____

[2]Defendants' motion is not page numbered. Plaintiffs count from the caption page.

an individual right.  <u>United States v. Emerson</u>, 270 F.3d 203 (5th Cir. 2001), <u>cert</u>. <u>denied</u>, ___

U.S. ___, 122 S. Ct. 2362, 153 L. Ed. 2d 184 (2002).  Defendants' later proposition, that "every

circuit but the 5th . . . [has] held that the Second Amendment does not create an individual right to

possess a firearm," Motion, p. 5, is also incorrect.  The collective-individual rights debate has not

yet been resolved in either the Second Circuit or, more notably, the D.C. Circuit – although the

D.C. Circuit suggested it would adopt the individual rights model.[3]

That defendants do not attempt to analyze the history or text of the Second Amendment is

not surprising.  The notion that the Second Amendment secures only a "collective" right is easy

to assert, but not possible to prove with reference to the text of the amendment or the lengthy

record son the topic left by the Framers, each of which establishes that the character of Second

Amendment rights is no different than that of other constitutional rights.  Some of the "collective

rights" cases concede they are not based on <u>Miller</u> or, indeed, on any Supreme Court precedent;

none cited by defendants contain any actual discussion of *why* the Second Amendment would

secure only a "collective right."

_____

[3]Defendants also apparently misunderstand the origin of rights.  The Fifth Circuit did not
hold that the Second Amendment "creates" any rights.  The Constitution does not create rights; it
secures them. <u>See</u>, <u>i.e.</u> U.S. Const., amend. IX ("The enumeration in the Constitution of certain
rights shall not be construed to deny or disparage others retained by the people.")  Consistent
with this unimpeachable understanding of the Constitution's framework, the Fifth Circuit held
the Second Amendment secures an inherent right.  The distinction is important.

**ARGUMENT**

I.      **THE SUPREME COURT'S DECISION IN *UNITED STATES V. MILLER* DID NOT ADOPT A "COLLECTIVE RIGHTS" VIEW OF THE SECOND AMENDMENT.  TO THE CONTRARY, *MILLER* SUPPORTS INTERPRETING THE SECOND AMENDMENT AS ANY OTHER INDIVIDUAL RIGHT.**

The myth that the Supreme Court's decision in Miller, *supra*, 307 U.S. 174, uniquely relegated the Second Amendment to status as a lower-class "collective" right, in contrast to the unquestioned understanding that the remaining Constitutional rights secure the freedoms of individuals, is sadly persistent.  However, it is also demonstrably false by reference to the actual text of the Miller opinion.

Miller raised a Second Amendment challenge to his indictment under the National Firearms Act for possession of an untaxed sawed-off shotgun.  Rather than focus on the nature of the substantive right claimed by Miller, the Supreme Court focused on the weapon to which Miller claimed a right.  The Court began by noting that among the powers of Congress lie certain prerogatives regarding "the Militia."  U.S. Const., art. I, sec. 8, cl. 15 ("to provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"); U.S. Const., art. I, sec. 8, cl. 16 ("to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States . . .").  As the Second Amendment contains a prefatory justification clause providing, "A well regulated Militia being necessary to the security of a free state," U.S. Const., amend. II, Miller reasoned that  "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of such [militia] forces the declaration and guarantee of the Second Amendment were made.  It must be interpreted and applied with that end in view." Miller, 307 U.S. at 178.

"With that end in view," the Supreme Court next set out to define "the militia," correctly concluding that "militia" referred simply to members of the public capable of bearing arms in defense of the government if called upon to do so:

> The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia -- *civilians primarily, soldiers on occasion*.
>
> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia *comprised all males physically capable of acting in concert for the common defense*. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms *supplied by themselves* and of the kind in common use at the time.

Miller, 307 U.S. at 178-79 (emphasis added). The "militia system . . . implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence." Miller, 307 U.S. at 179-80 (citation omitted).

> These passages from Miller suggest that the militia, the assurance of whose continuation and the rendering possible of whose effectiveness Miller says were purposes of the Second Amendment, referred to the generality of the civilian male inhabitants throughout their lives from teenage years until old age and to their personally keeping their own arms, and not merely to individuals during the time (if any) they might be actively engaged in actual military service or only to those who were members of special or select units.

Emerson, 270 F.3d at 226.

There was never any question that the Miller defendants were members of the militia. "Had the lack of [militia] membership or engagement been a ground of the decision in Miller, the Court's opinion would obviously have made mention of it. But it did not." Emerson, 270 F.3d at 224 (footnote omitted). Rather, the case turned on whether the sawed-off shot gun in question

6

was suitable for such common defense, and a weapon in common use:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

Miller, 307 U.S. at 178 (emphasis added) (citation omitted).

Assuming that Miller referenced some state-sanctioned organization is the root of the collective rights error. See, i.e. Motion, at 2 (reading Miller as discussing "the state militia.") But the assumption is obviously not correct. The Supreme Court was clearly referencing the Militia as a Constitutional concept described in the Militia Clauses of Article I, and it defined this entity to be not the people of any particular state, but a portion of the American public generally. The Supreme Court still speaks of "the Militia" in this manner, as in recognizing that the militia and the armed forces are different concepts: "Congress was authorized both to raise and support a national army and also to organize 'the Militia.'" Perpich v. Dept. of Defense, 496 U.S. 334, 340, 110 S. Ct. 2418, 2423, 110 L. Ed. 2d 312 (1990).

The concept suggested by defendants, not discussed or considered in Miller, is what the Framers called a "select militia."

> [M]any Americans at this time not only feared a standing army but also a select militia, a militia comprised of only a relatively few selected individuals (perhaps the youngest and fittest) who were more frequently and better trained and equipped than the general, unorganized militia. a portion of the arms-bearing public that, while not part of a standing army as such, would be given special training and consideration by the state.

Emerson, 270 F.3d at 227 n.23; Id., at 239 and n.42.

7

This distinction, between "the Militia" and a "select" portion of it survives to this day. Congress defines "the militia of the United States" as comprising all able-bodied males between the ages of 17 and 45, as well as male members of the National Guard up to age 64, who are or intend to become citizens; as well as female members of the National Guard, 10 U.S.C. § 311. Excluded from this definition of Militia, among others, are "members of the armed forces, except members who are not on active duty." 10 U.S.C. § 312(a)(3). Miller's "militia" definition is also consistent with the Fifth Amendment's guarantee that individuals may only be charged with serious crimes "by presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. Const., amend. V. The Militia is obviously a concept apart from the army or navy, and its members are entitled to the protection of the grand jury when not actively defending against invasion or insurrection.

As Professor Akhil Amar concluded, "the militia is identical to the people . . ." Amar, The Bill of Rights 51 (1998); see also Nordyke v. King, ___ F.3d ___, 2003 U.S. App. LEXIS 2911 at *23 (9th Cir., Feb. 18, 2003) (Gould, J., specially concurring). The two are synonyms. There is, quite simply, no support for the contrary proposition that "militia" means "states" or "soldiers."

Miller's expansive definition of "militia" as comprising private individuals capable of acting for the common defense and "expected to appear bearing arms supplied by themselves and of the kind in common use," Miller, 307 U.S. at 178-79, has never been questioned by the Supreme Court. If any position on the collective-individual rights debate can be gleaned from Miller's definition of "Militia," it is the individual rights view.

