# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Shelly Parker *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03CV00213 (EGS) |
| | ) | |
| District of Columbia | ) | |
| and Anthony Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF *AMICUS CURIAE*
## BRADY CENTER TO PREVENT GUN VIOLENCE

WILMER, CUTLER & PICKERING
Eric Mogilnicki, Esq. (D.C. Bar. No. 443682)
John A. Valentine, Esq. (D.C. Bar No.473072)
2445 M Street, N.W.
Washington, D.C. 20037-1420
(202) 663-6000

BRADY CENTER TO PREVENT
  GUN VIOLENCE
Dennis A. Henigan, Esq. (D.C. Bar. No. 951897)
Brian J. Siebel, Esq. (D.C. Bar. No. 437115)
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005
(202) 289-7319

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTEREST OF AMICUS CURIAE ................................................................................... 1

SUMMARY OF ARGUMENT .......................................................................................... 2

ARGUMENT ...................................................................................................................... 3

    I.    *UNITED STATES v. MILLER* FIRMLY ESTABLISHED THAT
        THE SECOND AMENDMENT DOES NOT CONFER ANY
        INDIVIDUAL RIGHT TO BEAR ARMS UNRELATED TO
        MILITARY SERVICE .......................................................................................... 3

        A.    *Miller's* Plain Language Rejects The Individual Rights View .................... 4

        B.    The Vast Majority Of Courts Have Interpreted *Miller* As A
            Rejection Of Any Individual Right to Bear Arms Under
            The U.S. Constitution ................................................................................ 7

    II.   THE HISTORY BEHIND THE CREATION OF THE SECOND
        AMENDMENT DEMONSTRATES THAT THE FRAMERS DID
        NOT INTEND TO CREATE AN INDIVIDUAL RIGHT TO BEAR
        ARMS ................................................................................................................. 11

        A.    The Framers Of The Constitution Did Not Intend To Create
            An Individual Right To Bear Arms .......................................................... 12

            1.   The purpose of the Second Amendment was to ensure
                that the militia would remain an effective fighting force ............... 13

            2.   The framers did not intend the term "militia" to be
                 coextensive with the population as a whole ................................... 16

        B.    The Drafters Of The Second Amendment Rejected Language
            Supportive Of An Individual Right Interpretation .................................. 18

        C.    Contemporaneous Social and Political Circumstances Indicate
            That The Framers Did Not Intend To Foreclose Local
            Firearms Regulations .............................................................................. 20

CONCLUSION ................................................................................................................. 23

i

## TABLE OF AUTHORITIES

### CASES

*Aymette v. State*, 21 Tenn. 154 (1840) .......................................................................................15

*Burton v. Sills*, 248 A.2d 521 (N.J. 1968) ...................................................................................7

*Burton v. Sills*, 394 U.S. 812 (1969) ...........................................................................................7

*\*Cases v. United States*, 131 F.2d 916 (1st Cir. 1942) ................................................................6

*English v. State*, 35 Tex. 473 (1872) ........................................................................................15

*Farmer v. Higgins*, 498 U.S. 1047 (1991) ...................................................................................1

*Fraternal Order of Police v. United States*, 173 F.3d 898 (D.C. Cir. 1999) .....................7, 10, 11

*Fresno Rifle & Pistol Club v. Van de Kamp*, 965 F.2d 723 (9th Cir. 1992) ....................................1

*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) .....................................................9

*Hickman v. Block*, 81 F.3d 98 (9th Cir. 1996) ..........................................................................9, 13

*Lewis v. United States*, 445 U.S. 55 (1980) ...................................................................................6

*Love v. Pepersack*, 47 F.3d 120 (4th Cir. 1995) ...........................................................................9

*MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) .........................................6

*Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002) .............................................................10

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2003) ..............................................................*passim*

*Stevens v. United States*, 440 F.2d 144 (6th Cir. 1971) ................................................................9

*Thomas v. City Council of Portland*, 730 F.2d 41 (1st Cir. 1984) .................................................8

*United States v. Emerson*, 46 F. Supp. 2d 598 (N.D. Tex. 1999) ..................................................5

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) ........................................................*passim*

*United States v. Graham*, 305 F.3d 1094 (10th Cir. 2002),
   cert. denied, 2003 U.S. LEXIS 527 (U.S. Jan. 13, 2003) ....................................................10

*United States v. Miller*, 26 F. Supp. 1002 (W.D. Ark. 1939) ........................................................23

*\*United States v. Miller*, 307 U.S. 174 (1939) ...................................................................*passim*

*United States v. Nelsen*, 859 F.2d 1318 (8th Cir. 1988) ..................................................................9

*United States v. Oakes*, 564 F.2d 384 (10th Cir. 1977) ...................................................................9

*United States v. Price*, 328 F.3d 958 (7th Cir. 2003) .......................................................................9

*\*United States v. Rybar*, 103 F.3d 273 (3d Cir. 1996) ................................................................5, 8

*United States v. Toner*, 728 F.2d 115 (2nd Cir. 1984)......................................................................8

*United States v. Wilson*, 315 F.3d 972 (8th Cir. 2003) ....................................................................9

*United States v. Wright*, 117 F.3d 1265 (11th Cir. 1997).............................................................1, 9

*Wright v. United States*, 302 U.S. 583 (1938) ..........................................................................12, 18

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).....................................................23

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8 .............................................................................................12, 13, 16, 20

U.S. Const. amend. II.......................................................................................................*passim*

U.S. Const. amend. V .................................................................................................................16

## BOOKS AND TREATISES

*The Records of the Federal Convention of 1787* (Max Farrand ed., rev. ed. 1937)......................14

*American State Papers* (1980)......................................................................................................20

*Archives of Maryland* 52:448-74 (William H. Browne *et al.* eds., 1885-1996)............................22

Carl T. Bogus, *The Hidden History of the Second Amendment*,
    31 U.C. Davis L. Rev. 309 (1998).......................................................................................4

*The Complete Bill of Rights: The Drafts, Debates, Sources and Origins*
    (Neil H. Cogan ed., 1997)...............................................................................................15

Saul Cornell, *Commonplace or Anachronism, The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221 (1999) ..............................................................4

*Documents of American History* (Henry Steele Commager, ed., 9th ed. 1973)............................17

Dyche English Dictionary (1794)....................................................................................................15

*The Federalist No. 9* (Hamilton) in 15 *The Documentary History of the Ratification of the Constitution* 492 (J. Kaminski & G. Saladino eds., 1984)..........................20

