IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, et al., | ) | Case No. 03-CV-0213-EGS |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES** |
| v. | ) | **IN SUPPORT OF PLAINTIFF'S** |
| | ) | **MOTION FOR ATTORNEY** |
| DISTRICT OF COLUMBIA, et al., | ) | **FEES AND COSTS** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS**

**COME NOW** Plaintiff Dick Anthony Heller and his undersigned counsel, and submit

their Memorandum in Support of Plaintiff's Motion for Attorney Fees and Costs.

Dated: August 25, 2008      Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
Robert A. Levy (D.C. Bar No. 447137)
Clark M. Neily, III (D.C. Bar No. 475926)
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
Phone: 703.835.9085
Fax:   703.997.7665

By:    /s/Alan Gura
Alan Gura

Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      PLAINTIFF'S COUNSEL ARE ENTITLED TO RECOVER
        THEIR FEES PURSUANT TO 42 U.S.C. § 1988. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     THE TIME SUBMITTED BY COUNSEL WAS REASONABLY
        NECESSARY TO ACHIEVE SUCCESS IN THE LITIGATION. . . . . . . . . . . . . . . . . 7

III.    THE HOURLY RATES PROFFERED BY PLAINTIFFS ARE
        CONSISTENT WITH ESTABLISHED RATES FOR SIMILAR
        WORK IN THE WASHINGTON, DC MARKET FOR LEGAL SERVICES. . . . . . . . . 10

        A.      The Attorneys' Billing Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      The Attorneys' Skill, Experience, and Reputation. . . . . . . . . . . . . . . . . . . . 12

        C.      The Prevailing Market Rates in the Community.. . . . . . . . . . . . . . . . . . . . . . 15

IV.     COUNSEL ARE ENTITLED TO ENHANCEMENT OF
        THEIR FEE FOR PROVIDING HIGH QUALITY
        REPRESENTATION IN A CASE OF EXCEPTIONAL SUCCESS. . . . . . . . . . . . . . . 24

V.      COUNSEL IS ENTITLED TO HIS REASONABLE
        EXPENSES IN ADVANCING THIS LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

STATUTES

20 U.S.C. § 1415(i)(3)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

COURT RULES

Sup. Ct. R. 43.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CASES

*Am. Lands Alliance* v. *Norton*, 525 F. Supp.2d 135 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . 21

*Barnes* v. *City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bd. of Trs. of the Hotel & Rest. Emples. Local 25* v. *JPR, Inc.*,
    136 F.3d 794 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bebchick* v. *Washington Metro. Area Transit Comm'n*,
    805 F.2d 396 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Blanchard* v. *Bergeron*, 489 U.S. 87 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Blum* v. *Stenson*, 465 U.S. 886 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 19, 24, 26

*Brotherton* v. *Cleveland*, 141 F. Supp.2d 907 (S.D. Ohio 2001). . . . . . . . . . . . . . . . . . . . . . . . . 30

*Castellon* v. *United States*, 864 A.2d 141 (D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*City of Burlington* v. *Dague*, 505 U.S. 557 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Copeland* v. *Marshall*, 641 F.2d 880 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Covington* v. *District of Columbia*, 57 F.3d 1101 (D.C. Cir. 1995). . . . . . . . . . . 10, 11, 15, 19, 21

*Gomez* v. *Gates*, 804 F. Supp. 69 (C.D. Cal. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Goos* v. *National Ass'n of Realtors*, 997 F.2d 1565 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 12

*Guam Soc'y of Obstetricians & Gynecologists* v. *Ada*,
100 F.3d 691 (9th Cir. 1996)...................................................... 29, 30

*Hensley* v. *Eckerhart*, 461 U.S. 424 (1983) ............................................. 6, 24

*Hollowell* v. *Gravett*, 723 F. Supp. 107 (E.D. Ark. 1989)................................ 30

*Jordan* v. *United States Dep't of Justice*, 691 F.2d 514 (D.C. Cir. 1982)................. 9

*King* v. *Palmer*, 906 F.2d 762 (D.C. Cir. 1990). ...................................... 28

*King* v. *Palmer*, 950 F.2d 771 (D.C. Cir. 1991) (en banc).................... 25, 26, 28

*Laffey* v. *Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984). ...................... 4

*McDowell* v. *District of Columbia*, 2006 U.S. Dist. LEXIS 46371 (D.D.C. 2006)........... 21

*McKenzie* v. *Kennickell*, 875 F.2d 330 (D.C. Cir. 1989)................................ 25

*Miller* v. *Philipp*,
2008 U.S. Dist. LEXIS 62500 (D.D.C. August 12, 2008)............ 18-20, 22, 23, 28

*Missouri* v. *Jenkins*, 491 U.S. 274 (1989). ........................................... 18

*Muldrow* v. *Re-Direct, Inc.*, 397 F. Supp.2d 1 (D.D.C. 2005)........................... 20

*Murray* v. *Weinberger*, 741 F.2d 1423 (D.C. Cir. 1984)................................ 25

*Palmer* v. *Barry*, 704 F. Supp. 296 (D.D.C. 1989)................................. 17, 32

*Parker* v. *District of Columbia*, 311 F. Supp.2d 103 (D.D.C. 2004)..................... 27

*Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*,
483 U.S. 711 (1987)................................................................. 25

*Roe* v. *Wade*, 410 U.S. 113 (1973)................................................... 30

*Salazar* v. *District of Columbia*, 123 F. Supp.2d 8 (D.D.C. 2000). ........... 15, 17, 21, 22

*Save Our Cumberland Mountains, Inc.* v. *Hodel*,
857 F.2d 1516 (D.C. Cir. 1989) (en banc)................................. 4, 11, 17

*Sexcius* v. *District of Columbia*, 839 F. Supp. 919 (D.C. Cir. 1993)............. 17, 18, 32

*Shakman* v. *Democratic Org. of Cook County*,
  677 F. Supp. 933 (N.D. Ill. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sierra Club* v. *E.P.A.*, 769 F.2d 796 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Smith* v. *District of Columbia*, 466 F. Supp.2d 151 (D.D.C. 2006). . . . . . . . . . . . . . . . . 9, 20, 27

*Swedish Hosp. Corp.* v. *Shalala*, 1 F.3d 1261 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . 8

*Thompson* v. *Kennickell*, 836 F.2d 616 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Trout* v. *Ball*, 705 F. Supp. 705 (D.D.C. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vizcaino* v. *Microsoft, Inc.*, 290 F.3d 1043 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*West Virginia University Hospitals, Inc.* v. *Casey*, 499 U.S. 83 (1991). . . . . . . . . . . . . . . . . . . 25

*Yazdani* v. *Access ATM*, 474 F. Supp.2d 134 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 21

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES AND COSTS

### INTRODUCTION

Following six years of careful planning and extensive litigation, culminating at the Supreme Court, Plaintiff has completely prevailed against the Defendants.  The result is one of the most profound and important victories available under our system of justice: the Supreme Court has made clear that the people of the United States enjoy a fundamental, individual constitutional right enumerated in the Bill of Rights.

Counsel, who labored on this case on a pro bono basis, and to whom fee and expense rights under 42 U.S.C. § 1988 were assigned in writing at the outset of litigation, are entitled to recover their cash outlays and the reasonable value of their time.

Plaintiff's counsel worked in a highly-efficient manner.  Most of the work was performed by just three attorneys.  In contrast, Defendants were represented at the Supreme Court by nine attorneys from three of the nation's largest law firms, and had access to all the legal resources provided by their own vast governmental budgets.[1]  The case also saw one of Defendants' top attorneys (Lutz Prager) return from retirement, as well as the addition of noted litigator Alan Morrison as a special counsel for the sole purpose of handling the defense of this matter.