Defendants' assertion that the Supreme Court confirmed a "collective rights" interpretation of <u>Miller</u> in <u>Lewis v. United States</u>, 445 U.S. 55, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980), is mistaken.  The only mention of <u>Miller</u> in <u>Lewis</u> comes as a parenthetical description in a footnote.  The description reads: "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" <u>Lewis</u>, 445 U.S. at 65 n.8.  This is cited for the passing proposition that a law barring felons from possessing arms does not implicate Second Amendment rights.  The Supreme Court does not elaborate on this tangential reference, but an equally compelling interpretation is that felons need not be armed for the militia to retain its effectiveness, a point with which plaintiffs would not quarrel.  In any event, <u>Lewis</u> was not the last word from the Supreme Court as to <u>Miller</u>'s meaning:

> In <u>Miller</u>, we determined that the Second Amendment did not guarantee a citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be "ordinary military equipment" that could "contribute to the common defense."  The Court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment.

<u>Printz v. United States</u>, 521 U.S. 898, 938 n.1, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997) (Thomas, J., concurring) (quoting <u>Miller</u>, 307 U.S. at 178).

The other alleged Supreme Court precedent cited by defendants is <u>Burton v. Sills</u>, 248 A.2d 521 (N.J. 1968), a particularly unpersuasive case from the high court in *New Jersey*. Without discussing <u>Miller</u> or engaging in any analysis, <u>Burton</u> dubiously declared that "[m]ost students of the subject would undoubtedly express agreement with the substance of the currently expressed view that 'the term 'well-regulated militia' must be taken to mean the active, organized militia of each state, which today is characterized as the state National Guard.'" <u>Burton</u>, 248

A.2d at 526 (citation omitted).  By the time this opinion issued, noted scholars such as William

Rawle, Justice Joseph Story, and St. George Tucker had already taken the opposite view.

Laurence Tribe, William Van Alstyne, and Akhil Amar would follow in their footsteps.  How

Burton assumed that "the Militia" in the federal Constitution must mean an organized, select

militia in a state; and that this view would be summarily adopted by most observers, is not

explained.  But the reasoning is suspect, for Burton also asserts, without citing any authority, that

the Second Amendment "was not framed with individual rights in mind."  Id.  This view is

simply ignorant of the history of the Second Amendment, discussed *infra*.

## II. THE DISTRICT OF COLUMBIA CIRCUIT READS *MILLER* TO ESTABLISH A TEST QUALIFYING SPECIFIC FIREARMS OR EXAMINING WHETHER A CHALLENGED RULE IMPAIRS THE EFFECTIVENESS OF THE MILITIA, IMPLICITLY ADOPTING THE INDIVIDUAL RIGHTS MODEL OF THE SECOND AMENDMENT.

The Fifth Circuit's Emerson opinion has justly received wide-spread attention as the first

federal appellate court opinion analyzing the Second Amendment with any depth and,

consequently, adopting the individual rights model.  Yet two years prior to Emerson, the D.C.

Circuit examined the constitutionality of a federal act in a manner that indicates acceptance of the

Second Amendment as an individual right.

Although the D.C. Circuit's opinion in FOP II, *supra*, 173 F.3d 898, did not explicitly

adopt the individual rights model, its analysis of Miller is plainly inconsistent with any

"collective rights" approach to the Second Amendment.  Defendants' suggestion that the D.C.

Circuit is among those that has adopted the collective rights view, and their citation of FOP II to

that effect, is wrong.

10

In the FOP litigation, Fraternal Order of Police v. United States ("FOP I"), 332 U.S. App. D.C. 49, 152 F.3d 998 (D.C. Cir. 1998), rehearing, FOP II, supra, 173 F.3d 898, the D.C. Circuit considered a challenge by a police officers' organization to that portion of the Gun Control Act of 1968 barring domestic violence misdemeanants from possessing government-issued firearms. The Court struck down the provision in FOP I as unconstitutionally irrational in violation of the Fifth Amendment's Due Process Clause, because domestic violence felons who had presumably committed more serious crimes were allowed to retain their firearms while in police service. In so doing, the court noted that "[d]espite the intriguing questions raised, we will not attempt to resolve the status of the Second Amendment right," because the misdemeanant-felon disparity appeared so patently irrational. FOP I, 152 F.3d at 1002. In FOP II, the Court reversed itself on reconsideration, but not before reaching the police officers' Second Amendment arguments and providing a Miller analysis consistent with the individual rights perspective.[4]

The D.C. Circuit first observed that Miller may propose nothing more than what plaintiffs claim it means – a test "to separate weapons covered by the [Second] amendment from uncovered weapons." FOP II, 173 F.3d at 906. Yet the FOP's failure to argue Miller's irrelevance to the question at hand led the court to "assume the [Miller] test's applicability." Id. Having decided to apply Miller even though the FOP did not base its case on the type of firearm protected by the Second Amendment, the D.C. Circuit addressed how to do so:

> [W]e are not altogether clear what kind of "relationship"--or, to quote Miller more precisely, "reasonable relationship,"– is called for here. This Miller test appears in some

---

[4]FOP did not raise a pure Second Amendment argument, but rather one that relied upon the Second Amendment as support for a substantive due process right. The circuit court was "mystified" by this decision, but was forced to consider the Second Amendment nonetheless. FOP II, 173 F.3d at 906.

sense to invert the commercial speech test, which requires the government to show that legislation restricting such speech bears a reasonable relationship to some "legitimate" or "substantial" goal.  We suppose <u>Miller</u> would be met by evidence supporting a finding that the disputed rule would materially impair the effectiveness of a militia, though perhaps some other showing could suffice. We need not fix the exact form of the required relationship, however, because FOP has presented no evidence on the matter at all.

<u>FOP II</u>, 173 F.3d at 906 (citations omitted).

The FOP's Second Amendment argument rested solely on the fact that "in 'most' states, police officers can be called into service as militia members."  <u>FOP II</u>, 173 F.3d at 906.  The D.C. Circuit did not find the argument persuasive because FOP failed to show that "police officers [are] any more susceptible to such service than ordinary citizens (or in some cases, than males between the ages of 17 and 45)." <u>FOP II</u>, 173 F.3d at 906.[5]  Moreover, the FOP failed to show how barring police officers convicted of domestic violence misdemeanors from possessing firearms would "have a material effect on the militia." <u>FOP II</u>, 173 F.3d at 906.

In other words, a statute barring a limited class of individuals from owning firearms may not offend the Second Amendment.[6]  Implicit in the D.C. Circuit's reasoning, however, is that if a rule could be shown to impair a significant portion of "ordinary citizens" from functioning as militia, that is, acting in armed concert for the common good or in self-defense, or if a rule were to otherwise impair the effectiveness of a militia, it could violate the Second Amendment.

_____

[5]Of course, "the Militia" is a constitutional term defined by the Supreme Court in <u>Miller</u>, which the states can no more re-define through legislation than they can the meaning of any other constitutional concept.

[6]Though not an issue in this litigation, plaintiffs do not disagree with this principle.  For example, government routinely bars or restricts fundamental constitutional rights to felons or children, to name two classes of people routinely denied the right to vote.  Similar rules restricting Second Amendment rights could be tailored narrowly to satisfy compelling governmental interests.