*The Federalist No. 46* (Madison) in 15 *The Documentary History of the Ratification of the Constitution* 492 (J. Kaminski & G. Saladino eds., 1984)..........................14

Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195, 197 (2000) .............................. 14, 15, 18-21

Robert Hardaway *et al.*, *The Inconvenient Militia Clause of the Second Amendment: Why the Supreme Court Declines to Resolve the Debate Over the Right to Bear Arms*, 16 St. John's J. Legal Comment. 41 (2002) ...............................................6

D. Henigan, *Arms, Anarchy and the Second Amendment*, 16 Val. U. L. Rev. 107 (1991)..............................................................................................................................1

D. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. Dayton L.R. 5 (1989) ....................................................1

D. Henigan, E.B. Nicholson, D. Hemenway, *Guns and the Constitution: The Myth Of a Second Amendment Protection for Firearms in America* (Alethia Press 1995)..............................................................................................................1

Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship*, 55 Wm. & Mary Q. 39 (1998)...........................................22

Don Higginbotham, *The Second Amendment in Historical Context*, 16 Const. Comment. 263 (1999)..............................................................................4

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983) ...........................................................16

Jonathan E. Lowy, *Symposium: The Second Amendment*, 10 Seton Hall Const. L.J. 839 (2000) ..................................................................22

Oxford English Dictionary (J.A. Simpson & E.S.C. Weiner, eds., 2d ed. 1989)..........................15

Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (1956) ............................22

Proposal 12 of the New Hampshire State Convention (June 21, 1788) ........................................19

Jack Rakove, *The Second Amendment: The Highest Stage of Originalism,*
   76 Chi.-Kent L. Rev. 103 (2000) .........................................................................14, 16, 21, 22

*Recent Cases,* 8 Geo. Wash. L. Rev. 230 (1939-40) .....................................................................5

*Recent Decisions,* 38 Mich. L. Rev. 403 (1939-1940) ...................................................................5

Resolution of the First Congress, March 4, 1789, *in* 1 *The Debates in the Several
   State Conventions on the Adoption of the Federal Constitution* 338 (Jonathan
   Eliot ed., 1836, rprt. 1941)............................................................................................................13

David Yassky, *The Second Amendment: Structure, History, and Constitutional
   Change,* 99 Mich. L. Rev. 588 (2000) ......................................................................................23

Now comes the Brady Center to Prevent Gun Violence ("Brady Center"), by its

undersigned counsel, and files this Memorandum *amicus curiae* in support of Defendants

District of Columbia and Anthony Williams.

## INTEREST OF AMICUS CURIAE

Founded in 1983 as the Center to Prevent Handgun Violence, the Brady Center is a

national, non-profit public interest organization dedicated to reducing gun violence through

education, research and legal advocacy. The Brady Center has a substantial and ongoing interest

in ensuring that our Nation's constitutional jurisprudence not function as a barrier to strong

government action to prevent gun violence. Through its Legal Action Project, the Brady Center

has filed numerous briefs *amicus curiae* in federal and state cases involving the constitutionality

of gun laws, including appearances in the Supreme Courts of Indiana, Ohio, and Rhode Island. It

also has appeared in several significant Second Amendment cases as *amicus curiae*, including

*Farmer v. Higgins*, 498 U.S. 1047 (1991), *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir.

2001) and *Fresno Rifle & Pistol Club v. Van de Kamp*, 965 F.2d 723 (9th Cir. 1992). In

addition, Brady Center attorneys have made significant contributions to scholarly research on the

meaning of the Second Amendment. *See, e.g.*, D. Henigan, *The Second Amendment in the

Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. Dayton L.R. 5 (1989) (cited with

approval in *United States v. Hale*, 978 F.2d 1016 (8th Cir. 1992) and in *United States v. Wright*,

117 F.2d 1265 (11th Cir. 1997)); D. Henigan, *Arms, Anarchy and the Second Amendment*, 16

Val; U. L. Rev. 107 (1991); D. Henigan, E.B. Nicholson, D. Hemenway, *Guns and the

Constitution: The Myth of Second Amendment Protection for Firearms in America* (Aletheia

Press 1995).

1

The Brady Center believes its mission to reduce gun violence can be accomplished without banning all guns. Accordingly, this Memorandum takes no position on the merits of the regulations at issue in this lawsuit. The Brady Center files this Memorandum in order to assist the Court in interpreting the Second Amendment of the United States Constitution.

## SUMMARY OF ARGUMENT

By this action, Plaintiffs seek to contest long-settled precedent that construes the Second Amendment of the U.S. Constitution as protecting only the ability of the states to maintain a "well-regulated Militia."[1/] Plaintiffs' Complaint challenges firearms restrictions of the District of Columbia (the "District") on the theory that the "Framers of the Bill of Rights intended to, and textually did, guarantee an individual right to keep and bear arms in the Second Amendment, unrelated to militia service." Plfs.' Summ. J. Br. at 7. This theory is simply wrong. The District's gun regulations are plainly not subject to attack under the Second Amendment, because the Second Amendment confers no individual right to own or use firearms on which Plaintiffs might base their claim.

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court held that the "possession or use" of a weapon must bear "some reasonable relationship to the preservation or efficiency of a well regulated militia" to receive Second Amendment protection. Since *Miller*, nearly every federal court of appeals to consider the issue – including the U.S. Court of Appeals for the D.C. Circuit – has rejected the contention that the Second Amendment contains any right to own or use firearms unrelated to militia service.

---

[1/]    "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II.

The linchpin of Plaintiffs' Second Amendment challenge is dicta in the opinion of a Fifth

Circuit panel in *United States v. Emerson*, which distinguished *Miller* and concluded that the

Second Amendment "protects the right of individuals," including those not engaged in militia or

military service, "to privately possess and bear their own firearms." 270 F.3d 203, 260 (5th Cir.

2001). Since *Emerson*, federal appellate courts confronted with similar claims have uniformly·

rejected that case's unique theory that the Second Amendment creates an "individual right" to

bear arms. Plaintiffs attempt to rebut this formidable authority with a selective reading of *Miller*,

other Second Amendment precedent, and early American history. Less partisan scholarship,

however, refutes Plaintiffs' incomplete portrayal of Second Amendment jurisprudence and the

amendment's historical background, and confirms the widely accepted understanding that there

is no federal constitutional right to firearm possession outside the context of militia service. The

Court should accordingly grant Defendants' motion to dismiss Plaintiffs' Complaint in its

entirety and deny Plaintiffs' motion for summary judgment.