And as though Defendants needed any additional help, the Solicitor General's Office supported their position at the Supreme Court, urging that the D.C. Circuit's opinion in the case be vacated and remanded for further proceedings because the laws might well be reasonable and therefore constitutional.

---

[1]The D.C. Office of the Attorney General boasts approximately 340 attorneys and 250 support staff.  http://occ.dc.gov/occ/cwp/view,a,3,q,530974,occNav,|31692|.asp

1

Notably, Plaintiff's counsel, faced with the daunting burden of pursuing a case of this magnitude and importance, expended literally thousands of additional hours not strictly considered as legal services and thus not included in this motion. The fees requested are thus quite small, both by the standards of complex federal litigation in this community, and relative to the degree of counsels' success – even after accounting for counsels' earned enhancement for an "exceptional case," which this case clearly is.

Mr. Levy personally bore the expenses of this litigation. Not all expenses plainly necessary to the representation (e.g., thousands of dollars required for printing Supreme Court briefs) are recoverable. But those which are recoverable, and not taxable as ordinary costs, should be paid by Defendants pursuant to Section 1988.

## <u>STATEMENT OF FACTS</u>

This case was filed in February, 2003, following extensive research, analysis, and preparation. Defendants vowed publicly to vigorously defend the challenged laws – and, along with their amici, made good on those vows. A cursory look through this Court's docket reveals contested requests by Defendants for additional time, heavily briefed cross-dispositive motions, significant amici participation, various briefs solicited by the Court to better its own understanding of the issues, and a failed consolidation effort by copy-cat litigants seeking to derail Plaintiff's litigation goals.

The D.C. Circuit twice ordered the parties to file motions on the question of whether Plaintiffs were even entitled to be heard, and Defendants repeatedly argued for summary affirmance or dismissal of the appeal. Of course, the depth and breadth of the core issues litigated before this Court, the D.C. Circuit, and the Supreme Court, were vast. No fewer than 67

2

amicus briefs were filed at the Supreme Court alone, many raising unique and challenging perspectives.

Throughout it all, Plaintiffs' legal team consisted primarily of the three undersigned attorneys, with occasional support from a small handful of others, all working on a pro bono basis. Lead counsel Alan Gura was paid a nominal, reduced, and capped rate by co-counsel Robert Levy, who also personally bore all the expenses of the litigation.[2] None of Plaintiffs' other counsel received any compensation whatsoever for working on this case.

Attorneys Gura, Huff, Possessky, and Day kept contemporaneous records of most of the time invested in this litigation. Neily, Levy, and Healy have largely reconstructed their time. None of these records fully reflects the time actually required to competently conduct the representation: some hours were inadvertently omitted from our records, or overlooked in the process of reconstructing timesheets; other tasks were not recorded because the associated hours do not qualify as billable, e.g., responding to and working with media, training clients to do the same, lobbying against legislative interference, responding to inquiries about the matter, and generally engaging the court of public opinion on the important issues raised by the case.

The hours to be billed, as accounted for in the attached exhibits and declarations: Alan Gura: 1,661 hours; Clark M. Neily, III: 808.3 hours; Robert A. Levy: 595.6 hours; Gene Healy:

---

[2]Although Gura asked for an exiguous payment to get involved in the matter, he never saw this as anything other than a pro bono case, the great bulk of which might ultimately be paid for by Defendants under Section 1988. Counsel would prefer that the details of this arrangement remain confidential, but will disclose those details if the Court deems them relevant. For now, suffice it to say that dividing Gura's fee by the number of hours worked, the hourly compensation in dollars is a single-digit number, and the final payment under this arrangement was received in mid-2003. Levy will, of course, be reimbursed this amount from the amount recovered by Gura pursuant to this motion.

33.7 hours; Laura A. Possessky: 18 hours; Christopher M. Day: 3.5 hours; Thomas Huff: 153.6

hours.  The hourly billing rate for Gura, Neily, Levy, Possessky, and Day is $557; the hourly

billing rate for Healy is $494; and the hourly billing rate for Huff is $285.  Counsel have earned

an enhancement multiplier of 2.0 considering the nature of this case.

Additionally, Mr. Levy expended $3,544 in travel expenses, $212.36 in postage, $765.44

in photocopy and printing expenses, $124.47 in messenger fees, $244 in teleconferencing

charges, $3,250 as payment to attorney Stephen Halbrook to conduct some initial research into

the matter, and $4,400 to attorney Don Kates, for assistance in drafting Plaintiffs' reply brief in

the D.C. Circuit.  These expenses are all recoverable under Section 1988.  Reimbursement of

these expenses will not make Levy whole, but will partially compensate him  for cash layouts

over a period of many years to sustain this litigation.

## SUMMARY OF ARGUMENT

The lodestar method of calculating Section 1988 fees is well-established: the number of

hours reasonably worked, multiplied by the reasonable value of counsel's time, multiplied by a

performance enhancement in exceptional cases.

The hours submitted by counsel are patently reasonable.  In this Court, in the absence of

other evidence of counsels' ordinary and accepted rates, the hourly rate is set pursuant to an

updated version of the so-called "Laffey Matrix," as first described in *Laffey* v. *Northwest*

*Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part*, *Save Our Cumberland Mountains,*

*Inc.* v. *Hodel*, 857 F.2d 1516 (D.C. Cir. 1989) (en banc) .  The D.C. Circuit, and judges of this

Court, have accepted updated versions of the Laffey Matrix that reflect relevant market

conditions.  In this instance, one of Plaintiff's counsel has a relevant established billing rate; six

4

other counsel submit the expert analysis of noted economist Dr. Michael Kavanaugh, whose expertise has been accepted in this Court (among others) on this subject before, to establish their rates pursuant to the Laffey Matrix.[3]

Of the six attorneys claiming market rates as established by Dr. Kavanaugh, five are in the "11-19" year experience level of the Laffey Matrix, and one attorney is at the "8-10" year experience level.  Mr. Huff, a second year associate at Kenyon & Kenyon, is the only moving attorney who has an established relevant rate.  Notably, Mr. Huff's usual billing rate is virtually identical to the rate that Dr. Kavanaugh would estimate for him.

Civil rights litigation often spans many years.  Compensating counsel today at yesteryear rates is economically irrational, failing to account for the present value of money.  The easiest and most readily-accepted practice accounting for the delayed receipt of compensation is to simply award counsel their fees for all hours at the current rate.

To the base lodestar amount, a multiplying enhancement is occasionally awarded for exceptional cases, where the result is especially important and there is significant professional risk to counsel in pursuing the litigation, such that ordinary market lodestar calculations do not serve Section 1988's purpose of attracting qualified counsel to important civil rights work.  If this is not an "exceptional case" warranting an enhancement multiplier, we are at a loss to describe what case would qualify.

---

[3]Counsel acknowledge that Judge Lamberth has not adopted Dr. Kavanaugh's rates. Respectfully, Judge Lamberth erred in describing Dr. Kavanaugh's methodology.  *See discussion, infra*.

5

The attorney fees due and owing, not including fees for the presentation of this motion,[4]

are as follows:

> Alan Gura: 1,661 hours x $557/hr. x 2.0 enhancement = $1,850,354.00
> Clark M. Neily, III: 808.3 hours x $557/hr. x 2.0 enhancement = $900,446.20
> Robert A. Levy: 595.6 hours x $557/hr. x 2.0 enhancement = $663,498.40
> Thomas Huff: 153.6 hours x $285/hr. x 2.0 enhancement = $87,552.00
> Gene Healy: 33.7 hours x $494/hr. x 2.0 enhancement = $33,295.60
> Laura A. Possessky: 18 hours x $557/hr. x 2.0 enhancement = $20,052.00
> Christopher M. Day: 3.5 hours x $557/hr. x 2.0 enhancement = $3,899.00

## ARGUMENT

## I.   PLAINTIFF'S COUNSEL ARE ENTITLED TO RECOVER THEIR FEES PURSUANT TO 42 U.S.C. § 1988.

"The purpose of § 1988 is to ensure effective access to the judicial process for persons

with civil rights grievances.  Accordingly, a prevailing plaintiff should ordinarily recover an

attorney's fee unless special circumstances would render such an award unjust." *Hensley* v.