Considering the Supreme Court's definition of militia as members of the public expected to bring their own arms if called upon to do so, it appears the D.C. Circuit would not approve of the statutes challenged herein.

**III.    NONE OF THE CASES CITED BY DEFENDANTS IN SUPPORT OF THE COLLECTIVE RIGHTS VIEW CONTAIN ANY MEANINGFUL ANALYSIS OF THE SECOND AMENDMENT.**

The Fifth Circuit engaged in a comprehensive analysis not only of the Second Amendment, but also of the various cases construing the Second Amendment as a "collective right."  "[I]t respectfully appears to us that all or almost all of these opinions seem to have done so either on the erroneous assumption that Miller resolved that issue or without sufficient articulated examination of the history and text of the Second Amendment."  Emerson, 270 F.3d at 227.  Indeed, some of these opinions openly concede that they are not based on Miller, though they offer no other meaningful support for their conclusion.

Typical of the "collective rights" jurisprudence is Thomas v. Members of City Council, 730 F.2d 41 (1st Cir. 1984) (per curiam).  This one-paragraph opinion simply holds, without discussion, that the Second Amendment confers no rights to carry a concealed handgun.  Only a string citation similar to page 4 of defendant's brief is supplied.  In the same vein, United States v. Toner, 728 F.2d 115 (2d Cir. 1984), states that gun possession is not a fundamental right and cites Miller, but does not discuss the matter further.  In fact, the Toner appellant conceded as much, Toner, 728 F.2d at 128, so the Second Circuit's passing observation was plainly dicta.  Defendants also cite to United States v. Graves, 554 F.2d 65 (3d Cir. 1977), but concede its collective rights language is dicta.  See Graves, 554 F.2d at 66 n.2. ("Graves has not attempted to invoke the Second Amendment.")

13

On examination, the Fourth Circuit's invocation of the "collective rights" theory in <u>Love v. Pepersack</u>, 47 F.3d 120 (4th Cir.), <u>cert. denied</u>, 516 U.S. 813, 116 S. Ct. 64, 133 L. Ed. 2d 27 (1995), is also dicta.  The Fourth Circuit declined to find that Maryland troopers violated Love's Second Amendment rights on grounds that the Second Amendment was not incorporated by the Fourteenth Amendment.  <u>Love</u>, 47 F.3d at 123.  The analysis should have ended there.  But to the extent <u>Love</u> mentioned the collective rights theory, it apparently acknowledged that <u>Miller</u> was not the source of the notion, describing <u>Miller</u>, accurately, as supporting the argument that "the amendment does not confer an absolute individual right to bear any type of firearm."  <u>Love</u>, 47 F.3d at 124.  The Court then cites to an earlier case which held, perfunctorily, that denying firearms to felons does not "affect[] the maintenance of a well-regulated militia," <u>id.</u>, (citation omitted), a conclusion not at odds with the individual rights model.

Also dicta is the language quoted by defendants from <u>Stevens v. United States</u>, 440 F.2d 144 (6th Cir. 1971), <u>overruled</u>, <u>United States v. Bass</u>, 404 U.S. 336, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971), to the effect that the Second Amendment "applies only to the right of the State to maintain a militia."  <u>Id.</u>, at 149.  The Second Amendment was not at issue in <u>Stevens</u>, and the only support for this observation is a citation to <u>Miller</u>, which is not even described parenthetically.  Again, there was simply no attempt to analyze the Second Amendment right.  In any event, the Sixth Circuit recognized that <u>Stevens</u> was overruled by the Supreme Court within a year of its issuance and the case is no longer binding circuit law.  <u>United States v. Wilson</u>, 456 F.2d 1042, 1043 (6th Cir. 1972); <u>United States v. McCreary</u>, 455 F.2d 647, 649 (6th Cir. 1972).[7]

---

[7] The statutory issue in <u>Stevens</u> and <u>Bass</u> has since been addressed by Congress.

14

The collective rights case of Gillespie v. City of Indianapolis, 185 F.3d 693 (7th Cir., 1999), cert. denied, 528 U.S. 1116, 120 S. Ct. 934, 145 L. Ed. 2d 813 (2000), is no more persuasive.  Gillespie raised the same issue as the FOP litigation, namely, the firearms disability imposed on police officers convicted of domestic violence.  The Seventh Circuit reached the Second Amendment claim, but unlike the D.C. Circuit, decided the matter under the collective-rights view.  Unlike Emerson's examination of the Second Amendment, the Seventh Circuit's analysis of the amendment consisted of a single sentence:

> The link that the amendment draws between the ability 'to keep and bear Arms' and '[a] well regulated Militia' suggests that the right protected is limited, one that inures not to the individual but to the people collectively, its reach extending so far as is necessary to protect their common interest in protection by *a* militia.

Gillespie, 185 F.3d at 710 (emphasis added).  Again, the critical collective-rights error is present: mistaking the Constitution's concept of "*the* Militia" referred to in Article I, sections 15 and 16 and the Fifth Amendment, properly defined in Miller as consisting of a large segment of the population, for a specific state organization.

Gillespie then concedes that "[t]he Supreme Court's jurisprudence on the scope of this amendment is quite limited itself, and not entirely illuminating," Id., but describes Miller as a collective rights case and concludes by citing, without discussion, other cases that repeat the error.  Gillespie makes no effort to examine the roots of the collective rights notion or explain it beyond the cursory citation of the Second Amendment, casual misreading of Miller, and citation to other cases standing for the same proposition.

Defendants' reliance on United States v. Nelson, 859 F.2d 1318 (8th Cir. 1988) to establish the collective rights theory is also unavailing.  A single paragraph in Nelson addressed

15

the appellant's claims that an act of Congress restricting the transportation of switch-blade knives

infringed on his Second Amendment rights.[8]  Unlike other collective rights cases, <u>Nelson</u> relies

on <u>United States v. Cruikshank</u>, 92 U.S. 542, 23 L. Ed. 588 (1876), for the proposition that the

Second Amendment does not grant any rights.  This much is not disputed; the Constitution

generally does not grant any positive rights, but rather secures those that inhere in individuals.

<u>Cruikshank</u> reached the same conclusion about First Amendment rights: "[t]he particular

amendment now under consideration assumes the existence of the right of the people to assemble

for lawful purposes, and protects it against encroachment by Congress. The right was not created

by the amendment." <u>Cruikshank</u>, 92 U.S. at 552.  This surely does not suggest that the First

Amendment secures a right of the states to organize demonstrations and issue propaganda.

     <u>Cruikshank</u> is notable for concluding that *none* of the rights enjoyed by American citizens

are secure, in a constitutional sense, from Klan violence such as the infamous Colfax Massacre

from which the case arose.  <u>Cruikshank</u> left the freedmen to the protection of Southern state

"justice," striking down the Enforcement Acts by which the federal government sought to

prosecute individuals who would interfere with their fellow citizens' constitutional rights.  Not

surprisingly, chief among the individual rights the federal government sought to protect in

<u>Cruikshank</u> was the Second Amendment right to keep and bear arms.  The case's holding that the

Bill of Rights is not incorporated against the states by the Fourteenth Amendment has long been

discredited.  <u>See</u>, <u>i.e.</u> <u>Palko v. Connecticut</u>, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937).