## ARGUMENT

**I.      *UNITED STATES v. MILLER* FIRMLY ESTABLISHED THAT THE SECOND
         AMENDMENT DOES NOT CONFER ANY INDIVIDUAL RIGHT TO BEAR
         ARMS UNRELATED TO MILITIA SERVICE.**

Plaintiffs attempt to distinguish *United States v. Miller*, 307 U.S. 174 (1939), on the

ground that *Miller* did not address whether the Second Amendment creates an individual right to

bear arms. To Plaintiffs, the near universal recognition that *Miller* rejected the individual right

view is merely a "well-circulated myth." Plfs.' Summ. J. Br. at 11. They contend that *Miller*'s

analysis turned not on the substantive aspect of the right to bear arms, but on the nature of the

weapon at issue (*i.e.*, whether the weapon was suitable for militia service). *Id.* at 12-13. A less

selective reading of *Miller* confirms that Plaintiffs' argument is merely wishful thinking. As

3

every federal appellate court, save the Fifth Circuit, already recognizes, *Miller* firmly rejected the notion of an individual, constitutional right to bear arms that is unrelated to militia service.

### A.   *Miller's* **Plain Language Rejects The Individual Rights View.**

*Miller* is without question the seminal case interpreting the Second Amendment.[2] In *Miller*, the defendants were indicted under the National Firearms Act for carrying unregistered firearms in interstate commerce. The defendants challenged their indictment on the basis that it violated the Second Amendment. The Court rejected their claim and, in the process, provided clear guidance that the substantive right created by the Second Amendment relates to preserving the effectiveness of a "well-regulated Militia" for the common defense, not an individual right to bear arms.

Writing for a unanimous Court, Justice McReynolds stated that it was the "obvious purpose" of the Amendment to "assure the continuation and render possible the effectiveness" of militia forces, and that the Amendment "*must* be interpreted and applied with that end in view." *Id*. at 178 (emphasis added).[3] The Court noted that, historically, militia members were expected to supply their own arms "when called for service" to "[t]he militia which the States were

---

[2]   *See, e.g.*, Carl T. Bogus, *The Hidden History of the Second Amendment*, 31 U.C. Davis L. Rev. 309 (1998); Saul Cornell, *Commonplace or Anachronism, The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221 (1999); Don Higginbotham, *The Second Amendment in Historical Context*, 16 Const. Comment. 263 (1999).

[3]   The Government made the identical point in its *Miller* brief:

> Indeed the very language of the Second Amendment discloses that this right has reference only to the keeping and bearing of arms by the people as members of the state militia or other similar military organization provided for by law.

United States Br. at 4-5, *United States v. Miller*, 307 U.S. 174 (1939).

expected to maintain and train," and that militia members were expected to act "in concert for the common defense." *Id.* at 178-9. The plain message from the *Miller* Court was that the right to "keep and bear arms" in the Second Amendment refers only to *the means* by which the state militias were to be armed, not to any right of individuals to possess and use firearms.[4] Because the defendants in *Miller* had failed to demonstrate that their "possession or use" of their firearm had "some reasonable relation to the preservation or efficiency of a well regulated militia," *id.* at 178, they could not invoke the protection of the Second Amendment.

*Miller* thus viewed the Second Amendment as guaranteeing the right to bear arms only to those who needed such arms for service in the "militia," a group described by the Court as those "acting in concert for the *common* defense." *Id.* at 179 (emphasis added). The Court made clear that Second Amendment analysis must focus on whether the defendant's "*possession* or *use*" of the weapon in question has a collective, rather than an individual, purpose. *Id.* at 178. This has been the prevailing construction of *Miller* for more than six decades.[5] According to one scholar who recently conducted an exhaustive review of Second Amendment law and policy:

---

[4]    Scholarly commentary published shortly after *Miller* was handed down interpreted the Court's ruling similarly. *See, e.g., Recent Decisions*, 38 Mich. L. Rev. 403, 404 (1939-1940) (constitutional right to bear arms exists "as a necessity to the existence of a well regulated militia.... Today the state supplies the weapons and this necessity for the citizen bearing arms no longer exists."); *Recent Cases*, 8 Geo. Wash. L. Rev. 230, 231 (1939-40) ("The Second Amendment plainly states that its object is to preserve to the states their security and freedom by means of a well regulated militia.").

[5]    The Court should not accept Plaintiffs' argument that the outcome in *Miller* turned on the nature of the weapon at issue. Implicit in Plaintiffs' argument is the assumption that *Miller* would have upheld the defendants' Second Amendment challenge had the defendants' weapon been employable in military service (*e.g.*, a machine gun, rocket launcher, or bazooka). Apart from the district court opinion in *United States v. Emerson*, 46 F. Supp. 2d 598, 608 (N.D. Tex. 1999), no other court – not even the Fifth Circuit – has adopted such an apocalyptic reading of *Miller*. The First and Third Circuits rightly dismissed this attempt to distinguish *Miller* as specious. *See United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996) ("[H]owever clear the Court's suggestion that the firearm before it lacked the necessary military character, it did not

> It has been clear to all Circuit Courts interpreting *Miller* that the Second
> Amendment strongly suggests a narrow right view of the right to bear
> arms.... There is nothing in the *Miller* Court's discussion of the history of
> the Second Amendment that suggests an individual right to bear arms for
> his own uses. The intent of the Second Amendment was to give
> individuals an unrestricted access to firearms when the individual had
> been called to serve in a state militia and when the individual was acting in
> concert for the common defense.

Robert Hardaway *et al.*, *The Inconvenient Militia Clause of the Second Amendment: Why the*

*Supreme Court Declines to Resolve the Debate Over the Right to Bear Arms*, 16 St. John's J.

Legal Comment. 41, 114 (2002).