*Eckerhart*, 461 U.S. 424, 429 (1983) (citations and internal quotation marks omitted).

> Where, as here, the relief sought is generally nonmonetary, a substantial fee is particularly
> important if that statutory purpose is to be fulfilled.  It is relatively easy to obtain
> competent counsel when the litigation is likely to produce a substantial monetary award.
> It is more difficult to attract counsel where the relief sought is primarily nonmonetary.

*Copeland* v. *Marshall*, 641 F.2d 880, 907 (D.C. Cir. 1980).  Even in civil rights cases where

monetary relief is available, such relief does not reflect the litigation's full value.  "Unlike most

private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional

rights that cannot be valued solely in monetary terms."  *Blanchard* v. *Bergeron*, 489 U.S. 87, 96

(1989) (citation omitted).

---

[4]Fees and costs associated with the fee litigation will be the subject of a supplemental
motion.  *See Sierra Club* v. *E.P.A.*, 769 F.2d 796, 811 (D.C. Cir. 1985).

Counsel have earned their fees.

"The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Adjustments to that fee then may be made as necessary in the particular case." *Blum* v. *Stenson*, 465 U.S. 886, 888 (1984) (citation omitted). Accordingly, it is well-established that the fees to which counsel are entitled are composed of three variables: (1) the reasonable number of hours, multiplied by (2) the reasonable hourly rate, multiplied by (3) an enhancement multiplier in exceptional cases. Each variable is discussed in turn.

## II.    THE TIME SUBMITTED BY COUNSEL WAS REASONABLY NECESSARY TO ACHIEVE SUCCESS IN THE LITIGATION.

The total number of hours claimed by counsel is on its face appropriate and quite modest relative to the work product produced in the case. Early in the litigation, Defendants acknowledged that the case would be time-consuming. Seeking significant extension of time to respond to Plaintiffs' motion for summary judgment and opposition to Defendants' motion to dismiss, Defendants remarked,

> Even a cursory review of plaintiffs' [briefs] reveals that plaintiffs' counsel has been researching and crafting argument on the central issue in this case for months if not years . . . Litigating this case requires analysis that goes well beyond the legal research sufficient to argue most legal issues and encompasses 200 years of historical materials and debate.

Def. Mot. to Enlarge Time, 4/3/03, at 5. "This is an issue of extreme importance to the public and should be decided based on a thorough examination of the issues." Id., at 4. Defendant Mayor Williams stated the challenged laws were aspects of the city's "core" culture. Defendant Mayor Fenty remarked that this litigation was the most important ever faced by the city.

7

Counsels' work on this case, going well beyond normal legal research, and comprehending 200 years of historical materials and debate in addition to the highly nuanced and difficult considerations of sensitive and complex civil rights litigation, required far more than the hours put forth in this fee petition.

The D.C. Circuit admonishes,

> it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable.  This Court has reiterated the Supreme Court's warning that "[a] request for attorney's fees should not result in a second major litigation."

*Swedish Hosp. Corp.* v. *Shalala*, 1 F.3d 1261, 1269-70 (D.C. Cir. 1993) (citations and internal quotation marks omitted).  Fortunately, there is no need for this sort of exercise here.

Plaintiffs' lead counsel, Alan Gura, was half of a two-person law firm throughout the merits stage of proceedings in the D.C. Circuit and through the conclusion of the case in the Supreme Court.  Messrs. Neily, Levy and Healy volunteered their time as individuals, while serving full-time in public-interest jobs.  Mr. Huff and, in effect, Ms. Possessky and Mr. Day, likewise volunteered their time apart from full-time employment in private practice.

Arrayed against this band of self-funded small firm and public-interest volunteers were the vast resources of the District of Columbia's Office of the Attorney General, nine of the top attorneys from three of the nation's largest firms, an untold number of other attorneys and support staff at those firms, and eventually, the Solicitor General of the United States.

The records submitted, actual and reconstructed, are sufficient to confirm the efficiency of Plaintiff's legal team.

> [I]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted.  To enable opposing counsel adequately to assess the merits of the motion, and the court to fulfill its obligations, no more is necessary than fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiation, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, [and] associates. . . .

*Jordan* v. *United States Dep't of Justice*, 691 F.2d 514, 520 (D.C. Cir. 1982) (footnote and quotation marks omitted).  Judge Kessler explained the time-keeping requirements well:

> When a lawyer writes, for example, that she spent six or eight hours in one day "researching and drafting" a brief dealing exclusively with issues on which her client has ultimately prevailed, there is certainly no need for her to itemize every case she looked up or every paragraph she labored over. Trial courts must recognize how lawyers work and how they notate their time. It must be remembered that the ultimate inquiry is whether the total time claimed is reasonable.

*Smith* v. *District of Columbia*, 466 F. Supp.2d 151, 158 (D.D.C. 2006).[5]

The bottom line is that the number of hours claimed in this case is quite low relative to the work product presented to the various courts hearing the matter.  The Court possesses sufficient information to discern roughly how much time was spent, by whom, doing what, in conducting some of the myriad activities constituting the representation.

To keep the matter of Plaintiff's counsels' hours in perspective: one of Defendants' firms, O'Melveny and Myers, recently billed a bankrupt client in excess of $3.1 million for one month's work, exceeding 4,000 hours, for responding to government subpoenas.  *See* Exhibit 9.  This is almost as much as Plaintiff's legal team would bill for nearly six years of litigation securing a fundamental constitutional right before the Supreme Court.  If Section 1988's mission is to be

---

[5]Counsel further note that they must err on the side of protecting attorney-client and work-product privileges in not revealing excessive details in publicly shared billing records. Defendants cannot insist, under the guise of auditing billing records, on revealing details of their adversaries' thought processes and communications with each other and with clients.

taken seriously, ordinary people with civil rights claims must be afforded the same access to

quality legal representation available to bankrupt sub-prime lenders.

III.    **THE HOURLY RATES PROFFERED BY PLAINTIFFS ARE CONSISTENT WITH ESTABLISHED RATES FOR SIMILAR WORK IN THE WASHINGTON, DC MARKET FOR LEGAL SERVICES.**

"[A] fee applicant's burden in establishing a reasonable hourly rate entails a showing of at

least three elements: the attorneys' billing practices; the attorneys' skill, experience, and

reputation; and the prevailing market rates in the relevant community." *Covington* v. *District of*

*Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  Each factor is addressed in turn.

A.    <u>The Attorneys' Billing Practices</u>.

Upon examination, billing practices are relevant and determinative only in setting the fees

of Thomas Huff, a second year associate at Kenyon and Kenyon who voluntarily conducted

research relating to Plaintiffs' merits brief before the Supreme Court.  Mr. Huff is employed by a

firm that engages in complex federal litigation on a regular basis at market rates.  Mr. Huff's

regular billing rate is $285 an hour.

The other attorneys in the case simply lack relevant hourly billing practices.  Neily, Levy,

and Healy are employed by non-profit public interest organizations that do not charge hourly

billing rates.  But "reasonable fees under § 1988 are to be calculated according to the prevailing

market rates in the relevant community, regardless of whether plaintiff is represented by private

or non-profit counsel." *Blum*, 465 U.S. at 895 (footnote omitted).