---

[8]<u>But</u> <u>see</u> <u>State v. Delgado</u>, 298 Ore. 395, 692 P.2d 610 (Ore. 1984) (state constitutional
right to keep and bear arms protects the right to carry a switch-blade).

Apart from Cruikshank, Nelson merely cites Miller as a collective rights case, and cites several other collective rights cases.  As with the other cases cited by defendants, Nelson recites the collective rights conclusion but does not examine it.

Few cases stretch Miller as much as Hickman v. Block, 81 F.3d 98 (9th Cir. 1996).  In Hickman, the Ninth Circuit went so far as to state Miller "found that the right to keep and bear arms is meant solely to protect the right of the states to keep and maintain armed militia." Hickman, 81 F.3d at 101.  Of course Miller contains no such conclusion.  The Ninth Circuit would later admit, albeit in dicta, that "our determination . . . that Miller endorsed the collective rights position is open to serious debate." Silveira v. Lockyer, 312 F.3d 1052, 1064 (9th Cir. 2002).  Hickman further errs by suggesting that the Second Amendment "creates a right" of the states to maintain "an armed militia," Id., at 102, a concept in direct conflict with U.S. Const., art. I, sec. 10, forbidding the states to keep troops in time of peace without consent of Congress, "unless actually invaded, or in such imminent Danger that will not admit of delay."

Defendants invoke Unites States v. Oakes, 564 F.2d 384 (10th Cir. 1977), cert. denied, 435 U.S. 926, 98 S. Ct. 1493, 55 L. Ed. 2d 521 (1978), for the proposition that the individual rights model of the Second Amendment "has long been rejected."  The only support for this conclusion in Oakes is a cite to Miller.  Oakes then misinterprets Miller as proposing that the Second Amendment's purpose "was to preserve the effectiveness and assure the continuation of the state militia." Oakes, 564 F.2d at 387; contra United States v. Hale, 978 F.2d 1016, 1021 (8th Cir. 1992) (Beam, J., concurring specially), cert. denied, 507 U.S. 997, 113 S. Ct. 1614, 123 L. Ed. 2d 174 (1993).  Again, as discussed extensively supra, Miller defined "the Militia" of the Constitution, and did so by defining it as those members of the public capable of bearing arms

17

"supplied by themselves" and acting with each other for the common defense if called upon to do so, not any standing state military organization or collection of such organizations.

The collective rights case cited by defendants that comes closest to accurately reflecting Miller and the Second Amendment's true meaning, though it ultimately fails these efforts, is United States v. Wright, 117 F.3d 1265 (11th Cir.), cert. denied, 522 U.S. 1007, 118 S. Ct. 584, 139 L. Ed. 2d 422 (1997).  In Wright, the Eleventh Circuit correctly acknowledged that "At the time of ratification, and as remains the case today, the militia was defined broadly and was understood to include "all males physically capable of acting in concert for the common defense." Wright, 117 F.3d at 1272-1273 (quoting Miller, 307 U.S. at 177).  Inexplicably, however, Wright then offers that Miller "strongly suggests that only militias actively maintained and trained by the states can satisfy the 'well regulated militia' requirement of the Second Amendment." Wright, 117 F.3d at 1272.  Where Miller "strongly suggests" such a proposition is not explained.

The Eleventh Circuit also acknowledges the fact that Congress was delegated the power, under Art. I, sec. 8, cl. 16, to arm the militia.  Id., at 1273.  Inexplicably, Wright's very next paragraph opens with the contrary suggestion that "[t]he Second Amendment was inserted into the Bill of Rights to protect the role of the states in maintaining and arming the militia."  Id.  In support of this view, the Eleventh Circuit relies on three sources: the Eighth Circuit's opinion in Hale, supra, which relies on interpretations of Miller contrary to that of Wright; a law review article co-authored by Dennis Henigan, a prominent gun control activist; and an earlier treatise by noted constitutional scholar Laurence Tribe, who has since changed his mind and now espouses the individual rights model in the current edition of his treatise:

18

Perhaps the most accurate conclusion one can reach with any confidence is that the core meaning of the Second Amendment is a populist/republican/federalism one: Its central object is to arm "We the People" so that ordinary citizens can participate in the collective defense of their community and their state. But it does so not through directly protecting a right on the part of states or other collectivities, assertable by them against the federal government, to arm the populace as they see fit. Rather, the amendment achieves its central purpose by assuring that the federal government may not disarm individual citizens without some unusually strong justification consistent with the authority of the states to organize their own militias. That assurance in turn is provided through recognizing a right (admittedly of uncertain scope) on the part of individuals to possess and use firearms in the defense of themselves and their homes . . . a right that directly limits action by Congress or by the Executive Branch . . .

1 Tribe, American Constitutional Law, n.221 at 902 (3d ed. 2000). In any event, as the Fifth Circuit's historical analysis aptly demonstrates, the Framers were equally suspicious of "select militias" as they were of standing armies. See discussion, *supra*.

Finally, defendants look to the collective rights opinion of the District of Columbia Court of Appeals in Sandidge v. United States, 520 A.2d 1057 (D.C.), cert. denied, 484 U.S. 868, 108 S. Ct. 193, 98 L. Ed. 2d 145 (1987). Plaintiffs first observe that Sandidge is not binding authority, as interpretation of the federal constitution is not a "state law" matter. D.C. Code § 11-101 (establishing this Court under U.S. Const., art. III). "[T]he Court Reform Act unequivocally distributed the 'judicial power in the District of Columbia' between the federal courts and the District of Columbia courts, allotting to each its own sphere and making neither subservient to the other." M.A.P. v. Ryan, 285 A.2d 310, 313 (D.C. 1971) (footnote omitted). As they would in any state, defendants city and its mayor must not violate the federal constitution as interpreted by the local Article III court, even if the "state" court would approve of their conduct.

Neither is Sandidge at all persuasive. Sandidge did little more than point to other collective rights cases, and reference the fact that the District maintains a select militia in

19

addition to its broad, "enrolled militia" which includes most able-bodied males between the ages of 17 and 45.  D.C. Code § 49-401.  Sandidge read Miller as nearly meaningless, limited to its facts:  "[t]he Supreme Court 'did not intend to formulate a general rule in Miller, but merely dealt with the facts of that case.'" Sandidge, at 1058 (citations omitted).  The D.C. Court reasoned that the Miller test would permit individuals to own certain highly destructive weapons, a result that must have been "inconceivable" to the Supreme Court.  Sandidge, at 1059 n.2.

Having largely rejected Miller, the D.C. Court of Appeals simply adopted, without any discussion, the conclusion that "the purpose of the Second Amendment is to preserve the effectiveness and assure the continuation of the state militia."  Sandidge, 1059 (citation omitted).  Again, the necessary errors here are neglecting Miller's definition of "the Militia," a term used throughout the Constitution; assuming that the militia of the Second Amendment is an organized, select state militia; and overlooking both Congress's prerogative to arm "the Militia," U.S. Const., art. I, sec. 8, cl. 16, and the prohibition on the states keeping troops without congressional consent, U.S. Const., art. I, sec. 10, cl. 3.