Since *Miller*, the Supreme Court has twice affirmed that decision's "collective right"

interpretation of the Second Amendment. In *Lewis v. United States*, 445 U.S. 55 (1980), the

Court considered, *inter alia*, whether 18 U.S.C. § 1202(a)(1), which criminalizes possession of a

firearm by a convicted felon, could survive an equal protection challenge. If the statute had

infringed a fundamental right, the Court would have been required to analyze the statute's

constitutionality using strict scrutiny, under which the statute would have to be narrowly tailored

to fit a compelling interest to survive review. *See, e.g., MD/DC/DE Broadcasters Ass'n v. FCC*,

236 F.3d 13, 21 (D.C. Cir. 2001) ("For a government action to withstand strict scrutiny it must

'serve a compelling governmental interest, and must be narrowly tailored to further that

interest.'" (citation omitted)). Instead, the Supreme Court used a rational-basis review, noting

that the legislative restriction at issue "[did not] trench upon any constitutionally protected

liberties." *Lewis*, 445 U.S. at 65 n.8 (citing *Miller* and three lower court cases rejecting Second

---

state that such character alone would be sufficient to secure Second Amendment protection. In
fact, the *Miller* Court assigned no special importance to the character of the weapon itself, but
instead demanded a reasonable relationship between its "possession or use" and militia-related
activity."); *Cases v. United States*, 131 F.2d 916, 922 (1st Cir. 1942) (susceptibility of firearm to
military application not determinative).

6

Amendment challenges).  The Court's analysis presupposes that *Miller* stands for the proposition

that the Second Amendment does not create a fundamental right to possess firearms.  Similarly,

the Court dismissed the appeal of *Burton v. Sills*, 248 A.2d 521, 527 (N.J. 1968), in which the

state court cited *Miller* in holding that the Second Amendment did not confer a right to bear arms

unrelated to militia service, for "want of a substantial federal question." *Burton v. Sills*, 394 U.S.

812 (1969).  This dismissal would not have been appropriate if the Court believed there was

doubt that *Miller* had resolved that the Second Amendment does not confer an individual right.

In short, the Supreme Court established the scope of the Second Amendment in *Miller*

and has seen no need to revisit the issue since.  Plaintiffs' effort to construe *Miller* in a manner

that recognizes an individual right to bear arms is without roots in the text of the *Miller* opinion.

Any such distortion of *Miller* would be fundamentally inconsistent with the Court's express view

that the Second Amendment was drafted "[w]ith obvious purpose to assure the continuation and

render possible the effectiveness of [militia] forces" for the "common defense." *Miller*, 307 U.S.

at 178.

**B.    The Vast Majority Of Courts Have Interpreted *Miller* As A Rejection Of Any
Individual Right to Bear Arms Under The U.S. Constitution.**

With one exception, the federal courts' universally understand *Miller* as a repudiation of

the individual right view of the Second Amendment. *See infra* at 9-11.  In an effort to evade this

overwhelming precedent, Plaintiffs place excessive reliance on a single opinion by the Fifth

Circuit reaching the opposite conclusion in dicta, *Emerson*, 270 F.3d 203, and a D.C. Circuit

opinion that has essentially nothing to say on the subject, *Fraternal Order of Police v. United

States* ("*FOP*"), 173 F.3d 898, 906 (D.C. Cir. 1999).  Neither case seriously challenges the well-

settled meaning of *Miller* described above, and Plaintiffs advance no other compelling reason to

7

question the almost uniform line of decisions that reject the theory that the Second Amendment

provides an individual right to bear arms.

The majority opinion in *Emerson* adopted a position squarely at odds with Supreme

Court and lower federal court precedent. *Emerson* arose from charges of carrying a pistol while

subject to a restraining order issued by a Texas state court, in violation of 18 U.S.C. § 922(g).

The district court voided the statute's gun-possession ban as violative of the Second Amendment.

On appeal, the Fifth Circuit unanimously reversed on the ground that the ban was reasonable, but

a two-member majority nonetheless concluded that the Second Amendment confers an

individual right to "possess and bear" firearms outside the context of militia service. *Emerson*,

270 F.3d at 260. The third judge, who concurred in the result, criticized the majority's Second

Amendment opinion as irrelevant dicta because the existence of an individual right to bear arms

was unnecessary to the court's decision to sustain the defendant's indictment and deny his

Second Amendment claim. *Id.* at 272-74 ("The determination whether the rights bestowed by

the Second Amendment are collective or individual is entirely unnecessary to resolve this case

and has no bearing on the judgment we dictate by this opinion.... [N]o court need follow what

the majority has said in that regard.").

Prior to *Emerson*, every federal court of appeals to interpret *Miller* had rejected the

argument that the Second Amendment establishes any individual right to bear arms. *See, e.g.*,

*Thomas v. City Council of Portland*, 730 F.2d 41, 42 (1st Cir. 1984) ("Established case law

makes clear that the federal Constitution grants appellant no right to carry a concealed

handgun."); *United States v. Toner*, 728 F.2d 115, 128 (2nd Cir. 1984) ("right to possess a gun is

clearly not a fundamental right"); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996)

(*Miller* requires "a reasonable relationship between [a weapon's] 'possession or use' and militia-

related activity" (citation omitted); *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995) (Second

Amendment "does not confer an absolute individual right to bear any type of firearm"); *Stevens*

*v. United States*, 440 F.2d 144, 149 (6th Cir. 1971) (Second Amendment applies solely to state

militias; thus, "there can be no serious claim to any express constitutional right of an individual

to possess a firearm"); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999)

(Second Amendment right "inures not to the individual but to the people collectively, its reach

extending so far as is necessary to protect their common interest in protection by a militia");

*United States v. Nelsen*, 859 F.2d 1318, 1320 (8th Cir. 1988) (defendant's failure to make

plausible claim that challenged statute "would impair any state militia" precludes Second

Amendment protection); *Hickman v. Block*, 81 F.3d 98, 101 (9th Cir. 1996) ("the Second

Amendment is a right held by the states, and does not protect the possession of a weapon by a

private citizen"); *United States v. Oakes*, 564 F.2d 384, 387 (10th Cir. 1977) (Second

Amendment's purpose "was to preserve the effectiveness and assure the continuation of the state

militia"); *United States v. Wright*, 117 F.3d 1265, 1273 (11th Cir. 1997) (Second Amendment is

"intended to protect only the use or possession of weapons that is reasonably related to a militia

actively maintained and trained by the states"); *Fraternal Order of Police v. United States*, 173

F.3d 898, 906 (D.C. Cir. 1999) (Plaintiffs' Second Amendment claim fails for lack of evidence

demonstrating challenged statute's "material impact on the militia").