Gura and Possessky are partners at a private, for-profit law firm, but do not have standard,

fixed hourly rates.  Their work is typically performed on a flat-fee, contingency, or blended basis

that produces no particular billing history reflected in a set hourly rate.  To the extent they charge

10

hourly rates, those rates are frequently set at consciously sub-market rates in order to provide

legal services to those who otherwise could not afford them.[6]  Attorneys "who either practice

privately and for-profit but at reduced rates reflecting non-economic goals or who have no

established billing practice" are "quite clear[ly] . . . entitled to an award based on the prevailing

market rates." *Covington*, 57 F.3d at 1107 (footnote omitted).  "[T]he prevailing market rate

method heretofore used in awarding fees to traditional for-profit firms and public interest legal

services organizations shall apply as well to those attorneys who practice privately and for profit

but at reduced rates reflecting non-economic goals." *Covington*, 57 F.3d at 1107 (quoting *Save

Our Cumberland Mountains, Inc.* v. *Hodel*, 857 F.2d 1516, 1524 (D.C. Cir. 1989) (en banc)).

"Deciding whether an attorney has a public-spirited reason for a representation should not

be all that difficult.  An important part of this inquiry will focus on whether the fee charged in

fact differs significantly from the market value of the attorney's services." *Bd. of Trs. of the

Hotel & Rest. Emples. Local 25* v. *JPR, Inc.*, 136 F.3d 794, 807 (D.C. Cir. 1998).  Considering

that Gura's effective rate in this case was nominal, and that Possessky and Day's rate was zero,

these were, by definition, below any market-based rate the Court might accept.  Indeed, Gura

expressly offered a "reduced, flat fee" rate because, as stated in his initial proposal, he was

"sympathetic to the cause and sensitive to the need to limit the cost of this venture."  Gura Decl.,

¶ 6.  On principle, Gura honored the original fee agreement despite a generous offer to advance

additional funds owing to the unforeseen development of the case.  Gura Decl., ¶ 8.  *Compare*

---

[6]Section 1988 and other fee shifting provisions acknowledge the simple reality that
people of ordinary means in our nation cannot access the market for complex federal litigation,
especially in civil rights cases seeking declaratory and injunctive where no monetary relief is
available to form the basis of a contingency fee.  Even where contingency fees are available, it is
often the prospect of fee shifting that makes a litigation economically viable.

*Goos* v. *National Ass'n of Realtors*, 997 F.2d 1565, 1569 (D.C. Cir. 1993) ("there [was] nothing in the record . . . to suggest that Ms. Goos's attorney offered her a discounted rate for altruistic reasons.")[7]

Christopher Day, a partner in Gura's predecessor firm, recorded some time for brief consultation early in the case.  Mr. Day's regular rate is $325 an hour, but his practice is centered in Fairfax and, indeed, he is not a member of the local legal community as he is not admitted to practice in the District of Columbia.  Because the relevant rate is the rate in the local legal community, Day's ordinary rate is not relevant.

**B.** **The Attorneys' Skill, Experience, and Reputation.**

Counsels' skill is best reflected in the quality of their work product.  *Res ipsa loquitur*. However, as precedent instructs reviewing counsels' experience and reputation, some discussion of these factors is in order.  Alan Gura entered this case with extensive civil rights litigation experience.  Gura began his litigating career serving as a Deputy Attorney General for the State of California, in the Civil Division of the state's justice department.  As such, Gura was tasked with first-chair responsibility for representing the state and its employees in a broad array of matters in California state and federal courts, in trial and on appeal.  Gura handled dozens of cases, ranging from aviation to privacy rights, including a heavy emphasis on civil rights.  Gura Decl., ¶ 2.

---

[7]It is also beyond dispute that Gura and Possessky frequently represent clients at below-market rates for non-economic reasons, are active in civic and bar affairs, and could, were they motivated to return to large-firm practice, again command much higher hourly rates for their expertise than those they charge their public-interest clients.  The same, of course, is true of Neily, Healy, and notwithstanding his lack of mega-firm experience, Levy.

As a litigation associate with Sidley & Austin, Gura continued developing experience in the civil rights field, defending various of the firm's clients who, albeit private entities, faced civil rights issues as state actors owing either to their contractual assumption of state functions or for other reasons alleged by opposing counsel.  Gura left Sidley to serve as Counsel to the United States Senate Judiciary Committee, and subsequently opened his own practice, focusing primarily on civil rights and intellectual property litigation. Gura Decl., ¶ 3.  Gura earned degrees at Cornell and Georgetown, and has been published in various legal and general interest publications.  Gura Decl., ¶¶ 1, 4.  Alan Gura was first admitted to practice law in 1995, and is a member of the California, District of Columbia, and Virginia bars.  Gura Decl., ¶ 1.

Clark Neily is likewise highly experienced in handling civil rights matters, having served for the past eight years as Senior Attorney at the Institute for Justice, among the nation's preeminent public interest law firms.  During that time he has practiced constitutional law exclusively and has served as lead counsel in numerous state and federal cases, first-chairing several trials, briefing and arguing appeals in both federal and state courts, and working on several of the Institute's U.S. Supreme Court cases.  Neily Decl., ¶ 3.  Neily also has substantial large firm experience with Dallas's Thompson & Knight, where he served as lead counsel in dozens of cases, gained first-chair trial experience, and worked on a variety of professional liability, complex commercial, and intellectual property cases.  Neily Decl., ¶ 2. Neily holds dual degrees from the University of Texas, where he served as Chief Articles Editor of the Texas Law Review.  Neily was first admitted to practice law in 1994 and is a member of the District of Columbia and Texas bars.  Neily Decl., ¶ 1.

13

Robert Levy is a leading legal commentator and constitutional scholar whose expertise is frequently sought by major media outlets, and whose books, law review articles, and other prolific writings are widely known and well-respected.  Levy was an adjunct professor of law at Georgetown University for seven years, and has lectured on constitutional law at dozens of law schools.  He received his Juris Doctor from George Mason University in 1994, the year in which he was first admitted to practice law.  Levy was class valedictorian and chief articles editor of the law review.  He also and holds Bachelors, Masters, and Ph.D. degrees in Business from the American University.  Levy Decl., ¶¶ 1-3.

Gura, Neily, and Levy have all clerked in United States District Courts.  Levy has also clerked for D.C. Circuit judge Douglas Ginsburg.  Gura Decl., ¶ 2; Neily Decl., ¶ 2; Levy Decl., ¶ 2.

Gene Healy, a 1999 graduate of the University of Chicago law school and 1994 graduate of Georgetown, is currently a Vice President of the Cato Institute.  A scholar in his own right, Healy once worked as a commercial litigation associate at Howrey Simon Arnold & White.  Healy Decl., ¶¶ 1-2.

 Laura Possessky earned a Juris Doctor from Georgetown in 1995 and a Bachelors degree, *magna cum laude*, from the University of Pennsylvania in 1991.  Ms. Possessky handles media and intellectual property matters for the firm, and her practice has a strong public interest emphasis.  In addition to several years either in the employ of or counseling public interest clients, she has devoted many years of voluntary service to the District of Columbia Bar, having thrice been elected by the membership as a voluntary leader.  Possessky Decl., ¶¶ 1-3.

14

Thomas Huff is a second year associate at Kenyon and Kenyon, handling a variety of intellectual property matters but also participating in his firm's pro bono practice, in affiliation with the ABA's Death Penalty Representation Project (assisting criminal defendants) and the Office of the Capital Defender in Northern Virginia.  Huff has earned a Bachelor of Science in Computer Science from George Mason University, and a Juris Doctor from George Washington University.   Huff Decl., ¶¶ 1, 2.

Christopher Day, a graduate of Michigan State University, was first admitted to practice law in 1994.  A former Assistant Commonwealth's Attorney in Virginia, Mr. Day has been in private practice in that state since 2000.  Day Decl., ¶¶ 1-2.