## IV.    THE SECOND AMENDMENT TO THE UNITED STATES CONSTITUTION PROTECTS AN INDIVIDUAL'S RIGHT TO KEEP AND BEAR ARMS, EVEN WHILE NOT ENGAGED IN STATE SERVICE.

Justice Story has argued that "[t]he right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic." Story, Commentaries on the Constitution, Vol 3, p 746 (1833).   The "individual rights" model is now the position of the United States.[9]   An examination of the Second Amendment's history, text, and structure,

---

[9]See Opposition to Petition for Certiorari in United States v. Emerson, No. 01-8780, at 19 n.3, and Appendix A thereto, Memorandum From The Attorney General To All United States Attorneys, Re: United States v. Emerson, Nov. 9, 2001, available at http://www.usdoj.gov/osg/

separately and within the context of the Constitution as a whole, confirms "that it protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms, such as [an ordinary] pistol . . . that are suitable as personal, individual weapons and are not of the general kind or type excluded by [United States v. Miller, 307 U.S. 174, 59 S. Ct. 816, 83 L.Ed. 1206 (1939)]."  Emerson, 270 F.3d at 260.

> **A.**    **The Supreme Court Has Not Explicitly Decided Whether The Second Amendment Protects An Individual or "Collective" Right, But Has Repeatedly Suggested The Amendment Secures An Individual Right.**

Although the "collective rights" theories find no support in Supreme Court precedent, the Supreme Court has long indicated that the right to keep and bear arms is no different from any other constitutional right: rights belonging to "the people" belong to individuals.

This point was most recently made in United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S. Ct. 1056,  108 L. Ed. 2d 222 (1990), where the Supreme Court was called upon to define "the people" entitled to the Fourth Amendment's protection against unreasonable searches and seizures.  Verdugo-Urquidez, a citizen and resident of Mexico, was detained in the United States following his arrest by Mexican authorities.  His property in Mexico was subsequently searched by officers of both countries without a warrant.  Affirming that resident aliens enjoy constitutional rights, the Court nonetheless held that Verdugo-Urquidez's presence in the United States was too incidental to afford him protection as one of "the people:"

"[T]he people" seems to have been a term of art employed in select parts of the

---

briefs/2001/0responses/2001-8780.resp.pdf.  As early as 1875, the federal government took the litigating position that the Second Amendment affords an individual right.  See Cruikshank, *supra*, 92 U.S. 542.

21

> Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." See also U.S. Const., Amdt. 1 ("Congress shall make no law . . . abridging . . . *the right of the people* peaceably to assemble") (emphasis added) . . . While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First *and Second Amendments*, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

Verdugo-Urquidez, 494 U.S. at 265 (citation omitted) (emphasis added); see also Patton v.

United States, 281 U.S. 276, 298, 50 S. Ct. 253, 258, 74 L. Ed. 854 (1930), overruled on other

grounds, Williams v. Florida, 399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970) ("The first

ten amendments and the original Constitution were substantially contemporaneous and should be

construed *in pari materia*.")

In light of such precedent, it would be difficult to construe "the people" of the Second

Amendment as some form of collective governmental entity.  "It appears clear that 'the people,'

as used in the Constitution, including the Second Amendment, refers to individual Americans."

Emerson, 270 F.3d at 229.

> Several other Supreme Court opinions speak of the Second Amendment in a manner plainly indicating that the right which it secures to 'the people' is an individual or personal, not a collective or quasi-collective, right in the same sense that the rights secured to 'the people' in the First and Fourth Amendments, and the rights secured by the other provisions of the first eight amendments, are individual or personal, and not collective or quasi-collective, rights.

Emerson, 270 F.3d at 228-229 (citations omitted).  For example, the infamous Dred Scott case

argued no Southern state would have adopted a constitution obligating it to respect privileges and

immunities of citizenship held by African-Americans, including "the full liberty of speech in

22

public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went*." <u>Scott v. Sandford</u>, 60 U.S. (19 How.) 393, 417, 15 L. Ed. 691, 705 (1856) (emphasis added).[10]

More enlightened courts friendlier to individual liberty have observed that the Second Amendment is no different than any other provision in the Bill of Rights securing the freedom of private citizens. The Supreme Court has never described the explicit protections of the Bill of Rights as being set forth in the First and Third through Eighth Amendments. Rather, the Court has spoken favorably of "the *personal rights* guaranteed and secured by the *first eight* amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; *the right to keep and to bear arms* . . ." <u>Duncan v. Louisiana</u>, 391 U.S. 145, 88 S. Ct. 1444, 1456, 20 L. Ed. 2d 491 (1968) (Black, J., concurring).

Indeed, the Supreme Court has thus referenced the Second Amendment in finding individuals hold various unenumerated rights. "[L]iberty encompasses [] more than those rights already guaranteed *to the individual* against federal interference by the express provisions of the

---

[10]<u>Scott</u> was, of course, overruled by enactment of the Fourteenth Amendment. Perhaps recalling <u>Scott</u>'s language, "[t]he same two-thirds of Congress that proposed the Fourteenth Amendment . . . also enacted the Freedmen's Bureau Act, which declared protection for the 'full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and . . . estate . . ., *including the constitutional right to bear arms* . . .'" Halbrook, *The Freedmen's Bureau Act and the Conundrum Over Whether the Fourteenth Amendment Incorporates the Second Amendment*, 29 N. Kentucky L.R., No. 4, 683-703 (2002) (quoting Act of July 16, 1866, 14 Stat. 173, 176; 15 Stat. 83 (1886)). Halbrook details the historical record of the Freedmen's Bureau Act demonstrating Congress was particularly concerned with Southern "Black Codes" that sought to disarm African-Americans, and the ability of the freedmen, including discharged Union soldiers, to defend themselves against Klan violence. <u>See</u> <u>also</u> Cottrol and Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309 (1991).

*first eight* Amendments." <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 847, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (emphasis added).

> The full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; *the right to keep and bear arms*; the freedom from unreasonable searches and seizures; and so on.

<u>Casey</u>, 505 U.S. at 848 (quoting <u>Poe v. Ullman</u>, 367 U.S. 497, 543, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961) (Harlan, J., dissenting) (emphasis added)); <u>Moore v. City of East Cleveland</u>, 431 U.S. 494, 97 S. Ct. 1932, 1937, 52 L. Ed. 2d 531 (1977) (same); <u>see</u> also <u>Staples v. United States</u>, 511 U.S. 600, 610, 114 S. Ct. 1793, 1799, 128 L. Ed. 2d 608 (1994) ("there is a long tradition of widespread lawful gun ownership by private individuals in this country.")

### B.    The Framers Clearly Intended That The Second Amendment Guarantee An Individual Right To Keep And Bear Arms.

"The founding generation certainly viewed bearing arms as an individual right based upon both English common law and natural law, a right logically linked to the natural right of self-defense." <u>Kasler v. Lockyer</u>, 23 Cal.4th 472, 505, 97 Cal.Rptr.2d 334, 357, 2 P.3d 581, 602 (2000) (Brown, J., concurring), <u>cert. denied</u>, 531 U.S. 1149, 121 S. Ct. 1090, 148 L. Ed. 2d 964 (2001).  "[T]he history of the Second Amendment reinforces the plain meaning of its text, namely that it protects individual Americans in their right to keep and bear arms whether or not they are a member of a select militia or performing active military service or training."  <u>Emerson</u>, 270 F.3d at 260.