Since *Emerson*, the federal courts' rejection of the individual right interpretation of the

Second Amendment has resumed without interruption. *See, e.g., United States v. Price*, 328 F.3d

958, 961 (7th Cir. 2003) ("Price argues ... *Emerson* ... and a recent letter written by Attorney

General John Ashcroft to the [NRA] provide us with reason to reexamine our position. We don't

think so."); *United States v. Wilson*, 315 F.3d 972, 972 (8th Cir. 2003), *reh'g and reh'g en banc*

*denied*, 2003 U.S. App. LEXIS 3908 (8th Cir. Jan. 10, 2003); *Silveira v. Lockyer*, 312 F.3d 1052,

1066 (9th Cir. 2003) ("when we give the text its most plausible reading and consider the

amendment in light of the historical context and circumstances surrounding its enactment we are

compelled to reaffirm the collective rights view we adopted in *Hickman*"), *reh'g en banc denied*,

328 F.3d 567 (9th Cir. 2003); *Olympic Arms v. Buckles*, 301 F.3d 384, 388-389 (6th Cir. 2002)

("Sixth Circuit precedent does not recognize a fundamental right to individual weapon ownership

or manufacture."); *United States v. Graham*, 305 F.3d 1094, 1106 (10th Cir. 2002) ("the right to

bear arms is a collective rather than individual right"), *cert. denied*, 2003 U.S. LEXIS 527 (U.S.

Jan. 13, 2003).

        In short, *Emerson* is unique and wrongly decided.  In finding that the Second Amendment

confers an individual right to bear arms, the Fifth Circuit parted ways with all eleven of its sister

circuits and with the explanation of the Second Amendment provided in *Miller*.  Apart from

*Emerson*'s dicta, there is no recognized authority for the individual right view espoused by

Plaintiffs.

        Plaintiffs' reliance on the D.C. Circuit's opinion in *FOP* does not close this gap.  *FOP*

involved a substantive due process challenge to the Gun Control Act, 18 U.S.C. § 922(g), which

prohibits domestic violence misdemeanants from possessing even government-issued firearms.

The Government argued that the Second Amendment only applies if the statute has a

"relationship to the 'preservation or efficiency of a well-regulated militia.'"  173 F.3d at 906

(citation omitted).  Although the court wondered whether the plaintiff "could have challenged the

test's applicability by arguing that it serves only to separate weapons covered by the [Second

Amendment] from uncovered weapons," the court said nothing about the validity of that

argument (because the plaintiff failed to assert it) and "assum[ed] the ... applicability" of the

Government's *Miller* test. *Id.*

This Court will search in vain for any statement in *FOP* that is "plainly inconsistent with

any collective rights' approach to the Second Amendment," as Plaintiffs insist. Plfs. Summ. J.

Br. at 17. To the contrary, *FOP* concluded that "*Miller* would be met by evidence supporting a

finding that the disputed rule would *materially impair the effectiveness of a militia*, though

perhaps some other showing could suffice." *Id.*[6] (emphasis added). By tying the application of

the Second Amendment to the effectiveness of the militia, *FOP* considered the issue from the

collective right point of view and rejected the notion that any Second Amendment right to bear

arms exists unrelated to militia service.

## II.   THE HISTORY BEHIND THE CREATION OF THE SECOND AMENDMENT DEMONSTRATES THAT THE FRAMERS DID NOT INTEND TO CREATE AN INDIVIDUAL RIGHT TO BEAR ARMS.

Plaintiffs' Second Amendment challenge is predicated on the position that the framers of

the Constitution originally intended that provision to create an individual right to bear arms.

Plaintiffs spin page-after-page of early American history in an effort to establish this proposition,

despite *Miller*'s specific recognition that the Second Amendment's "obvious purpose [is] to

assure the continuation and render possible the effectiveness of [militia] forces." *Miller*, 307

U.S. at 178. Given the clarity of the Second Amendment's language and *Miller*'s unambiguous

interpretation of it, there is scant reason to consider the Second Amendment's legislative history.

---

[6]    Plaintiffs struggle to place *FOP* in the individual right camp by arguing that the D.C. Circuit implicitly recognized that the militia consists of all ordinary citizens. Plfs.' Summ. J. Br. at 19. That is untrue. In responding to the plaintiffs' contention that "in 'most' states, police officers can be called into service as militia members," *FOP* merely recognized that the state laws cited by the plaintiffs placed no more obligation upon police officers to serve in the militia than "ordinary citizens." 173 F.3d at 906.

*See, e.g., Wright v. United States*, 302 U.S. 583, 589 (1938) ("The phrasing of [U.S. Const. art. I, § 7, par. 2] is entirely free from ambiguity, and there is no occasion for construction."). At any rate, to the extent legislative history matters here, it provides Plaintiffs no support. The historical context surrounding the Second Amendment's adoption forcefully confirms that it was not intended to interfere with local firearms regulations of the kind at issue in this case.

## A.   The Framers Of The Constitution Did Not Intend To Create An Individual Right To Bear Arms.

It is a fundamental principle of constitutional interpretation that one must give effect to every word of the passage being interpreted. *See, e.g., Wright v. United States*, 302 U.S. 583, 588 (1938) ("In expounding the Constitution of the United States ... every word must have its due force, and appropriate meaning' for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added."). This principle applies here and rebuts Plaintiffs' argument. The Second Amendment contains an introductory clause that provides clear contextual and interpretive guidance: "*A well-regulated Militia, being necessary to the security of a free State*, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II (emphasis added). This clause cannot be considered mere surplusage, as Plaintiffs suggest, Plfs.' Summ. J. Br. at 25-29, leaving the "the right of the people to keep and bear arms" unmodified. Rather, as the Court explained in *Miller*, the Amendment "*must be interpreted and applied*" in light of this clause, which makes clear that the "obvious purpose" of the Amendment is "to assure the continuation and render possible the effectiveness" of the militia. *Miller*, 307 U.S. at 178 (emphasis added).[2] A plain reading of the Amendment – that does not excise the

---

[2]    Indeed, *Miller* expressly observed that the Second Amendment was adopted to implement the authority over state militias granted to Congress in Article I, Section 8 of the Constitution, *Miller*, 307 U.S. at 178, which provides: "The Congress shall have Power ... To provide for

12

introductory clause – demonstrates that "the right of the people to keep and bear arms" exists

solely to support the "well-regulated Militia" necessary to maintain "the security of a free State."

*See, e.g., Hickman v. Block*, 81 F.3d 98, 102 (9th Cir. 1996) ("In light of the introductory clause],

it is only in furtherance of state security that 'the right of the people to keep and bear arms' is

finally proclaimed."). Thus, a correct interpretation of the Amendment must rely, in the first

instance, on the common understanding and purpose of "militia."