### C.   The Prevailing Market Rates in the Community.

"[I]n order to demonstrate [the prevailing market rate in the community], plaintiffs may point to such evidence as an updated version of the Laffey matrix or the U.S. Attorney's Office matrix, or their own survey of prevailing market rates in the community." *Covington*, 57 F.3d at 1109.   "[I]t is clear, as the Court of Appeals explained in *Covington*, that plaintiffs may submit a matrix alone, or 'may' supplement such matrix with surveys, affidavits, and evidence of recent court awards of fees to attorneys with comparable qualifications handling similar cases." *Salazar* v. *District of Columbia*, 123 F. Supp.2d 8, 14 (D.D.C. 2000) (citation omitted).

In *Salazar*, the Court accepted the methodology and expertise of Dr. Michael Kavanaugh in updating the Laffey Matrix, as well as billing surveys reported by the National Survey Center, the *National Journal*, and *Legal Times*.  Plaintiffs present the same high quality of information in this proceeding to assist the Court in determining the community's prevailing market rate. Dr. Kavanaugh's background and the widespread acceptance of his expertise by courts is

15

reflected in his attached declaration and curriculum vitae.  His methodology is based on sound

economic science and accepted legal principles.  The rates of various local firms – including

those retained in this case by the non-prevailing Defendants – confirm Kavanaugh's accuracy.

The science behind the preparation of an updated Laffey Matrix is straightforward.

Simply put, it starts with attorney fee rates previously adopted by the courts as reasonably

reflecting the local market, then updates them by applying an accepted rate of inflation.  The

Office of the U.S. Attorney for the District of Columbia prepares an updated version of the

Laffey Matrix by taking the 1982 hourly rates for the Washington D.C. metropolitan area

approved by the D.C. Circuit in 1983, and applying the change in the Metropolitan Washington

area Consumer Price Index (CPI) to those 1982 rates.  Kavanaugh Decl., ¶ 8;

http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html.

The method utilized by Plaintiff's expert, Dr. Kavanaugh, produces a significantly more

accurate matrix than that used by the U.S. Attorney.  There are two reasons for the improvement

in accuracy. First, Dr. Kavanaugh uses an index specific to legal services; the U.S. Attorney uses

the entire CPI for Metropolitan D.C., which includes items that are not relevant to the market for

legal services.  Indeed, these other items are given much more weight than legal services.[8]

Second, the U.S. Attorney's method starts with rates recorded in 1982; the method Dr.

Kavanaugh uses applies the specific legal services index to the more recent survey of rates for the

Washington D.C. metropolitan area developed in 1989 in response to the remand decision in

---

[8]A partial listing of such "non-legal service" items includes: food "away from home,"
alcoholic beverages, rent on primary residence, fuels and utilities, household furnishings and
operations, apparel, private transportation, gasoline, medical care, recreation and "education and
communication." *See* http://data.bls.gov/PDQ/outside.jsp?survey=cu

*Save Our Cumberland Mountains, supra*, 857 F.2d 1516.  Kavanaugh Decl., ¶ 9.

The method used to find the 1989 rates is described in the declaration of Joseph Yablonski submitted in the case of *Broderick* v. *Ruder*, D.C. Civil No. 86-1824 (Pratt, J.). Yablonski's survey is recognized as an appropriate basis for the updating of Laffey rates. Kavanaugh Decl., ¶ 9; *see, e.g.*, *Salazar*, 123 F. Supp.2d at 13; *Sexcius* v. *District of Columbia*, 839 F. Supp. 919, 924 (D.C. Cir. 1993); *Trout* v. *Ball*, 705 F. Supp. 705, 709 n.10 (D.D.C. 1989); *Palmer* v. *Barry*, 704 F. Supp. 296, 298 (D.D.C. 1989).

It is easy to see why Dr. Kavanaugh's approach would yield more accurate rate estimates than that of the U.S. Attorney's Office.  First, Dr. Kavanaugh uses more recent approved data as a starting point.  Kavanaugh Decl., ¶ 10.  Furthermore, in keeping with sound economic practice, Dr. Kavanaugh employs the most specific price index available – the index for legal services. Kavanaugh Decl., ¶ 11.  Applying a generalized all-inclusive CPI to specific markets for goods and services would be unreliable.  Kavanaugh Decl., ¶ 12.  For example, the price of a computer in 1970, adjusted by the overall CPI, would be radically higher than the actual price of that computer today.  Conversely, predicting the price of gasoline using the overall CPI increase since 2001 would not account for the steep rise in oil prices.  The superiority of Dr. Kavanaugh's approach is explained at length at ¶¶ 11-16, and was recognized by Judge Kessler in *Salazar*: "[Kavanaugh's] Laffey index has the distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index rather than the general CPI on which the U.S. Attorney's Office matrix is based."  *Salazar*, 123 F. Supp.2d at 14-15.

17

Dr. Kavanaugh's Laffey Matrix sets the current rate for Gura, Neily, Levy, Possessky, and Day – all of whom are in the 11-19 year category – at $557 an hour; the current rate for Healy, in the 8-10 year category, at $494 an hour; and the current rate for Huff, in the 1-3 year category, at $279 an hour – just six dollars below Huff's presumptively accurate market rate of $285. Kavanaugh Decl., ¶ 16.  These rates should be adopted.  Considering the age of this litigation, counsel must be compensated at the current market rates to compensate for the delay in payment. *Missouri* v. *Jenkins*, 491 U.S. 274, 283-84 (1989).  "Paying counsel at historical, or even current, rates based on their experience levels when they performed the work would not achieve this equivalence."  *Miller* v. *Philipp*, 2008 U.S. Dist. LEXIS 62500 at *56 (D.D.C. August 12, 2008); *Sexcius*, 839 F. Supp. at 926.

Plaintiffs are mindful that Judge Lamberth recently rejected Dr. Kavanaugh's approach in *Miller*, *supra*, 2008 U.S. Dist. LEXIS 62500.  But with all due respect to Judge Lamberth, whose opinion is excellent in certain other respects, *Miller*'s description of Dr. Kavanaugh's analysis is not factually correct.

Judge Lamberth correctly observed that "rates used in calculating the lodestar should accord with those 'prevailing in the community,'" *Miller*, at *48 (quoting *Blum*, 465 U.S. 896 n.11), and that "plaintiff must produce data concerning the prevailing market rates in the relevant community."  *Miller*, at *49 (quoting *Covington*, 57 F.3d at 1108).  But Judge Lamberth erred in next stating, "Kavanaugh's matrix does not comply with this mandate for geographic specificity."  Id.

As described above and in Dr. Kavanaugh's declaration, the "*rates*" employed by Dr. Kavanaugh are the same Washington, D.C. rates drawn from the 1989 Yablonski survey long-

approved in this circuit.  Judge Lamberth apparently confused Kavanaugh's "rates," which are

indeed local as required by precedent, with the CPI data, which is specific to legal services but

drawn nationally.  *See Miller*, at *48 ("Kavanaugh's matrix thus reflects *national* inflation trends,

while the USAO matrix accounts for price inflation within the *local community* -- a crucial

distinction") (emphasis in original).  Absolutely nothing in *Blum*, *Covington*, or any other

controlling opinion mandates that generalized CPI data be used rather than data specific to the

market for legal services.  As confirmed by Dr. Kavanaugh, the use of the generalized CPI is

scientifically unsound.

Ideally, local rates specific to legal services should be adjusted by a local index specific to

legal services.  Both Kavanaugh and the USAO matrix meet the first requirement:  They start

with local rates specific to legal services, although Kavanaugh's rates are more current.

Unfortunately, there is no local D.C. index specific to legal services.  Kavanaugh resolves that

problem by using a national index specific to legal services.  The USAO matrix, by contrast, uses

an index that is local but general-purpose, in which legal services play a minor role.  Given a

choice between those two admittedly imperfect approaches, it is clear that a national specific

index is preferable to a local general-purpose index.  Self-evidently, wide disparities can exist

between changes in D.C.'s legal rates and changes in D.C.'s overall price index.  Indeed, legal

rates could be advancing while overall prices decline, or vice versa.  On the other hand, there is

little reason to believe that major disparities will exist between changes in D.C.'s legal rates and

changes in national legal rates.