Proceeding on the principle that "a page of history is worth a volume of logic," <u>New York Trust Co. v. Eisner</u>, 256 U.S. 345, 349, 41 S. Ct. 506, 507, 65 L. Ed. 963 (1921), plaintiffs

review the extensive history confirming the Second Amendment guarantees individual rights. That guarantee is evident from the historical context of the amendment's adoption, its legislative history, and the contemporaneous understanding of the amendment by jurists and legal scholars.

After the Constitution was submitted for ratification in 1787, its Anti-federalist opponents charged that the vast powers granted the federal government over military affairs would allow Congress to destroy the militia through neglect or deliberate action, replacing it with a standing army designed to oppress the people.   The Federalist defenders of the document responded that a bulwark against oppression could be found in an armed populace, capable of defending themselves and their states.  With the adoption of the Second Amendment, the Federalists made good on their promise to trust the people with arms, permanently protecting that right from government infringement.

John Dewitt captured a key Anti-federalist fear when he predicted that, using its authority over the militia and its power to "To raise and support Armies," U.S. Const. art. I, § 8, cl. 12, Congress "may arm or disarm all or any part of the freemen of the United States, so that when their army is sufficiently numerous, they may put it out of the power of the freemen militia of America to assert and defend their liberties…." The Antifederalist Papers, 75 (M. Borden, ed. 1965).

The responses to such fears offered in the Federalist Papers show two things: (1) the Federalists, like the Anti-federalists, viewed the militia as consisting of all male citizens capable of bearing arms; and (2) the Federalists believed that widespread individual ownership of firearms would prevent the militia from being overpowered by any standing army, should the federal government ever become oppressive.  Thus, in Federalist 29, Hamilton writes:

25

[I]f circumstances should at any time oblige the government to form an army of any magnitude, that army can never be formidable to the liberties of the people, while there is a large body of citizens little if at all inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow citizens.

The Federalist No. 29, at 145 (Alexander Hamilton) (G. Carey, J. McClellan eds. 1990).

In Federalist 46, Madison echoed Hamilton's argument by pointing to "the advantage of being armed, which the Americans possess over the people of almost every other nation," and contrasting this situation with that of Europe, where "the governments are afraid to trust the people with arms." The Federalist No. 46 at 244 (James Madison) (G. Carey, J. McClellan eds. 1990). In America, any threat represented by a standing army would find its counterweight in "a militia amounting to near half a million of citizens with arms in their hands…" Id.

Unwilling to accept the Federalists' assurance that the proposed Constitution contained no power that would allow the federal government to disarm the people, the Anti-federalists continued to oppose its adoption without, at a minimum, specific protections for individual rights. Due to their influence, five of the states that ratified the Constitution also sent demands for a Bill of Rights to Congress. All five demanded protection for the right to bear arms; and all five make plain that the right to be protected belonged to individuals, not state governments. New Hampshire's proposal provided that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," language that unmistakably protects individual rights quite apart from any militia service. 1 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 326 (2d ed., 1836). Virginia's proposal, which served as a model for Madison's draft, provided "That the people have a right to keep and bear arms; that a well regulated Militia composed of the body of the people trained to

arms is the proper, natural and safe defense of a free State." 3 Jonathan Elliot, The Debates in the

Several State Conventions on the Adoption of the Federal Constitution 658 (2d ed., 1836).  Thus,

the language proposed by Virginia sets out the individual right and the preference for a militia in

two unambiguously independent phrases, while at the same time making clear that the "militia"

and the "people" are one and the same.

Having secured the Constitution's ratification, the Federalists were nonetheless mindful

of the reservations with which the Constitution was ratified and the popular desire for a written

declaration of rights.  In his first inaugural address, President Washington signaled that a Bill of

Rights might well be desirable, and pose no threat to the young Constitution:

> I assure myself that whilst you carefully avoid every alteration which might endanger the
> benefits of an united and effective government, or which ought to await the future lessons
> of experience; a reverence for the characteristic rights of freemen, and a regard for the
> public harmony, will sufficiently influence your deliberations on the question how far the
> former can be more impregnably fortified, or the latter be safely and advantageously
> promoted.

President Washington, Inaugural Address, April 30, 1789, quoted in Emerson, 270 F.3d at 244

(citation omitted).

Accordingly, on June 8, 1789, then-Congressman James Madison proposed several

amendments to the Constitution – among them one that provided in pertinent part that "The right

of the people to keep and bear arms shall not be infringed; a well armed, and well regulated

militia being the best security of a free country . . ."  That the amendment was designed to secure

a personal right of the citizen rather than a collective right of the states is clear from Madison's

notes for the speech introducing the amendments: "They [the proposed amendments] relate first

to private rights," 12 Papers of James Madison 193-194 (C. Hobson et al., eds. 1979), and his

27

initial proposal to place the amendment alongside other individual rights already protected by the Constitution.  Instead of suggesting that "the right of the people to keep and bear arms" be placed in Article I, sec. 8, with the Militia clauses, Madison proposed that it be placed along with other individual rights protected in Article I, sec. 9 – following the habeas corpus privilege and the proscriptions against bills of attainder and *ex post facto* laws, as well as Madison's own proposed protections for speech, press, and assembly.  The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 169 (N. Cogan, ed., 1997).

Madison's colleagues clearly understood the amendment to protect an individual right. As Rep. Fisher Ames of Massachusetts described Madison's proposals, "The rights of conscience, of bearing arms, of changing the government, are declared to be inherent in the people."  Letter from Fisher Ames to George Richards Minot (June 12, 1789) (excerpt reprinted in Young, The Origin of the Second Amendment 668 (2nd ed. 1995).  The revised text of the amendment, as ratified, differs from Madison's draft (among other ways) by moving the hortatory language about the militia to a prefatory clause, or preamble:  "A well regulated Militia, being necessary to the security of a free State…."  At the time no tension appeared between the preamble and the operative clause protecting the right of the people to keep and bear arms.  Its wording "made perfect sense to the Framers: believing that a militia (composed of the entire people possessed of their individually owned arms) was necessary for the protection of a free state, they guaranteed the people's right to possess those arms."  Kates*, Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217-18 (1983).  Indeed, throughout the entire legislative record, from proposal of the amendment through ratification, no assertion of a "collective rights" view can be found.  "If anyone entertained this notion in the

28

period during which the Constitution and Bill of Rights were debated and ratified, it remains one

of the most closely guarded secrets of the eighteenth century, for no known writing surviving

from the period between 1787 and 1791 states such a thesis."  Halbrook, That Every Man Be

Armed: The Evolution of a Constitutional Right 83 (1984).