### 1.  The purpose of the Second Amendment was to ensure that the militia would remain an effective fighting force.

The term "militia" is best understood within the framework and purpose of the Bill of

Rights. The Bill of Rights was designed to amend the Constitution "in order to prevent

misconstruction or abuse of its powers." Resolution of the First Congress, March 4, 1789, *in* 1

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 338

(Jonathan Eliot ed., 1836; rprt. 1941). The Second Amendment, like the other provisions

comprising the Bill of Rights, was intended to achieve this goal by limiting the power of the

federal government over the states.

As the debates over the Constitution and the Bill of Rights reveal, protecting the strength

and independence of the state militia was deemed important for two reasons. First, many of the

Framers regarded the militia as a practical alternative to the dreaded standing army. "As the

greatest danger to liberty is from large standing armies," Madison argued, "it is best to prevent

them by an effectual provision for a good militia." 2 *The Records of the Federal Convention of*

---

calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel
Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing
such Part of them as may be employed in the Service of the United States, reserving to the States
respectively, the Appointment of the Officers, and the Authority of training the Militia according
to the discipline prescribed by Congress." U.S. Const. art. I, § 8.

13

*1787*, at 388 (Max Farrand ed., rev. ed. 1937). Second, Antifederalists suspicious of the

concentration of power regarded the militia as an important bulwark against a tyrannical national

government. Any attempt by a standing army to impose tyranny, Madison reassured his

countrymen, "would be opposed [by] a militia amounting to near half a million of citizens with

arms in their hands." *The Federalist No. 46* (Madison) in 15 *The Documentary History of the

Ratification of the Constitution* 492 (J. Kaminski & G. Saladino eds., 1984).

Both of these objectives would be compromised if the national government retained the

power to either dismantle the militia or to permit the militia to deteriorate by neglect and

insufficient provision. The Second Amendment addressed this problem by ensuring that the

states would have the ability to provide independently for the needs of the militia. *See Silveira*,

312 F.3d at 1076 (holding that the Second Amendment was included in the Bill of Rights "in

order to preserve the efficacy of the state militias for the people's defense–not to ensure an

individual right to possess weapons") (emphasis added). *See also* Paul Finkelman, *"A Well

Regulated Militia": The Second Amendment in Historical Perspective*, 76 Chi.-Kent L. Rev. 195,

197 (2000) ("[T]he Second Amendment reconfirmed that even though Congress would have the

primary responsibility for arming and organizing the state militias, the states could maintain their

own militias, if Congress failed to do its job."); Jack Rakove, *The Second Amendment: The

Highest Stage of Originalism*, 76 Chi.-Kent L. Rev. 103, 161-62 (2000) (demonstrating that "the

issue under discussion" in the debates over the Second Amendment "was always the militia, and

that issue was posed primarily as a matter of defining the respective powers of two levels of

government").

The historical argument against the individual right interpretation is buttressed by

specific facts pertaining to the evolution of the text of the Second Amendment. Madison's

14

proposed draft of the Second Amendment initially provided: "The right of the people to keep

and bear arms shall not be infringed; a well armed, and well regulated militia being the best

security of a free country: *but* no person religiously scrupulous of bearing arms, shall be

compelled to render military service in person." *The Complete Bill of Rights: The Drafts,*

*Debates, Sources and Origins* 169 (Neil H. Cogan ed., 1997) (emphasis added). Madison's

proposed exception for "religiously scrupulous" objectors was subsequently omitted, but its

inclusion in the initial draft supports two conclusions concerning the language and intent of the

Second Amendment.

First, the "religiously scrupulous" clause indisputably employs the expression "bearing

arms" to refer to military service rather than any individual activity such as hunting or self-

defense. It is surely reasonable to conclude that the same language, when used in the clause

affirming the "right of the people to keep and *bear arms*," similarly pertains to military service.[8]

Second, Madison's original draft demonstrates that the overall thrust of the amendment

was directed to the role of the militia. If the preceding two clauses had been intended to affirm

an individual right to bear arms, the proposed exemption for "religiously scrupulous" persons

would have been unnecessary, and would certainly not have warranted the interposition of a

prefatory "but." *See* Finkelman, *supra*, at 227-28 (noting that Madison's exception for the

---

[8]     Both contemporaneous authorities and subsequent scholarship support this intratextual
analysis. *See, e.g.,* 1 Oxford English Dictionary 634 (J.A. Simpson & E.S.C. Weiner, eds., 2d
ed. 1989) (defining "to bear arms" as "to serve as a soldier, do military service, fight"); Dyche
English Dictionary (1794) (defining "arms" as "all manner of warlike instruments"). *See also*
*Aymette v. State*, 21 Tenn. 154, 161 (1840) ("A man in the pursuit of deer, elk, and buffaloes
might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he
had *borne arms*.") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1872) ("The word
'arms' in the connection we find it in the Constitution of the United States refers to the arms of a
militiaman or soldier, and the word is used in its military sense.").

religiously scrupulous would have no meaning at all if not connected to militia service, as no

state at the time required people to carry weapons for personal use).

### 2.    The framers did not intend the term "militia" to be coextensive with the population as a whole.

Plaintiffs and other proponents of the individual right interpretation attempt to

circumvent the centrality of the militia to the history and text of the Second Amendment by

arguing that the framers intended the term "militia" to be virtually coextensive with the

population as a whole. *See* Plfs.' Summ. J. Br. at 29-31; Don B. Kates, Jr., *Handgun Prohibition*

*and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217-218 (1983)

("[B]elieving that a militia (composed of the entire people possessed of their individually owned

arms) was necessary for the protection of a free state, [the framers] guaranteed the people's right

to possess those arms."). The structure, history, and text of the Second Amendment all refute the

proposition that the militia and the population as a whole are indistinguishable as repositories of

the constitutional "right to bear arms."

Use of the term "militia" in constitutional provisions other than the Second Amendment

suggests that the framers did not generally understand that term to consist of a spontaneous self-

assembly of the population at large. Article I gives Congress responsibility for "organizing,

arming, and disciplining" the militia. U.S. Const. art. I, § 8, cl. 16.  In addition, the Fifth

Amendment, adopted by the First Congress at the same time as the Second Amendment,

provides that a criminal defendant has a right to an indictment or a presentment "except in cases

arising in the land or naval forces, or in the Militia, when in actual service in time of War or

public danger...." U.S. Const. amend. V.  Both provisions employ the term militia to refer to

governmental entities. *See Silveira*, 312 F.3d at 1070-71 (noting that the use of the "militia" in

the Fifth Amendment "is most reasonably understood as referring to a state entity"); Rakove,

16

*supra*, at 126 (observing that Article I, Section 8, Clause 16 "considers the militia not as an

unorganized mass of the citizenry but as an institution subject to close legislative regulation").