Put differently, when measuring rate *changes*, legal specificity is more important than

geographical specificity. Were the choice purely binary, the relevant market (legal services)

19

would trump the locality.  For example, changes in attorney billing rates nationwide would be more relevant to our inquiry than changes in the price of milk at the courthouse cafeteria.

It is important to recall the guiding principle that leads courts to require the use of local community rates: accuracy.  Using local "*rates*" as required by precedent leads to greater accuracy.  Using generalized CPI data that is local, but based overwhelmingly on prices having nothing to do with *legal services*, leads to decreased accuracy.  Dr. Kavanaugh's matrix is "more accurate in that the calculation was based on increases/decreases in legal services rather than increase/decreases in the entire CPI which includes price changes for many different goods and services."  *Smith*, 466 F. Supp.2d at 156.

Nor can Dr. Kavanaugh be faulted for failing to use a Washington-based legal-services-specific CPI component.  The Bureau of Labor Statistics "does not produce a legal services index specific to any particular metropolitan area. To ask that the Washington DC area rates be adjusted by a Washington DC legal services index is to ask for an item that does not exist." Kavanaugh Decl., ¶ 15 n.4.

Judge Lamberth's claim that "Kavanaugh's alternative methodology has achieved only limited acceptance in this District," *Miller*, at *48, is overstated.  The claim is supported by a footnote referencing three cases as "declining to adopt," id., at *48 n.28, but *Dr. Kavanaugh did not participate in two of those cases*.  Kavanaugh Decl., ¶ 4 n.1.  Indeed, in one of these cited cases in which Kavanaugh did not participate, the Court *accepted* an updated Laffey Matrix virtually identical to that proposed by Kavanaugh for 2005-06, but reduced the award by 25% because the case was simple.  *Muldrow* v. *Re-Direct, Inc.*, 397 F. Supp.2d 1 (D.D.C. 2005).

The second case cited in *Miller*, in which Kavanaugh did not participate rejected the updated Laffey Matrix for lack of a "significant evidentiary record" supporting the proffered rates. *Yazdani* v. *Access ATM*, 474 F. Supp.2d 134, 138 (D.D.C. 2007). *Yazdani* drew upon *McDowell* v. *District of Columbia*, 2006 U.S. Dist. LEXIS 46371 (D.D.C. 2006), which suffered from the same flaw. The lesson of these cases is that parties wishing to employ an expert's analysis must employ the expert.

The only case cited by *Miller* declining to adopt Dr. Kavanaugh's expertise is simply wrong as a matter of law. *American Lands Alliance* v. *Norton*, 525 F. Supp.2d 135 (D.D.C. 2007) erroneously considered the U.S. Attorney's Laffey Matrix as "the standard" rate, which it most certainly is not. For starters, the U.S. Attorney was not involved in the original *Laffey* litigation, entering only an appearance as amicus curiae during the fee dispute.[9] But more critically, *Covington* specifically instructs that the U.S. Attorney's matrix is to be afforded *the same* consideration as any other updated Laffey Matrix or a party's own survey. *Covington*, 57 F.3d at 1109; *Salazar*, 123 F. Supp.2d at 14. It is thus error to refuse consideration of any rate evidence, on the presumptive assumption that the government's matrix is controlling. It is not. *American Lands* also based its conclusion on a determination that the case was not complex; at the very least, *American Lands* would be distinguishable on this point. If *American Lands* is to be read as calling for the government matrix in ordinary cases, and other evidence in extraordinary cases, this, too, would plainly be error under *Covington*.

---

[9]As the U.S. Attorney's Office uses its matrix in settlement of attorney fee claims, it has an interest in tamping down the claimed rates.

Although Dr. Kavanaugh's updated Laffey Matrix would on its own suffice to establish the prevailing market rates, specific survey data confirms the Matrix's exceptional accuracy. *See Salazar*, 123 F. Supp.2d at 13.  Plaintiffs first turn to the *National Law Journal*'s most recent survey of 2007 rates charged by various associate classes, with emphasis on the rates charged by Washington, D.C. firms.  At Dickstein, Shapiro, seventh and eighth year associates are billed at $400-$440 an hour.  Hogan & Hartson charge $475 an hour for an eighth year associate.  The same eighth year associate would yield $455 an hour at Patton, Boggs, and $485 an hour at Wilmer Hale.  Exhibit 10.

Dr. Kavanaugh's assessment that Gene Healy, formerly of Howrey Simon, could charge $494 an hour in 2008 for his nine years of experience is definitely in line with these rates. Kavanaugh's 11-19 year rate of $557 an hour in 2008 is likewise consistent with this data.

Incongruent with this real world data would be the U.S. Attorney's version of the Laffey Matrix, which holds 11-19 year attorneys to a rate of $410 in 2008 – substantially below the 2007 rates charged for attorneys with half as much experience, or even less experience, by every local firm that responded to the NLJ's associate class survey.  For example, a Wilmer attorney with 19 years experience, presumably by then an equity partner, would be valued by the U.S. Attorney at $410 per hour, or only 85% of what that firm regularly charges for *an eighth year associate*. Notably, *Miller* accepted the validity of Wilmer's rates.

Turning to the *National Law Journal*'s 2007 law firm rate survey, the picture is equally clear.  Again, focusing on Washington, D.C. firms:  Arent Fox charge $395 to $675 per partner hour, and as much as $440 per associate hour.  The average Hogan & Hartson attorney is billed at $490 an hour, with partners billing a median $590 an hour and an average of $600 an hour, in a

22

range that tops at $850 an hour.  Hogan associates are billed out at as much as $525 an hour.

Patton Boggs partners bill as much as $920 an hour, with an average rate of $536 and a median

rate of $525.  Associates at that firm bill as much as $520 an hour.  Wilmer partners start at $475

an hour but top out at $1,000 an hour, billing as much as $495 an hour for their associates.

Exhibit 11.  And those rates are, of course, a year older than the rates at issue here.

 An examination of the rates charged by some of opposing counsel's firms is also

instructive.  As noted *supra*, O'Melveny & Myers charge $705 for at least one experienced

partner.  Exhibit 9.  Covington & Burling partners, some of whom worked on this case, start at

$510 and range up to $800, with associates billing as much as $525 an hour.  Exhibit 11.  And as

for Akin Gump, the third firm that represented Defendants before the Supreme Court, clearly-

outdated (and thus, too low) survey data from 2002 demonstrates that in that year, its partners

billed at $350-$600 an hour.  Exhibit 12.

 Again, these real world rates are in line with the rates predicted by Dr. Kavanaugh's

Laffey Matrix.  The real world rates are also substantially higher than the rates predicted by the

U.S. Attorney's model.  Indeed, the U.S. Attorney's model tops out at $465 an hour for litigators

with over twenty years experience – a rate usually well-below the bottom of the range for

partners in firms handling complex federal litigation.  The U.S. Attorney's estimate, $465 per

hour, is also below the average rate of the entire Hogan & Hartson firm ($490), and over a

hundred dollars below the median ($590) and average ($600) rates of the firm's partnership.  The

U.S. Attorney's top $465 rate is also substantially below the average and median rates of Patton

Boggs partners ($536, $525), and is *less than half* the top $1000 rate for Wilmer partners, whose

fees were found presumptively accurate in *Miller*.  To borrow from Garrison Keillor, the U.S.

Attorney's matrix would transform the local bar into a Lake Wobegon, where all the lawyers are above-average. This cannot be so.