Every notable constitutional commentator of the 19th Century understood the Second

Amendment in those terms.  Supreme Court Justice Joseph Story called the right protected by the

amendment "a right of the citizens" and noted that "One of the ordinary modes, by which tyrants

accomplish their purposes without resistance, is, by disarming the people, and making it an

offence to keep arms . . ." Story, A Familiar Exposition of the Constitution of the United States,

264-265 (1842).  St. George Tucker, the earliest prominent commentator on the Constitution,

regarded the Second Amendment right as equivalent to Blackstone's "right of the subject,"

protecting "The right of self defence [which] is the first law of nature." 1 St. George Tucker,

Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the

Federal Government of the United States; and of the Commonwealth of Virginia, 143, 300

(1803).  William Rawle, in his 1829 treatise, also affirmed the individual rights view, declaring

that the amendment's wording was broad enough to protect the right from state infringement as

well as federal:

> No clause in the Constitution could by any rule of construction be conceived to give to
> congress a power to disarm the people. Such a flagitious attempt could only be made
> under some general pretence by a state legislature. But if in any blind pursuit of
> inordinate power, either should attempt it, this amendment may be appealed to as a
> restraint on both.

William Rawle, A View of the Constitution of the United States of America 125-26 (Da Capo

Press 1970) (2d ed. 1829).

29

The "collective rights" model of the Second Amendment is clearly a revisionist phenomenon.  The Framers, and all prominent scholars for whom the Framers were within living memory, envisioned the Second Amendment as securing an individual right.

**C.    The Text Of The Second Amendment Plainly Establishes That Individuals Have A Right To Keep And Bear Arms Independent Of State Service.**

1.    The Second Amendment's Preamble Does Not Limit The Rights Protected In The Operative Clause.

Were it not for its preamble, there could be no dispute that the Second Amendment secures an individual right to keep and bear arms; the Second Amendment would simply read, "The right of the people to keep and bear Arms, shall not be infringed."  The "collective rights" interpretations of the Second Amendment depend entirely upon reading the amendment's explanatory preamble, "A well-regulated militia being necessary to the security of a free state," as a limit on the substantive right preserved in the amendment's operative clause.  Apart from the contrary history discussed *supra*, establishing the Framers' intent to secure an individual right, the argument fails as a matter of grammar, statutory construction, and precedent.

As a simple matter of English grammar, the Second Amendment's first clause is prefatory and explanatory; it does not modify the subject "right of the people."  The ordinary grammatical rule is consistent with "longstanding and generally accepted principles of statutory construction, that, at least where the preamble and the operative portion of the statute may reasonably be read consistently with each other, the preamble may not properly support a reading of the operative portion which would plainly be at odds with what otherwise would be its clear meaning." Emerson, 270 F.3d at 233 n.32 (citations omitted).

30

That the Second Amendment's preamble cannot be read to eviscerate the substantive rights clause is also clear upon examining the manner in which the Supreme Court has interpreted the other two constitutional preambles: the Constitution's general preamble, and that of the Copyright and Patent Clause, U.S. Const., art. I, sec. 8, cl. 8 ("To Promote the Progress of Science and the useful Arts").  With respect to the former, the Supreme Court has long held that "[a]lthough that Preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the Government of the United States or on any of its Departments." Jacobson v. Massachusetts, 197 U.S. 11, 22, 25 S. Ct. 358, 359, 49 L. Ed. 643 (1905).  Plaintiffs are also unaware of any case in which a court has interpreted the preamble as a limitation, enjoining governmental action as inconsistent with "establish[ing] justice," "insur[ing] domestic tranquility," "promot[ing] the general welfare," or "secur[ing] the Blessings of Liberty."

The preamble to the Copyright and Patent Clause would arguably possess greater operative force than that of the Second Amendment, as it begins with the same article "to" defining all powers of Congress.  If Congress has the powers "To lay taxes," U.S. Const., art. I, sec. 8, cl. 1, "To borrow Money," U.S. Const., art. I, sec. 8, cl. 2, and so on, then the power which begins, "To promote the Progress of Science and the useful Arts" could stand alone absent the remainder of the sentence comprising the Copyright and Patent Clause.  In contrast, the Second Amendment's preamble would in isolation do no more than declare an ideal.  Yet just this term, the Supreme Court brushed aside the notion that the Copyright and Patent preamble carries any significant meaning. Eldred v. Ashcroft, ___ U.S. ___, 123 S. Ct. 769, 154 L. Ed. 2d 682 (2003).

31

Federal courts have long been wary of finding too much meaning in the Constitution's admonition that Congress has the power to establish a system of copyrights and patents "To promote the Progress of Science and the Useful Arts."  U.S. Const., art. I, sec. 8, cl. 8; see, e.g. Schnapper v. Foley, 215 U.S. App. D.C. 59, 667 F.2d 102, 112 (D.C. Cir. 1981) (citation omitted) ("Congress need not 'require that each copyrighted work be shown to promote the useful arts' . . .")   In Eldred, plaintiffs wishing to access certain copyrighted works about to enter the public domain were aggrieved when Congress extended the terms of existing copyrights. Plaintiffs in that action maintained that Congress could only maintain a copyright system that "promote[s] the Progress of Science," and lengthening the terms of pre-existing copyrights does not do so because extending an existing copyright term provides no incentive to create new works.  "Their idea is that the phrase 'limited Times' should be interpreted not literally but rather as reaching only as far as is justified by the preambular statement of purpose: If 50 years are enough to "promote . . . Progress," then a grant of 70 years is unconstitutional."  Eldred v. Reno, 345 U.S. App. D.C. 89; 239 F.3d 372, 377-78 (D.C. Cir. 2001), aff'd sub nom Eldred v. Ashcroft, supra.

The D.C. Circuit rejected the argument.  Not only was the preamble not a "substantive limit" on the power of Congress, the Supreme Court precedent marshaled in support of Elder's argument "never suggests that the preamble informs its interpretation of the substantive grant of power to the Congress."  Eldred, 239 F.3d at 378 (citation omitted).

On certiorari, the Supreme Court was only slightly more generous.

> [W]e have described the Copyright Clause as "both a grant of power and a limitation," and have said that "the primary objective of copyright" is "to promote the Progress of Science." The "constitutional command," . . . is that Congress, to the extent it enacts copyright laws at all, create a "system" that "promotes the Progress of Science."

Eldred, 124 S. Ct. at 784-85 (quoting Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 5 (1966) and Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)) (footnote omitted). Conceding that the preamble may act as a limitation, the Supreme Court gutted its effect. "[I]t is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." Eldred, 124 S. Ct. at 785 (citations omitted). The Supreme Court concluded that Congress had a rational basis for determining that the extension of existing copyright terms "promoted the Progress of Science." Ibid.

Eldred's lesson for the Second Amendment is clear. If the "progress" limitation in the Copyright and Patent preamble cannot effectively limit Congress's power to create a system of copyrights and patents, neither may a conceptualized ideal of a "well-regulated militia" restrain "the people" from exercising their "right to keep and bear arms," which "shall not be infringed." This is especially so in light of the accepted principle that the powers of Congress "are few and defined," Lopez v. United States, 514 U.S. 549, 552, 115 S. Ct. 1624, 1626, 131 L. Ed. 2d 626 (1995) (quoting The Federalist No. 45, pp. 292-93 (C. Rossiter ed. 1961)), while rights of the people include even those not enumerated in the founding document. U.S. Const., amend. IX. At most, Eldred stands for the proposition that the preambular language of the Copyright and Patent Clause establishes a highly-deferential test, which all but the most unjustifiable patent and

33

copyright laws would fail.  The fundamental rights secured by the Second Amendment are

entitled to no less protection than Congress's copyright and patent powers.[11]

> 2.     To The Extent The Preamble Serves As An Operative Guide, It Does Not
>        Limit The Rights Of The People, As "Militia" Is Practically Synonymous
>        With "People."