Given that Article I and the Fifth Amendment both contemplate a militia that is an organ of the

state, it is unreasonable to conclude – as Plaintiffs do – that the Second Amendment does not

treat the term "militia" in the same way. *See Silveira*, 312 F.3d at 1071 ("To determine that

'militia' in the Second Amendment is something different from the state entity referred to

whenever the word is employed in the rest of the Constitution would be to apply contradictory

interpretive methods to words in the same provision.").

The framers' general perception of the militia as a state entity is further corroborated by a

consideration of pre-constitutional history.  The predecessor document to the Constitution, the

Articles of Confederation, provided that "every state shall always keep up a well regulated and

disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have

ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of

arms, ammunition and camp equipage."  Articles of Confederation art. 6, *cited in Documents of*

*American History* 112 (Henry Steele Commager ed., 9th ed. 1973).  By expressly assigning

responsibility for establishing and maintaining the militia to the states, the Articles of

Confederation provide further proof that the founding generation pervasively regarded the militia

as constituting a state military force.  *See Silveira*, 312 F.3d at 1071 (discussing the Articles of

Confederation and concluding that "the prevailing understanding both before and at the time of

the adoption of Constitution was that a 'militia' constituted a state military force to which the

able-bodied male citizens of the various states might be called to service").

Finally, the language of the amendment itself refutes the contention that the militia is

indistinguishable, for purposes of the right to bear arms, from the population as a whole.  The

drafters of the Second Amendment did not merely establish a nexus between the right to bear

arms and service in a militia; they also specified the kind of militia necessary to effectuate their

purposes – one that is "well-regulated." This explicit textual stipulation "confirms that 'militia'

can only reasonably be construed as referring to a military force established and controlled by a

governmental entity." *Silveira*, 312 F.3d at 1072. There is no sensible way to believe that

allowing all citizens to bear arms would create a "well-regulated" fighting force, and ignoring

this phrase would render the prefatory clause nugatory, in violation of the fundamental principle

that constitutional interpretation must give effect to every word of the text in question. *See*

*Wright*, 302 U.S. at 588.

### B.    The Drafters Of The Second Amendment Rejected Language Supportive Of An Individual Right Interpretation.

Although an analysis of the subjective intentions of the framers does not lend itself to

mathematical certainty, there is a clear historical record with respect to what the framers said and

did during the constitutional amendment process. This factual record indicates that those

responsible for drafting the Bill of Rights were repeatedly presented with, and repeatedly

declined to embrace, language that would have created the individual right that Plaintiffs claim is

found in the Second Amendment.

In addressing the distribution of governmental power over the militia, the architects of the

Bill of Rights decided not to adopt language that would have unequivocally affirmed an

individual right to bear arms. The Pennsylvania Antifederalists, in a publication entitled *Reasons*

*for Dissent*, included fourteen proposed amendments to the Constitution. Finkelman, *supra*, at

206 (internal citations omitted). Although some of these were adopted virtually verbatim, the

First Congress substantially modified the seventh proposed amendment, which affirmed the right

of the people to bear arms "*for the defense of themselves* and their own state," and which

18

prohibited the enactment of any law to disarm "the people *or any of them* unless for crimes committed, or real danger of public injury from individuals." *Id.* at 206-07 (emphasis added). If Congress had incorporated these provisions into the Second Amendment, "the constitutional principle of private ownership of weapons would have been clear." *Id.* at 209. Instead, "Madison and his colleagues in the First Congress emphatically rejected the goals and the language of the Pennsylvania Antifederalists" relating to the bearing of arms. The "fact that Madison and Congress did not propose amendments along the lines demanded by the Pennsylvania Antifederalists leads to a prima facie conclusion that they did not intend to incorporate such protections into the Bill of Rights." *Id.* at 208-12

Similar logic defeats Plaintiffs' reliance on the New Hampshire proposal providing that "Congress shall never disarm *any Citizen* unless such as are or have been in Actual Rebellion." Proposal 12 of the New Hampshire State Convention (June 21, 1788), *in* Bill of Rights, *supra*, at 181 (emphasis added). Plaintiffs cite this proposal as language that "unmistakably protects individual right quite apart from militia service." Plfs. Summ. J. Br. at 23. They are conspicuously indifferent, however, to the fact that those who adopted the Second Amendment decided *not to employ the text of New Hampshire's proposal.* The fact that language decidedly more congenial to the individual right interpretation was proposed and rejected provides compelling evidence to bolster the commonsense intuition that the framers knew how to establish an individual right to bear arms – and opted not to do so. *See Silveira*, 312 F.3d at 1083 (noting that the New Hampshire proposal "suggests that an amendment establishing an individual right to bear arms would have been worded quite differently from the Second Amendment").

19

### C. Contemporaneous Social and Political Circumstances Indicate That The Framers Did Not Intend To Foreclose Local Firearms Regulations.

The framers of the Second Amendment, living in a time when various social and political upheavals seemed to threaten the integrity of the new republic, would have been extraordinarily reluctant to eviscerate the capacity of the government to suppress domestic insurrections. *See generally* Finkleman, *supra*, at 218-222. "The Second Amendment was enacted soon after the August 1786-February 1787 uprising of farmers in Western Massachusetts known as Shay's Rebellion." *Silveira*, 312 F.3d at 1072; *see also* Finkelman, *supra*, at 210. That event prompted widespread anxieties concerning the lingering threat of anarchy, and played a major role in the adoption of a new Constitution. *Id.* at 219-20 (quoting Hamilton, Madison, Washington, Pinckney, and others on the perceived threat of rapidly approaching anarchy). The Constitution was designed to address these fears by ensuring that the national government would have adequate power to enforce its laws. *See* U.S. Const. art. I, § 8, cl. 60 (granting Congress power "to raise and support Armies"); *id.* art. I, § 8, cl. 15 (granting Congress power to call out the militia to "suppress Insurrections"); *id.* art. I, § 8, cl. 9 (granting Congress with power to "punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations"); *see also The Federalist No. 9* (Hamilton), *reprinted in American State Papers* 47 (1980) (arguing that the strong national government established by the Constitution was necessary to keep at bay "tempestuous waves of sedition and party-rage"); Finkelman, *supra*, at 219-220. As Alexander Hamilton argued in his defense and explication of the Constitution, "[a] Firm Union will be of the utmost moment to the peace and liberty of the States" and "would prevent domestic faction and insurrection." *The Federalist No. 9* (Hamilton), *supra*, at 47.