Finally on this point, Plaintiffs again note that Kavanaugh's predictive Laffey Matrix would have Huff's market rate at $279 – exactly six dollars below his actual rate of $285. Dr. Kavanaugh's degree of accuracy thus appears to be 97.89%. And Huff's predicted rate erred on the low side.

## IV.   COUNSEL ARE ENTITLED TO ENHANCEMENT OF THEIR FEE FOR PROVIDING HIGH QUALITY REPRESENTATION IN A CASE OF EXCEPTIONAL SUCCESS.

The lodestar calculation is only "the most useful *starting point* for determining the amount of a reasonable fee." *Hensley*, 461 U.S. at 433 (emphasis added). "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434 (footnote omitted).

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Blum*, 465 U.S. at 901 (quoting *Hensley*, 461 U.S. at 435). "In view of our recognition that an enhanced award may be justified in some cases of exceptional success, we cannot agree with [the] argument that an upward adjustment is never permissible." *Blum*, 465 U.S. at 897 (internal quotation marks omitted).

The continuing availability of an enhancement multiplier in Section 1988 is also confirmed by Congressional action. Where Congress wished to prohibit enhancements in fee

24

shifting provisions, it has done so explicitly.  *See*, *e.g.* 20 U.S.C. § 1415(i)(3)(C) ("no bonus or

multiplier may be used in calculating the fees awarded under this subsection").  But although

numerous bills have been introduced in Congress to prohibit bonuses or multipliers in Section

1988 cases, "[s]o far these efforts to limit recovery of attorney's fees have been unavailing."

*Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 739 n.3 (1987)

(Blackmun, J., dissenting).

      The fact that prohibitions on multipliers are contained in other fee shifting provisions, but

are absent from Section 1988, would indicate that in the absence of such prohibition multipliers

remain available.  For example, in *West Virginia University Hospitals, Inc.* v. *Casey*, 499 U.S.

83, 92-97 (1991), the Supreme Court reasoned that the express authorization of expert witness

fee shifting in some provisions meant that no such fees were available in fee shifting provisions

that lacked such explicit authorization.  "[T]his court will not read into a statute language that is

clearly not there . . . . The express inclusion of one (or more) thing(s) implies the exclusion of

other things from similar treatment."  *Castellon* v. *United States*, 864 A.2d 141, 148-49 (D.C.

2004) (internal quotations and citations omitted).

      The D.C. Circuit has stated that "[o]nly in the rare case of exceptional success is an

enhancement of the lodestar proper for above average quality of representation."  *Murray* v.

*Weinberger*, 741 F.2d 1423, 1430 (D.C. Cir. 1984).  But "if the Supreme Court's caveat

authorizing enhancements in rare and exceptional cases is to be more than a theoretical

possibility, then this proceeding is one of such cases, deserving of an enhancement."  *McKenzie*

v. *Kennickell*, 875 F.2d 330, 338 (D.C. Cir. 1989), *overruled on other grounds, King* v. *Palmer*,

950 F.2d 771 (D.C. Cir. 1991) (en banc).  The exceptional status of this case should be self-evident.[10]

A primary objective of Section 1988 is for less affluent civil rights plaintiffs to be able to attract competent counsel to litigate extraordinarily difficult cases.

> The law regarding enhancements for quality of representation is well established: the lodestar figure is presumably the reasonable fee, and a multiplier for superior quality is appropriate only where the moving party has demonstrated "that enhancement was necessary to provide fair and reasonable compensation."

*Thompson* v. *Kennickell*, 836 F.2d 616, 622 (D.C. Cir. 1988) (quoting *Blum*, 465 U.S. at 901).

The unusual complexity of this case could not be addressed simply by adding more lawyers and support personnel.  The case included no discovery and no trial.  No attorney was assigned to sift through boxes of documents at any warehouse.  Rather, the case's difficulty was, as recognized by Defendants at the outset, owing to the enormous scope of the historical, legal and public policy issues raised by the central question, which was of profound public importance.

----

[10]It is critical to note the distinction between fee enhancements for the contingent nature of a case, and fee enhancements for the exceptional nature of litigation.  Contingency enhancements are, regrettably and incorrectly, disallowed.  In *King*, the D.C. Circuit sitting en banc declared that enhancements for contingency would not be available in statutory fee-shifting cases.  The Supreme Court followed suit in *City of Burlington* v. *Dague*, 505 U.S. 557 (1992).  But neither the D.C. Circuit nor the Supreme Court have disturbed the availability of exceptional case enhancements.

Apart from seeking an exceptional case enhancement, Plaintiffs and their counsel seek their enhancement on grounds of contingency as well.  Mindful that the contingency enhancement request is foreclosed by *King* and *Dague*, the request is made in the good faith belief that the issue requires revisiting, and that the panel opinion in *King*, and dissents in the en banc consideration of that case and in *Dague* had the better of the argument.  No lawyer rationally undertakes, on a contingent basis, work that would yield the same fee for the same work that could be earned without risk of non-payment.  Section 1988 commands that counsel be paid a "reasonable" fee, and it is patently unreasonable to assign lawyers' work zero premium for the risk of non-payment in cases with substantial such risk.  The risk of non-payment in non-contingent matters can be eliminated by asking for a retainer.

Counsel were required to scrutinize a great range of complex material, synthesize coherent and persuasive arguments, and anticipate, dissect, and respond to the opposition's analyses – all within the art of litigation as practiced at the highest level.

As this Court stated in rejecting Plaintiffs' claims,

> While plaintiffs extol many thought-provoking and historically interesting arguments for finding an individual right, this Court would be in error to overlook sixty-five years of unchanged Supreme Court precedent and the deluge of [contrary] circuit case law . . .

*Parker* v. *District of Columbia*, 311 F. Supp.2d 103, 109-110 (D.D.C. 2004).  Considering the scope of this litigation, that the Supreme Court's majority and dissenting opinions in this case comprised solely 157 pages is a testament to their *brevity*.  *Cf. Smith*, 466 F. Supp.2d at 158 n.7 ("Judge Tatel's 29-page opinion, along with the dissent of Chief Judge Ginsburg, evidence the complexity of the legal issues involved in this case.")

The ultimate result is, by any definition, exceptional.  This case will stand as a landmark foundational precedent in American constitutional law.  It marked the first time the Supreme Court defined the meaning and scope of the Second Amendment directly, and in doing so overruled the "deluge" of contrary precedent from nine federal circuit courts of appeals.  Prior to this case, no federal appeals court had ever struck down a legislative enactment as violating the Second Amendment.

Achieving this task required extensive litigation of ancillary matters.  For example, it was vital to Mr. Heller's victory that counsel successfully opposed the Question Presented by Defendants at the petition stage of the litigation.  Counsel also successfully countered Defendants' aggressive efforts to terminate the case for lack of standing.  Even with respect to those standing arguments that were not adopted by the D.C. Circuit, the appeals court

acknowledged that Plaintiff's claims were more consistent with Supreme Court precedent. To ensure the relief obtained at the appeals court, Plaintiffs filed a cross-petition for certiorari that the Supreme Court held for the entire term.

Then there is the controversial nature of the case, a well-recognized risk to Plaintiff's counsel. "[W]hen a lawyer risks permanent harm to his career to defend fundamental, if unpopular, legal principles, the lodestar may be inadequate to fully compensate him for this extraordinary sacrifice." *Miller*, at \*166 n.82. While success here will doubtless accrue to counsels' benefit, the risk undertaken by counsel included the consequences of failure. And even success has its limits. The right to keep and bear arms is popular in the United States, but it is *unpopular* within the organized bar. *See*, *e.g.* Supreme Court Amicus Br. of American Bar Ass'n. On balance, counsels' success brought joy to many people, but it also brought hateful and vulgar criticism. Gura Decl., ¶ 10. We regret nothing, but we risked a great deal. Risk requires enhancement in order to serve Section 1988's purpose of attracting qualified counsel to controversial but vitally important cases.