The Supreme Court in Miller viewed the preamble as an interpretive guide, a common

practice of statutory construction used in determining legislative intent.  Yet even to this extent,

it is unclear how the preamble would substantially limit the rights of the operative clause.

The past decade saw the rise of various organizations calling themselves "militias," but

"[o]rdinarily courts do not construe words used in the Constitution so as to give them a meaning

more narrow than one which they had in the common parlance of the times in which the

Constitution was written." United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533,

539, 64 S. Ct. 1162, 1166, 88 L. Ed. 1440 (1944).  Consistent with this practice, the Miller court

correctly gave the word "militia" its traditional definition as comprising all men capable of

bearing arms, and reasoned that the Second Amendment protects the type of arms that such

people – *private individuals*  – could be expected to own and use for the common defense if

called upon to do so.

---

[11]The Ninth Circuit's recent collective rights dicta in Silveira v. Lockyer did not survive
the Supreme Court's holding in Eldred, if, indeed, it was ever consistent with Supreme Court
precedent.  Graham v. John Deere, *supra*, 383 U.S. 1.  Silveira attached great import to the
Second Amendment's preamble on grounds that the language contains the Constitution's only
prefatory clause, rejecting the argument that the Second Amendment's preamble is structurally
similar to the preamble of the Copyright and Patent Clause.  The latter preamble, reasoned the
Ninth Circuit's dicta, "set[s] forth the substantive power granted to Congress, not the limitation
on such a power." Silveira, 312 F.3d at 1068 n.23.  The statement is contrary to Graham and
now, Eldred, holding the copyright preamble to be a limitation, albeit an ineffective one.  The
Supreme Court's unmistakable instruction is that preambular limitations carry little, if any,
weight.

34

Considering the persistent mischaracterization of the opinion, it bears repeating that Miller reviewed the same history examined in greater detail by plaintiffs *supra* and concluded "the militia" are not "troops" or "standing armies," but "civilians primarily . . . all males physically capable of acting in concert for the common defense . . . expected to appear bearing arms supplied by themselves and of the kind in common use at the time" if called for duty. Miller, 307 U.S. at 178-79.

Plaintiffs urge only one modification to Miller's definition of "Militia."  In the years following Miller, the Supreme Court held that the Fifth Amendment's Due Process Clause guarantees the equal protection of the law *vis a* vis the federal government on par with the Equal Protection Clause of the Fourteenth Amendment.  Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954).  As women are now considered capable of acting in concert for the common defense, and equal heirs to the natural rights preserved in the Bill of Rights, Miller's concept of the militia should be read in light of the modern understanding of the Fifth Amendment to include female as well as male civilians.  Allowing men, but not women, the right to keep and bear arms would not survive the heightened review to which gender-based distinctions are subjected.  See, i.e. United States v. Virginia, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) (women entitled equal access to military education).

        3.     The People Protected By The Second Amendment Are The Same People Protected Throughout The Bill Of Rights.

This point was clearly settled by the Supreme Court in United States v. Verdugo-Urquidez, *supra*, 494 U.S. 259, as discussed earlier in this brief.  The Framers knew how to distinguish between the concepts of "people" and "states," doing so explicitly throughout the

original Constitution and Bill of Rights.  See, i.e. U.S. Const., amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the *States*, are reserved to the *States* respectively, or to the *people*.") (emphasis added).  Indeed, the very phrase used to describe the Second Amendment's subject – "the right of the people" – also provides the subject of the First and Fourth Amendments.  U.S. Const., amend. I (". . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"); U.S. Const., amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . .").

Moreover, as the Fifth Circuit noted, construing the Second Amendment as a right of the states to arm a militia "would be in substantial tension with Art. 1, § 8, Cl. 16 (Congress has the power 'To provide for ... arming ... the militia. . .')."  Emerson, 270 F.3d at 227.  And to interpret the Second Amendment as securing an individual right to keep and bear arms, but only while serving in the military, would make little sense.  Presumably if the states would conscript people into military units, members of such units would be armed.  After all, "No State shall, without the Consent of Congress . . . keep Troops, or Ships of War in time of Peace . . . or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const., art. I, sec. 10, cl. 3.  If Congress would consent to a state raising an army or navy, there would be no need to guarantee the rights of such soldiers and sailors to keep weapons.

    4.    "The Right To Keep And Bear Arms" Is The Right To Privately Possess And Carry Ordinary Firearms.

As discussed *supra*, the Supreme Court's decision in Miller set forth a test for which "arms" are protected by the Second Amendment: "ordinary military equipment" that could

36

"contribute to the common defense" and is of a type in common use that people may be expected

to own.  <u>Miller</u>, 307 U.S. at 178-79.  It would make no sense to interpret the Second Amendment

as guaranteeing individuals sent to battle the right to carry a gun.  To do so is to

> either (1) contemplate actual military service for that purpose as including military
> service other than that which is ordered or directed by the government; or (2) construe the
> constitutional provision as saying no more than that the citizen has a right to do that
> which the state orders him to do and thus neither grants the citizen any right nor in any
> way restricts the power of the state.

<u>Emerson</u>, 270 F.3d at 232 n.30.  To define the bearing of arms as intended in the Second

Amendment, the Fifth Circuit looked to the following opinion of four current members of the

Supreme Court:

> Surely a most familiar meaning [of carrying a firearm] is, as the Constitution's Second
> Amendment ("keep and *bear* Arms") (emphasis added) and Black's Law Dictionary, at
> 214, indicate: "wear, bear, or carry . . . upon the person or in the clothing or in a pocket,
> for the purpose . . . of being armed and ready for offensive or defensive action in a case of
> conflict with another person.

<u>Emerson</u>, 270 F.3d at 232 (quoting <u>Muscarello v. United States</u>, 524 U.S. 125, 143, 118 S. Ct.

1911, 1921, 141 L. Ed. 2d 111 (1998) (Ginsburg, J., dissenting).

"Though the terms are related, the distinct right to 'keep' arms is individual and a helpful

antecedent to bearing arms in a militia." <u>Nordyke</u>, 2003 U.S. App. LEXIS 2911 at *21. (Gould,

J., specially conucrring).  "Keep" as used in the Second Amendment can only relate to an

individual right. <u>Emerson</u>, 270 F.3d at 232 (considering "keep" separately from "bear.").  To the

extent a gun is kept, but not borne upon the person, the gun is possessed in the sense that it is the

subject of a person's dominion and control.  Ordinarily, an object would be "kept" in the home or

elsewhere on possessed land.

37

## CONCLUSION

There is no legitimate basis for defendants' position that the Second Amendment secures only a "collective" right.  To the contrary, the Second Amendment plainly guarantees an individual right, the violation of which is clearly stated in the complaint.  Defendants' motion must be denied.

Dated: March 14, 2003

Respectfully Submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Day, LLC
Robert A. Levy (D.C. Bar No. 447137)
Gene Healy (D.C. Bar No. 468839)
Clark M. Neily, III (D.C. Bar No. 475926)
1717 K Street, N.W., Suite 600
Washington, D.C. 20036
Phone: 202.550.8777
Fax:    202.318.4512

By: _____
Alan Gura

Attorneys for Plaintiffs