Given the framers' concern with providing for national peace and security, it is highly unlikely that they would have adopted a provision that seriously undermined the ability of the

government to suppress domestic insurrections. If the First Congress had intended to create an individual right to bear arms, it would have been depriving itself of the power to regulate the flow of weaponry even in those places where it had plenary jurisdiction, such as the District of Columbia and the federal territories. *See* Finkelman, *supra*, at 211 (arguing that an individual right to bear arms might have crippled the ability of the federal government to successfully manage the Whiskey Rebellion, the Nullification crisis, and other a host of other problems, including those posed by pirates, illegal slave traders, and filibusters preparing for an illegal invasion of Latin America). Any such weakening of the national government's powers would have been contrary to the overall thrust of the new Constitution. "The goal was to prevent anarchy, violence, and rebellions. This prevention was accomplished by controlling the militias and the army and by retaining the right to limit weapons to those who formed 'A well-regulated Militia.'" *Id.* at 222.

Additional historical support for a collective right interpretation of the Second Amendment may be inferred from the framers' general reluctance to impose constraints on the broad police power of the states. *See* Rakove, *supra*, at 112-113 (emphasizing the prevailing understanding of the extent of a state's police powers, "which authorized government to legislate broadly in pursuit of the public health and welfare," and noting that this expansive conception of state regulatory authority was contemporaneously codified in the Tenth Amendment). If the architects of the Second Amendment had intended to proscribe state legislation limiting the ownership of dangerous weaponry, or even to significantly restrict the scope of such legislation, one would expect to encounter at least some discussion of this controversial contraction of state power during the course of the otherwise wide-ranging debates over the Bill of Rights. Instead, "there is not a single statement in the congressional debate about the proposed [Second]

21

amendment that indicates that any congressman contemplated that it would establish an individual right to possess a weapon." *Silveira*, 312 F.3d at 1085 (emphasis added), citing Rakove, *supra*, at 210-11; *see also* Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship*, 55 Wm. & Mary Q. 39, 40 (1998) (noting that during all the discussions and debates over the Second Amendment, "from the Revolution to the eve of the Civil War, there is precious little evidence that advocates of local control of the militia showed an equal or even a secondary concern for gun ownership as a personal right").

The absence of any recorded controversy on this point strongly suggests that those who created the Bill of Rights did not believe that the Second Amendment constrained the freedom of the states to exercise their police powers by regulating the ownership and use of dangerous weaponry within their borders.[9] This interpretation of the Second Amendment is also consistent with the fact that local regulation of firearms both preceded and survived the revolutionary era. In the mid-eighteenth century, for example, Maryland prohibited the ownership of guns by Catholics and seized the weapons of any eligible male who refused to serve in the militia. *See Archives of Maryland* 52:448-74 (William H. Browne *et al.* eds., 1885-96). In similar fashion, colonial legislatures from New Hampshire to South Carolina imposed communal storage of firearms, permitting them to be removed only in times of crisis or for muster day. *See* Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* at 321-335 (1956). This tradition of state regulation persisted during the American Revolution, when Connecticut and North Carolina adopted a policy of impressing firearms. Jonathan E. Lowy, *Symposium: The Second Amendment*, 10 Seton Hall Const. L.J. 839, 844 n.16 (2000) (citing J.H. Trumbull *et al.*, eds.,

---

[9]    *See* Rakove, *supra*, at 127 (observing that "the framers had no plausible, much less compelling, reason even to ask whether there should be any change in the traditional legislative competence of the states").

*The Public Records of the Colony of Connecticut Prior to the Union with New Haven Colony*

(1850-59); Walter Clark, ed., *The State Records of North Carolina* (1901-03)).

The states have long regulated gun ownership, and in more than two centuries of

American jurisprudence, only two federal courts have ever invalidated gun control laws on the

basis of the Second Amendment. David Yassky, *The Second Amendment: Structure, History,*

*and Constitutional Change*, 99 Mich. L. Rev. 588, 592 (2000). One of them was reversed by the

Supreme Court in *Miller*, and the other is the *Emerson* case that Plaintiffs ask this Court to

follow. *See United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001); *United States v. Miller*, 26

F. Supp. 1002 (W.D. Ark. 1939), *rev'd* 307 U.S. 174 (1939). The protracted and virtually

unanimous acquiescence of the federal courts in the right of the states to enact regulations

limiting the private ownership and use of firearms is not just a jurisprudential curiosity; it is itself

an important aspect of the history of the Second Amendment.[10] That history stands forthrightly

opposed to the proposition that the Second Amendment creates an individual right to bear arms

that is divorced from service in the militia and that confers constitutional immunity from the

traditional regulatory power of the states.

## CONCLUSION

For all of the foregoing reasons, the motion to dismiss of Defendants District of

Columbia and Anthony Williams should be granted, and the motion for summary judgment of

---

[10]     *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them. It is an inadmissibly narrow conception of American constitutional law to confine it to the words of the Constitution and to disregard the gloss which life has written upon them.").

Plaintiffs Shelly Parker, Dick Heller, Tom G. Palmer, Gillian St. Lawrence, Tracey Ambeau, and

George Lyon should be denied.

Dated:  July 25, 2003              Respectfully submitted,

                                   **WILMER CUTLER & PICKERING**

                                   Eric Mogilnicki ~~~

                                   Eric Mogilnicki, Esq. (D.C. Bar. No. 443682)
                                   John A. Valentine, Esq. (D.C. Bar No.473072)
                                   2445 M Street, N.W.
                                   Washington, D.C.  20037
                                   (202) 663-6000
                                   (202) 663-6363 Facsimile

                                   **COUNSEL FOR *AMICUS CURIAE* BRADY CENTER
                                   TO PREVENT GUN VIOLENCE**

                                   **OF COUNSEL:**

                                   Dennis A. Henigan, Esq. (D.C. Bar. No. 951897)
                                   Brian J. Siebel, Esq. (D.C. Bar. No. 437115)
                                   BRADY CENTER TO PREVENT GUN VIOLENCE
                                   1225 Eye Street, N.W., Suite 1100
                                   Washington, D.C. 20005
                                   (202) 289-7319
                                   (202) 898-0059 Facsimile