There is nothing unusual about a 100% fee enhancement. When contingency enhancements were (correctly) allowed by the courts, the 100% enhancement was so common that it came to be adopted as the standard enhancement level by the D.C. Circuit, despite misgiving that it was *insufficient* to serve the statute's purpose. *King* v. *Palmer*, 906 F.2d 762, 767 (D.C. Cir. 1990), *reversed*, 950 F.2d 771 (D.C. Cir. 1991) (en banc).[11]

---

[11]In common fund cases, where multipliers may still be based on contingency, the multiplier range is typically 1.0-4.0 with a tendency to the 1.5-3.0 range. *Vizcaino* v. *Microsoft, Inc.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002); *accord Bebchick* v. *Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 409 n.35 (D.C. Cir. 1986) (common fund: 1.6 multiplier).

The Ninth Circuit recently approved of a 2.0 multiplier/100% fee enhancement under Section 1988 to attorneys who successfully battled an abortion ban in Guam.  *Guam Soc'y of Obstetricians & Gynecologists v. Ada,* 100 F.3d 691 (9th Cir. 1996).  The court affirmed the district court's reasoning that owing to the controversial nature of abortion in Guam, it would have been difficult to find willing counsel to take the case.  Id., at 698-99.  Among other factors making the case undesirable, the court noted counsel "accepted this case in the face of a unanimous Legislature, as well as a Governor who had taken a strong personal and political stand on the issue," albeit despite contrary legal advice.  *Guam Society*, 100 F.3d at 698.

> The Court notes, and the record supports, that Guam is a relatively small and predominantly Catholic community and that this lawsuit was particularly emotionally-charged.  Declarations of other local attorneys also indicate that plaintiffs would have had much difficulty finding local counsel, due to the high visibility of the case, the small size of the island, and the many conflicts of interest occasioned by the many parties involved. There is no doubt in my mind that this case was deemed extremely undesirable in the community and that local counsel faced unusual and trying personal and professional pressures during the pendency of this lawsuit.

Id., at 699.

Many of these factors were present in this case.  That few attorneys would touch the matter is attested to by the fact that the challenged provisions stood for nearly three decades unmolested by meaningful Second Amendment litigation.  The immediate filing of a copy-cat action following the filing of Plaintiff's complaint, designed to subvert Plaintiff's litigation goals, and serious Congressional efforts to moot the D.C. Circuit's opinion for fear of what the Supreme Court might do with the case, underscore the extreme undesirability of the case even among those sympathetic to its cause.

29

Furthermore, Washington is a small community, and the subject matter of this litigation indeed produced "trying professional pressures" on counsel.  While counsel have not received the death threats recorded in *Guam Society*, inmate mail promising that one will deservedly be burned at the stake in a manner befitting some of history's greatest villains is not the sort of risk normally associated with the practice of law.  Gura Decl., ¶ 10.

It is futile to debate whether abortion is more or less controversial a topic than gun control, or to predict whether this case will prove to be more or less controversial than *Roe* v. *Wade*, 410 U.S. 113 (1973).  But there is one critical difference between this case and *Guam Society*: the attorneys in *Guam Society* were able to rely on *Roe* and its progeny.  The attorneys here *created* the foundational precedent.

Exceptional performance in cases that are not merely controversial, but present novel and complex matters, draw significant multipliers.  *See, e.g. Barnes* v. *City of Cincinnati*, 401 F.3d 729, 746 (6th Cir. 2005) (1.75 multiplier in transsexual sex discrimination case presenting "novelty and difficulty" and where "immense skill [is] requisite to conduct[] case properly"); *Shakman* v. *Democratic Org. of Cook County*, 677 F. Supp. 933, 945 (N.D. Ill. 1987) (1.333 multiplier where "[i]magination and creativity on the part of plaintiffs' counsel were necessary to fashion arguments persuasive enough to invoke judicial protection of constitutional rights which previously had not been clearly recognized by the courts"); *Brotherton* v. *Cleveland*, 141 F. Supp.2d 907, 913 (S.D. Ohio 2001) (1.5 multiplier awarded sole practitioner who "took a case with compelling facts, but scant case-law and brought to light a previously unrecognized cause of action"); *Gomez* v. *Gates*, 804 F. Supp. 69 (C.D. Cal. 1992) (excessive force: 1.75 multiplier); *Hollowell* v. *Gravett*, 723 F. Supp. 107 (E.D. Ark. 1989) (race discrimination: 1.75 multiplier).

30

Admittedly, there are no hard and fast rules about the size of Section 1988 exceptional case enhancements. But if exceptional case enhancements exist – and they do – an enhancement has been earned here.

## V.   COUNSEL IS ENTITLED TO HIS REASONABLE EXPENSES IN ADVANCING THIS LITIGATION.

Counsel are not typically required to donate large sums of their own money, on top of their pro bono time commitments, to advancing meritorious civil rights litigation. Consistent with his established philanthropic record, Mr. Levy has in this case gone well beyond what might be expected of a publicly-spirited attorney committed to advancing individual rights in our country. Mr. Levy's expenses here are not fully recoverable, most notably the many thousands of dollars necessarily expended on printing the specialized brief booklets required by the Supreme Court, which the Supreme Court sees fit to render non-taxable. Sup. Ct. R. 43.3. Ordinary filing and transcript costs born by Mr. Levy are set forth in the cost bill filed today.

But in addition to these ordinary costs, pursuant to Section 1988's allowance of expenses, Levy requests other compensable and ordinary expenses. Levy requests the cost of his travel to Washington, D.C. on those occasions where his presence here was reasonably required in order to participate in the case, as Levy's residence was in Florida during most of this six-year litigation. Levy also seeks to recover his expenditures for teleconferencing, postage, photocopying, and messenger fees, as well as legal fees advanced in the case to others for performing certain tasks.

> Reasonable photocopying, postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable "attorney's fee." If plaintiffs' request for these costs are sufficiently well-documented and reasonable, plaintiffs may recover these out-of-pocket expenses pursuant to the

31

statutory authority of § 1988 to shift "attorney's fees."

*Sexcius*, 839 F. Supp. at 927.  Travel expenses to Washington, D.C. have been allowed by this

Court as part of a Section 1988 recovery.  *Palmer*, 704 F. Supp. at 298-99.

Levy's claimed travel expenses are eminently reasonable, as they consist primarily of

coach airfare. There can be no doubt that the photocopying, postage, teleconferencing, messenger

and outside attorney charges are likewise recoverable.

## CONCLUSION

Many lament the dearth of quality legal representation for public interest cases.  Congress

wisely enacted Section 1988 to remedy this problem, but even this partial solution requires

implementation by the courts.  Plaintiffs' counsel have not only earned the right to their fees and

costs under existing law, but it is in the public interest that they be fairly compensated lest the

word go out to the bar that civil rights practice requires independent wealth or vows of poverty in

addition to generosity of spirit.

The courts (wrongly, in our view) bar fee recoveries that reflect the substantial risk of

non-payment in these plainly contingent matters.  The least that can be done is to compensate

counsel at market rates for their reasonable hours worked, with an appropriate enhancement for

having performed high quality work under daunting circumstances in an exceptional case.

The motion should be granted.

Dated: August 25, 2008                    Respectfully submitted,

                                          Alan Gura (D.C. Bar No. 453449)
                                          Gura & Possessky, PLLC
                                          Robert A. Levy (D.C. Bar No. 447137)
                                          Clark M. Neily, III (D.C. Bar No. 475926)
                                          101 N. Columbus Street, Suite 405
                                          Alexandria, VA 22314
                                          Phone: 703.835.9085
                                          Fax:    703.997.7665
                                    By:    ___/s/Alan Gura_____
                                          Alan Gura
                                          Attorneys for Plaintiff