UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
SHELLY PARKER, *et al.*                      )
                                             )
                    Plaintiffs,              )
                                             )
          v.                                 )          Civil Action No.03-0213 (EGS)
                                             )
DISTRICT OF COLUMBIA, *et al.*,              )
                                             )
                    Defendants.              )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFF HELLER'S MOTION FOR ATTORNEY FEES AND COSTS

### INTRODUCTION AND SUMMARY OF ARGUMENT

42 U.S.C. § 1988 entitles prevailing civil-rights plaintiffs to a reasonable fee. It does not

entitle them to enrich themselves at the expense of taxpayers at any time, let alone in a time of

financial crisis. Once all plaintiff's requested enhancements are taken into account, plaintiff's

counsel ask this Court to award attorney's fees at an effective rate of over $950/hour. This one

fact by itself suffices to demonstrate that plaintiff's petition is a study in unreasonableness. The

standard for determining a reasonable rate is one that produces "a fee that is sufficient to induce

a capable attorney to undertake the representation of a meritorious civil rights case," not "to

provide a form of economic relief to improve the financial lot of attorneys" or to "provide

windfalls to attorneys." *See Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (2010). There is no

credible argument that $950/hour was necessary to secure competent counsel. Accordingly,

plaintiff determinedly avoids the question throughout his brief and opposing counsel never even

offer the self-serving assertion that they would not have taken the case for the rate proposed by

the District (*i.e.*, standard *Laffey* Matrix rates traditionally awarded to prevailing civil-rights counsel in this jurisdiction).

The Supreme Court's decision in *Perdue*, moreover, provided that lodestar enhancements should be granted only "in rare circumstances" and should not be made based on such factors as "the novelty and complexity of a case" or "the quality of an attorney's performance." Plaintiff's motion, however, seeks to transform this limitation into authorization for almost $400/hour in enhancements on top of an already improperly enhanced lodestar rate that has been rejected by most judges in this District.

Given the extravagant nature of plaintiff's claim and his counsels' own self-assessments, one would never know plaintiff's attorneys themselves referred to this case as "simple" in an article published in the Legal Times. Nor would one know that, in bringing their claim, opposing counsel stood on the shoulders of voluminous scholarship on the Second Amendment as well as a thorough opinion by the Department of Justice's Office of Legal Counsel ("OLC") supporting their position. One also would never know from reading plaintiff's brief that the 2010 *Laffey* Matrix rates that plaintiff now seeks to increase by more than 200 percent (and then apply to work performed in each year of this litigation) originated in a case that was far longer and more complicated than this one and that was brought by some of the best attorneys in their field in the country. While this case was confined almost entirely to briefing and oral argument in three courts concerning the same single important constitutional issue, *Laffey* was an employment-discrimination class action involving thousands of plaintiffs that, at the time of the decision, had been litigated for more than 13 years. *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 359 (D.D.C. 1983). The *Laffey* plaintiffs' counsel, as conceded by opposing counsel, was "'one of the "premier" employment discrimination firms in the country.'" *Id.* at 372. Plaintiffs'

attorneys there achieved extraordinary success in the litigation, obtaining various injunctions throughout the case and a back-pay award of $52 million (in early 1980s dollars) for the 3,364 flight attendants in the plaintiff class. *Id.* at 360. The Matrix itself, moreover, was based not upon the rates for average lawyers, but rather upon affidavits and fee petitions from some of the most prominent attorneys in Washington, D.C. at the time. *See Rodriguez v. Secretary of Dep't of HHS*, 2009 WL 2568468, * 6 (Fed. Cl. 2009) ("In support of the higher rates requested [in *Laffey*], Mr. Rezneck did not seek to establish the average billing rates for competent counsel within the District of Columbia, but rather those charged by the best lawyers within the District in their most complex cases.").

Plaintiff makes no serious attempt to explain why the standard U.S. Attorney's *Laffey* Matrix (updated by the local cost-of-living adjustment) of $420/hour was insufficient to secure competent counsel. Rather than address this core question, plaintiff ignores it while attempting to build a mega-rate with at least four unsupportable building blocks. Plaintiff begins by seeking an hourly rate of $589/hour based on a version of the *Laffey* Matrix rejected by most courts in this jurisdiction and, as explained in an affidavit by a prominent economist, is an inappropriate vehicle for updating the Matrix based on hourly billable rates. Plaintiff's counsel then request an additional $200/hour adjustment under *Perdue* that rests on (1) a disregard of the clear reasoning of *Perdue*, (2) an exaggerated sense of entitlement and their own accomplishment that fails even to pay lip service to the boost that decades of scholarship provided them, and (3) an apparent absence of any appreciation for the high level of case-complexity and attorney quality on which the *Laffey* Matrix was originally based. Plaintiff also offers *no* credible market data despite the admonition of the Court in *Perdue* that such data are critical to justifying enhancements.

Unsatisfied with asking District taxpayers to pay them almost $800/hour, plaintiff's counsel also claim an entitlement to what they dub "*Perdue* interest" for asserted "excessive delay" that does not exist and that, in their counting, even includes the amount of time that the Supreme Court took to decide *Perdue*. At the same time, counsel ask the Court to award them 2010 rates for the entire course of this litigation, an approach used in some cases by the courts as a proxy for the very delay they claim justified their request for "*Perdue*" interest, a transparent attempt at double recovery. Plaintiff seeks to recover the lost value value of money a third time by claiming interest at a rate used by the Small Business Administration for *unsecured* loans (7.25%), a rate which itself dwarfs the federal rate for interest on judgments. Plaintiff's sole asserted basis for choosing this rate is the *ipse dixit* that it "appears to be" the "most appropriate 'standard' rate." Through this choice of a high rate for risky investments with no felt need to justify it, opposing counsel succeed only in offering a perfect symbol for the lack of any discretion that they have exercised in preparing this petition generally and more specifically, in calculating the rate that should be charged to District taxpayers.

Plaintiff's lack of discretion extends to the number of hours claimed. A client charged $1,000 an hour or anywhere near that amount would have just cause to expect some efficiency gains, but that client would be sorely disappointed in this case. As the District noted previously (and plaintiff did not bother to correct or justify), counsel ask for fees for work on which they were unsuccessful or which is otherwise noncompensable. For example, five of the six plaintiffs were dismissed for lack of standing in the Court of Appeals. They unsuccessfully petitioned the Supreme Court to review the dismissal. Despite their failure to have the five plaintiffs reinstated, they ask the District taxpayers to pay for that lack of success. They also ask for payment of non-reimbursable items, such as pre-complaint time spent recruiting potential plaintiffs.

Similarly, the hours claimed are frequently excessive for the task at hand—such as minor (and sometimes unsuccessful motions)—and often insufficiently supported with enough specificity to satisfy counsel's burden to establish the reasonableness of the charges. While constitutional and Supreme Court litigation of any sort requires a substantial expenditure of time, "there is a point," more than reached here, "at which thorough and diligent litigation efforts become overkill." *Oklahoma Aerotronics v. United States*, 943 F.2d 1344, 1347 (D.C. Cir. 1991). Many hours that counsel claim cannot be measured at all; they indulge in considerable instances of "block billing"—the lumping together of a number of disparate tasks into a single entry—that make it impossible for the Court to determine the reasonableness of the time spent on each separate task. Such block billing usually justifies an across-the-board percentage reduction in any award. In addition, two of the three attorneys who did the most work did not keep contemporaneous time records at all.

Finally, the Court should carefully scrutinize the large amount claimed here, in light of the impact this award will have on a public fisc. Even though public bodies are properly subject to fee-shifting statutes, "[s]pecial caution is required because of the incentive which the [government's] 'deep pocket' offers to attorneys to inflate their billing charges and to claim far more as reimbursement then would be sought or could reasonably be recovered from most private parties." *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 942 (D.C. Cir. 1984) (quoting *Copeland v. Marshall*, 594 F.2d 244, 250 (D.C.Cir.1978)). In light of the foregoing and all that follows, the fee award should be no more than $830,685.97. In addition, reimbursement of legitimate litigation expenses should not exceed $9,480.27.

**ARGUMENT**

Fee applicants have the burden of establishing both a reasonable hourly rate for the work performed and the reasonableness of the hours expended. *See, e.g., Role Models v. Brownlee*, 353 F.3d 962, 968 (D.C. Cir. 2004) (citing *Murray v. Weinberger*, 741 F.2d 1423, 1427 (D.C. Cir. 1984)). *Cf. American Petroleum Inst. v. EPA*, 72 F.3d 907, 915 (D.C. Cir. 1996) (even when disputed, burdens of production and persuasion regarding reasonableness of number of hours spent on various tasks remain with the plaintiff). As discussed herein, plaintiff has failed to meet either burden.

**I.    PLAINTIFF'S REQUESTED RATE IS UNREASONABLE AND SHOULD BE REDUCED TO THE *LAFFEY* RATE**

The appropriate rate for compensating plaintiff should be established by reference to the U.S. Attorney's Office ("USAO") Matrix, which is the presumptive rate in this jurisdiction for complex federal litigation. Particularly where (as here), attorneys lack a usual billing rate, *see* P.Mem. at 14 ("Plaintiff's counsel lack relevant hourly billing practices."), federal courts most frequently use the "lodestar" approach, which "looks to 'the prevailing market rates in the relevant community.'" *Perdu*, 130 S. Ct. at 1672 (quoting *Blum*, 465 U.S. at 895). There is a "strong" presumption that the lodestar method yields a reasonable fee. *Id*. at 1673 (citations omitted).

The most popular approach in this Circuit is to use the rates derived from the *Laffey* matrix, developed in *Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1983), *affirmed in part and reversed in part,* 746 F.2d 4 (D.C. Cir. 1984). That matrix has been adopted by this Court as a measure of reasonable hourly rates in fee-shifting cases, particularly for "public interest" lawyers who cannot point to their customary billing rate to demonstrate reasonableness. *See* Rezneck Decl. ¶ 7. (Attached as Exhibit A)The *Laffey* rate most frequently used by the

courts of this jurisdiction is maintained by the USAO, which publishes a chart trending forward the original *Laffey* matrix based on the Consumer Price Index ("CPI") for the metropolitan Washington area.[1] *See, e.g., American Lands Alliance v. Norton*, 525 F. Supp.2d 135, 149 (D.D.C. 2007) (listing "numerous cases in which members of this Court have endorsed the standard *Laffey* matrix."). The USAO *Laffey* matrix reflects prevailing market rates for representation in "complex federal litigation." *See, e.g., Covington v. District of Columbia,* 57 F.3d 1101, 1103 (D.C. Cir. 1995); *Pleasants v. Ridge*, 424 F. Supp.2d 67, 71 n.2 (D.D.C. 2006); *Muldrow v. Re-Direct, Inc.*, 397 F. Supp.2d 1, 4-5 (D.D.C. 2005).[2] As discussed herein, plaintiff offers no basis for departing from this standard approach.

A.  PLAINTIFF FAILS TO ESTABLISH THAT STANDARD *LAFFEY* RATES WOULD HAVE BEEN INSUFFICIENT TO INDUCE COMPETENT COUNSEL TO TAKE THIS CASE

As indicated in the introduction, a "reasonable fee" is one "that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," not "to provide a form of economic relief to improve the financial lot of attorneys." *Perdue*, 130 S. Ct. at 1672. Plaintiff's counsel assert that they are entitled to a "reasonable fee," but never explain why standard *Laffey* rates are insufficient under the Supreme Court's definition of "reasonable." Far from establishing that *Laffey* rates would have been insufficient to induce a competent attorney

---

[1]  *Available online at* http://www.justice.gov/usao/dc/Divisions/Civil_Division/ Laffey_Matrix_8.html. (Attached as Exhibit B)

[2]  In *Muldrow*, the court acknowledged "that the skill, experience, and reputation of plaintiff's attorneys is of the highest caliber [and] that their reduced rates are public-spirited." *Id.* The court also observed that USAO *Laffey* matrix rates have gained acceptance in the D.C. Circuit "as a measure of appropriate fees for complex federal litigation." *Id.* The court proceeded to award rates 25% lower than *Laffey* matrix rates because plaintiff's successful § 1983 case was not sufficiently complex to merit *Laffey* rates. *Id.*

to take the case, opposing counsel never even offer the self-serving assertion that they themselves would not have taken the case if they knew they would have received *Laffey* rates at the conclusion of the case.

Rather than address this basic standard, plaintiff retreats to conclusory generalities such as, "Counsel were happy to work on this case, but adequate representation could not have been secured absent Section 1988's promise of reasonable compensation to reflect the true market value of a victory. The risks and open-ended time commitment were daunting enough without the prospect of not being compensated for this work." P.Mem. at 3. Such assertions address only straw arguments. No one is claiming that plaintiff's attorneys should receive no fee. Instead, the District's position is only that plaintiff's attorneys should receive the standard rate for complex federal litigation in this jurisdiction. For 95 percent of the hours (*i.e.*, all but Mr. Huff's hours), this rate would be $420/hour.

Plaintiff attempts to avoid the basic standard by reference to language in *Perdue* stating that an enhancement may be appropriate "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value . . . ." P.Mem. at 32. While the District addresses counsels' performance in greater detail below, there are three evident fallacies that should be highlighted at the outset. *First*, the Supreme Court's opinion makes clear that the quoted language is not a freestanding invitation to recognize exceptional performance with enhancements. To the contrary, each justice in the majority was careful to emphasize that "there is a strong presumption that the lodestar is sufficient" and that departures from the lodestar are appropriate only in "rare" and "exceptional" circumstances. *Perdue*, 130 S. Ct. at 1669; *see also id*. at 1677 (Kennedy, J., concurring) ("extraordinary cases are presented only in the rarest circumstances"); *id*. at 1678 (Thomas, J.,

concurring) ("careful readers will observe the precise limitations that the Court imposes on the availability of such enhancements . . . the lodestar calculation will *in virtually every case* already reflect all indicia of attorney performance relevant to a fee award") (emphasis added).

*Second*, plaintiff disregards the fact that the presumptive lodestar used in this jurisdiction itself originated as a means of compensating the best attorneys in the country for a truly extraordinary performance. As stated in the introduction, the *Laffey* plaintiff's counsel was conceded by opposing counsel to be "'one of the 'premier' employment discrimination firms in the country.'" 572 F. Supp. at 372. Plaintiffs' attorneys there achieved extraordinary success in the litigation, obtaining various injunctions throughout the case and a back-pay award of $52 million (in early 1980s dollars) for the 3,364 flight attendants in the plaintiff class. *Id*. at 360. The Matrix itself, moreover, was based not upon the rates for average lawyers, but rather upon affidavits and fee petitions from some of the most prominent attorneys in Washington, D.C. at the time. *Rodriguez*, *supra*, at * 6. In addition, the Matrix was weighted towards larger law firms, which (as discussed *infra*) typically bill at higher rates than small firms such as the firm where plaintiff's attorneys work. *Id*. Accordingly, the suggestion that the *Laffey* Matrix is the rate only for ordinary performance by average attorneys could not be more wrong.

*Third*, the quoted language must be considered as part of the larger question of whether the lodestar rate is "adequate to attract competent counsel," and again, plaintiff offers no reason to believe it is not. *Perdue*, 130 S. Ct. at 1673. Moreover, in the truly extraordinary circumstance, plaintiff must offer "specific proof linking the attorney's ability to a prevailing market rate." *Id*. at 1674. As discussed below, the only evidence of market rates offered by plaintiff is thoroughly inadequate for a number of reasons. In sum, because plaintiff has not even attempted to establish that this rate was insufficient to attract competent counsel (including but

not limited to opposing counsel themselves), and because it is plaintiff's burden to establish the appropriate rate, plaintiff offers no basis for departing from *Laffey* rates. Thus, while the following refutes each of the "trees" that make up plaintiff's requested $950/hour rate, it bears emphasis that their failure to make any serious attempt to address the forest, alone, requires application of the USAO *Laffey* Matrix.

*Fourth*, if anything the unique and historically important nature of this case runs strongly against plaintiff's claim to enhanced rates because of the tremendous career opportunities (both tangible and intangible) that it offered to opposing counsel. Few attorneys have the opportunity to argue a Supreme Court case, and fewer still have the opportunity to argue one of this significance. It was, literally, the opportunity of a lifetime and the first Supreme Court argument for plaintiff's counsel; plaintiff cannot minimize those benefits (which included the opportunity to litigate in *McDonald v. Chicago* (decided June 28, 2010)) by pointing to "criticism" from an extremist federal inmate. *See* P.Mem., Declaration of Alan Gura ¶ 16.

Relatedly, in recent years, attorneys have proven willing to represent clients *pro bono* before the Supreme Court for free, not for purely public spirited reasons (which would be irrelevant), but rather because of the fascinating nature of this practice, the business-building opportunities it offers, and in this case, the opportunity to argue a case of historic significance. Prominent Supreme Court advocate Tom Goldstein, for example, built his practice initially by representing clients for free, and his practices are now imitated by others.[3] In this case, there

---

[3]     *See*, *e.g.*, Tony Mauro, *Paper Chaser, How a young self-employed lawyer became the best Supreme Court litigator in Washington* (WASHINGTON MONTHLY, July/August 2004) (*available at* www.washingtonmonthly.com/features/2004/0407.mauro.html) (discussing the changes to Supreme Court practice resulting from this approach and noting that "Today, lawyers who lose at the appeals court report that they often get multiple offers of help to petition the Supreme Court"); Noam Schreiber, *Meet Tommy Goldstein*, *The Hustler*, THE NEW REPUBLIC (April 10, 2006) (*available at* http://www.tnr.com/article/meet-tommy-goldstein) (explaining the

were unquestionably numerous excellent attorneys who gladly would have represented plaintiffs for free in the Supreme Court, a fact that only further confirms that the exorbitant rates claimed here (or anywhere close to those rates) were not required to obtain competent counsel. Indeed, courts often consider the more intangible benefits of interesting and high-profile cases in considering fee awards.[4]

B.   THE ENHANCED *LAFFEY* MATRIX IS AN INAPPROPRIATE MEASURE OF RATES BOTH IN THIS CASE AND MORE GENERALLY

In seeking to inflate their hourly rates, plaintiff's counsel first err in arguing that the Matrix, promulgated by economist Michael Kavanaugh, represents the proper trending forward of the *Laffey* Matrix long in use in this court. There are a number of reasons why this approach is unjustified. Prior to addressing the flaws in that methodology, however, the District first addresses the mistaken and unexplained suggestion that *Perdue* renders irrelevant the dispute over which *Laffey* Matrix is preferable. *See* P.Mem. at 21. This suggestion by plaintiff is puzzling given *Perdue*'s conclusion that departures from the lodestar are only appropriate in rare circumstances.  The inescapable conclusion is that the establishment of the correct lodestar is

---

"vast, unexploited market of individuals "without money and knowledge of how the Supreme Court operates"); Deborah L. Cohen, *Taking the Firm to SCOTUS School* (ABA JOURNAL, Feb. 1, 2008) (*available at* http://www.abajournal.//www.abajournal.com/magazine/article/taking_ the_firm_to_scotus_school/) (describing the rise of partnerships between elite Supreme Court firms and law-school *pro bono* Supreme Court clinics and noting the "recruiting value" and the "business development value" to firms from such *pro bono* work).

[4] In *Simmonds v. New York City Department of Corrections,* the Court reduced the hourly rates  sought by Steptoe & Johnson attorneys, i.e. the rates they charged paying clients  by 33-41% .  While the reduction was based on the fact that the attorney's areas of practice was not federal civil rights, the Court also noted that the firm was also compensated by being afforded the opportunity to train young associates and to enhance its image of doing *pro bono* work.  No. 6 Civ. 5298 (NRB), 2008 U.S. Dist. LEXIS 74539, *14 (SDNY)

central to any request for fees.    The following subsections address why plaintiff's chosen lodestar is incorrect.

> 1.    The Courts Have Generally Rejected the *Kavanaugh* Matrix

The first reason for rejecting the *Kavanaugh* Matrix is that most courts have done the same. *See, e.g., Interfaith Comty. Org. v. Honeywell Int'l*, 426 F.3d 694, 709 (3rd Cir. 2005) (explaining that there are "few decisions approving the use of [Dr. Kavanaugh's] approach . . . ."). Since the decision utilizing that Matrix in *Salazar v. District of Columbia*, 123 F.Supp.2d 8 (D.D.C. 2000), most local court decisions on attorneys' fees have applied the USAO *Laffey* matrix, specifically rejecting Kavanaugh's approach. *See, e.g.*, *D.L. v. District of Columbia*, 256 F.R.D. 239, 243 (D.D.C. 2009); *Fraternal Order of Police, D.C. Lodge 1 v. Barry*, 2009 WL 430393, * 3 (D.D.C. 2009); *Woodland v. Viacom, Inc.*, 255 F.R.D. 278, 280 (D.D.C. 2008); *Miller v. Holzmann*, 575 F.Supp.2d 2, 13 (D.D.C. 2008); *Am. Lands Alliance*, 525 F.Supp.2d at 150; *M.R.S. Enter., Inc. v. Sheet Metal Workers Int'l Ass'n Local 40*, 2007 WL 950071, *4 (D.D.C. 2007); *Yazdani v. Access ATM*, 474 F.Supp.2d 134, 138 (D.D.C. 2007); *McDowell v. District of Columbia*, 2006 WL 1933809, * 2 (D.D.C. 2006).

> [A]ll that can be said is that, since *Salazar*, a court, based on the record before it, found that (1) the use of the updated *Laffey* rate was not unreasonable or clearly erroneous and (2) the use of the updated *Laffey* rate was reasonable when *the defendant did not object to its use*.

*M.R.S. Enter., Inc.*, 2007 WL 950071 at *4 (D.D.C. 2007) (emphasis added).

Chief Judge Lamberth discussed and rejected Dr. Kavanaugh's methodology in *Miller v. Holzmann*, 575 F.Supp.2d at 4. In a comprehensive opinion laying out the then-current state of attorney's-fee case law in this Circuit, the Court rejected both relator's use of Dr. Kavanaugh's enhanced *Laffey* matrix and the request for a 100% enhancement, ultimately awarding

approximately 37% of the amount sought. Chief Judge Lamberth begins by noting that "Kavanaugh's alternative methodology has achieved only limited acceptance in this District." *Id*. at 17 (footnote omitted). Judge Lamberth then observed that Dr. Kavanaugh's analysis incorrectly uses *national* price-inflation data, while the USAO matrix takes into account *local* price inflation, which complies with case law's "mandate for geographic specificity." *Id*. at 18 (citing *Blum*, 465 U.S. at 896 n.11 (rates should be those "prevailing in the community"), *Covington*, 57 F.3d at 1108 (market rates are those "in the relevant community")).

Plaintiff attempts to undermine the reasoning of Chief Judge Lamberth's opinion by misstating it. According to plaintiff, in concluding that Kavanaugh's matrix did not comply with the Circuit's "mandate for geographic specificity" Chief Judge Lamberth "apparently confused Kavanaugh's 'rates,' which are indeed local as required by precedent, with rates of change in the CPI, which is specific to legal services but drawn nationally." P.Mem. at 24. Plaintiff reaches this conclusion by cobbling together isolated quotations from the opinion. In truth, and as any reading of the full opinion makes clear, Chief Judge Lamberth did not confuse anything. His comments with respect to geographic specificity and rates are clearly directed at Kavanaugh's use of the national rate of change; he was not confused about the baseline hourly rates that Kavanaugh was using.

Plaintiff also overstates *Covington*, insisting that that decision mandates that the USAO matrix "be afforded *the same* consideration as any other updated Laffey matrix or a party's own survey." P.Mem. at 21 (emphasis in original). *Covington*, of course, did not say any such thing; the Circuit there only noted that the *Laffey* matrix was not the sole bases for determining the appropriate loadstar for a given attorney and that other evidence, such as surveys, or

> affidavits reciting the precise fees that attorneys with similar qualifications have
> received from fee-paying clients in comparable cases; and evidence of recent fees

> awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases[.]

might be used to establish an appropriate loadstar.

*Covington*, 57 F.3d at 1109. As discussed in subsection 3, plaintiff has failed to marshal any legitimate evidence, much less a sufficient amount, to justify a departure from the presumptive rate in this jurisdiction, and more importantly, to justify the "enhanced" fees he seeks .

Moreover, even where plaintiffs have been able to show an actual market rate that they charge, courts have declined to award that rate where it can be shown that a lower rate is sufficient to attract competent counsel to the case. In one recent decision, Judge Friedman declined to award Steptoe & Johnson its asserted market rates for work Judge Friedman viewed as "excellent," based on a finding that USAO *Laffey* rates were sufficient to compensate the firm's lawyers.

> [A]pplying the hourly rates charged by Steptoe to its paying clients would result in the District of Columbia paying unnecessarily high attorneys' fees at a time when the District is in financial straits. *See* Tr. at 3, 7. In its discretion, therefore, the Court will not require the District to pay attorneys' fees at the hourly rate normally charged by some of the most expensive law firms in the city. Calculating the amount of fees to be awarded to [class counsel] based on the hourly rates in the [USAO] *Laffey* matrix will fairly compensate for the excellent work those lawyers have performed on behalf of the plaintiff class, at the same time recognizing the firm's commitment to *pro bono publico*.

*Blackman v. District of Columbia*, 677 F.Supp.2d 169, 176 (D.D.C. 2010). These decisions confirm that the standard *Laffey* rates are appropriate and sufficient to secure competent counsel.

2.      The Kavanaugh Matrix Rests on a Deficient Methodology

For various reasons, the reasoning underlying the Kavanaugh matrix is deficient and does not justify the requested departure. Counsels' rationale for the enhanced rates sought is a

declaration from an economist, Michael Kavanaugh, that advocates an "enhanced" matrix based on the *nationwide* cost of legal services, rather than the localized CPI, which by definition is tied to changes in the cost of living in a specific metropolitan area. *See* P.Mem. at 21; Kavanaugh Dec. ¶¶ 9, 15 & n.5.[5] Kavanaugh claims that his application of a national index to a specific function provides a better projection of the relevant costs of legal services in metropolitan Washington, D.C., than does the USAO's use of an index specific to metropolitan Washington, D.C. based on a wide array of goods and services. Kavanagh Decl. ¶ 10. Apart from Chief Judge Lamberth's opinion in *Holzmann*, the flaws in Kavanaugh's approach have been refuted in detail by another economist in a recent case. [6] The Affidavit of Dr. Laura A. Malowane ("Malowane Aff.") (Attached as Exh. C) was submitted by the United States in the fee dispute in *Norden v. Clough*, 674 F.Supp.2d 126 (D.D.C. 2009). Ultimately, Dr. Malowane concludes that the USAO Laffey Matrix is a more accurate method to determine current market rates for attorneys in Washington, D.C. Malowane Aff. at 9. Dr. Kavanaugh's methodology should therefore be rejected for a number of reasons.

Dr. Malowane concludes—like Judge Lamberth—that Kavanaugh's use of a national legal-services price index is inappropriate, both because it is national and because it measures only price changes in flat-fee rates for simple, consumer-oriented legal services like wills and

---

[5]     The CPI is "is a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." *See* http://www.bls.gov/dolfaq/blsfaqtoc.htm. *See also* http://www.bls.gov/dolfaq/bls_ques3.htm (CPI incorporates goods and services from categories such as food and beverages, housing, apparel, transportation, medical care, and recreation).

[6]     Opposing counsel do not explain why the rates for attorneys for the year ending May 31, 2010, in the matrix on Dr. Kavanaugh's website, *see* http://www.laffeymatrix.com/see.html, are considerably less than the rate indicated in Dr. Kavanaugh's instant declaration, which purports to state the rates as of April 2010. *See* Kavanaugh Decl. ¶ 16.

uncontested divorces, and not complex federal litigation in the Washington, D.C., metropolitan area, typically billed at hourly rates. *Id.* ¶¶ 12–24.

The Bureau of Labor Statistics develops the U.S. Legal Services Index by contacting practicing consumer-oriented attorneys and recording the flat fee charges for defined procedures such as a an uncontested divorce. In so doing, it tracks the change in fees for a given service, not changes in the hourly rates charged by civil litigators in complex federal litigation. Malowane Dcl. At ¶ 21.

Moreover, Kavanaugh's use of a national legal-services price index fails to take into account the discounted rates, contingency fees, and other flexible billing practices used by law firms in this area. *Id.* ¶¶ 25–28.

Further, plaintiffs in this case were represented by an extremely small firm, and as various courts and Dr. Malowane recognize, small firms typically charge less than large firms. *See Wilcox v. Sisson*, No. 02-14555, 2006 WL 1443981, at * 2 ("'The market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms—presumably because of their greater resources and investments . . . .'") (D.D.C. 2006).[7] *See* Malowane Aff. ¶¶ 33, 37 (explaining that billing rates typically increase with the size of the law firm).

---

[7] Courts in non-*Laffey* jurisdictions have similarly recognized that the size of an attorney's firm is a relevant factor in determining a reasonable market rate. *See Saunders v. The Salvation* Army, No. 06-2980, 2007 WL 927529, *3 (S.D.N.Y. March 27, 2007) (citations omitted); *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362 (S.D.N.Y. 2005); *Natural Resources Defense Council*, *Inc. v. Fox*, 129 F. Supp. 2d 666 (S.D.N.Y. 2001); *Gucci America*, *Inc. v. Rebecca Gold Enterprises*, *Inc.*, No. 89-4736, 1993 WL 88270 (S.D.N.Y. 1993). The Second Circuit also has recognized that "several market rates may prevail" in an area with a large and diverse legal community like New York's. *Clambless v. Masters*, *Mates*, & *Pilots Pension Plan*, 885 F.2d 1053, 1059 (2d Cir. 1989).

Dr. Malowane has further amplified her opinion in a second declaration prepared for this case. (Second Malowane Dcl. Attached as Exhibit D)  In her declaration Dr. Malowane makes clear that her opinions set forth in her earlier Declaration were not limited to the facts of that case. *Id.* at ¶ 4.  Dr. Malowane also reports the initial conclusions of a study being conducted by CT TyMerix and The Corporate Executive Board that finds that the rates attorneys actually bill are lower than the "rack" rates used in the National Law Journal study on which Plaintiff relies. *Id.* at ¶ 6. For all of these reasons, the Kavanaugh Matrix is unreliable and should not be followed.

Moreover, even in *Salazar*, the Court characterized the enhanced fees sought as "at the very high end of the billing range for senior partners with major D.C. law firms." 123 F. Supp. 2d at 14 n.4. Neither the size of opposing counsels' firm nor their levels of experience qualify them to receive these same rates, awarded to attorneys who "have spent a lifetime in public interest law handling complex federal litigation . . . ." *Id*. Counsel here simply assume that they should be paid the same amount as big-firm partners in the private market, but as stated above, nothing justifies that assumption. Lawyers at small firms typically earn less than lawyers at larger firms.

Moreover, attorney Levy does not appear to have *any* litigation experience, yet counsel demands $790/hour for his services (not accounting for the additional enhancement for purported "delay"). Case law suggests that attorney's fees should be awarded based on an attorney's actual experience in litigation. *See, e.g., id.* at 15 (plaintiff did not justify rate of attorney without litigation experience; court awarded paralegal rate for work done, *i.e.*, less than half the rate claimed). The *Kavanaugh* matrix is thus irredeemably flawed as a general matter and separately inappropriate to the facts of this case.

3.     The Limited Amount of Rate Data Offered by Plaintiff Is Unreliable and
Does Not Justify Enhanced *Laffey* Rates

Plaintiff makes no serious attempt to justify the request for enhanced *Laffey* rates with credible market data. Instead, opposing counsel rely almost exclusively on the National Law Journal survey of the 250 largest law firms. *See* P.Mem. 28–29, 36–37. There are various reasons why this survey provides no support for their position. *First*, as explained by Dr. Malowane, these rates "are misleading and should not be used for comparison purposes" because they "reflect nominal billing rates and not realized rates (i.e., the amount actually collected divided by the hours actually expended on the work)." *See* Malowane Aff. ¶ 36. For this reason alone, the National Law Journal survey is not competent evidence of market rates.

Data released after Dr. Malowane submitted her affidavit confirms the correctness of her observations concerning such surveys. Specifically, a report by CT TyMetrix, a company that handles e-billing and matter management for law firms, conducted a survey of actual rates billed to clients. *See* Amy Miller, *Survey Shows Law Firms Charging Different Rates for the Same Work*, "Corporate Counsel," Nat'l L. J., May 26, 2010 (*available online at* http://www.law.com/jsp/article.jsp?id=1202458774347). Attached as Exh. X.

This report thus rests on actual billing data, rather than unsworn nominal rates offered by firms primarily more as a badge of quality rather than as a reflection of an actual, negotiated market rate. More specifically, the "report examines billing from more than 4,000 law firms, 50,000 individual billers and 18.9 million invoice items from 2007 to 2009." *Id*. The report concludes that "just over three-fourths of the 3,448 partners, associates and paralegals in the survey billed different hourly rates to different clients for similar work. . . . The largest rate differences range from $350 an hour to $1,000." *Id*. The "median partner rate was $340 an hour,"

well under the USAO *Laffey* Matrix rate of $420 and just over half of the enhanced Kavanaugh

Matrix rate. *Id*. In other words, "the rates partners actually bill is lower than the typical 'rack'

rates reported by most surveys." *Id*. Given the evident uselessness of the nominal rates provided

by plaintiff through the NLJ survey, opposing counsel thus have effectively provided no market

data at all to justify their enhanced lodestar rate.

     *Second*, the NLJ survey could not be relied on even if it offered reliable data because it

purports to "represent rates for large multi-office firms listed in the National Law Journal's

survey of the nation's 250 largest law firms. In 2007, the firms cited by counsel ranged in size

from 392 to 1,092 attorneys." Malowane Aff. ¶ 37. Plaintiffs in this case, however, were not

represented by a large law firm. Because small firms typically charge less than large firms, *see*

*supra*, a survey of the nation's largest law firms would therefore be valueless even if it were

otherwise reliable.


    C.    *PERDUE v. KENNY A.* CONFIRMS THAT PLAINTIFF IS NOT ENTITLED TO
           A LODESTAR ENHANCEMENT

    Plaintiff disregards the teachings of *Kenny A. v. Perdue* and makes a number of errors in

unjustifiably claiming an enhancement of nearly $400 above the already inflated lodestar counsel

claim as a base rate. As indicated above, each justice in the *Kenny A.* majority was careful to

emphasize just how rare departures from the lodestar should be. Nothing about this case justifies

the conclusion that plaintiff's attorneys should receive an enhancement that the Court has held

should be unavailable in "virtually all cases."


    1.    Plaintiff's Counsel Are Not Entitled to a Performance Enhancement.

Plaintiff offers no coherent basis for claiming the "rare" entitlement to a performance enhancement, let alone an enhancement that would increase opposing counsels' rate to $789/hour (prior to their final enhancement request) for 95 percent of the hours claimed. As an initial matter, the Supreme Court made clear that performance adjustments may occur only "in accordance with specific proof linking the attorney's ability to a prevailing market rate." *Perdue*, 130 S. Ct. at 1674. As shown in the preceding section, plaintiff has provided no such data. For this reason alone, the claim for a *Perdue* enhancement must fail, and no further discussion is necessary.

While one could stop here, plaintiff's enhancement claim is separately misguided for a number of other reasons. As noted previously, the "rare circumstances" require "specific evidence that the lodestar fee would not have been adequate to attract competent counsel." *Perdue*, 130 S. Ct. at 1674. Opposing counsel have offered no such evidence. Instead, they emphasize the historical nature of the precedent set in the case and then adorn it with *ipse dixit* such as: "If this is not a case where the attorney performance reflects a higher-than-matrix value, Section 1988's promise of a 'reasonable attorney's fee' is illusory. And if the bar cannot expect that Section 1988 would reward this sort of representation with a commensurate market rate, then Section 1988 will not attract competent counsel to this most challenging, controversial, yet critically necessary work." P.Mem. at 35. Such statements are not "evidence" in any sense of the word. Absent is any explanation of why $420/hour for lawyers with well under 20 years experience (let alone the $589 offered under plaintiff's proposed lodestar) would be insufficient to induce competent attorneys to take on such representation. Far from offering such an explanation, plaintiff's counsel have not even been willing to assert that they themselves would have been unwilling to take on this litigation had they known that they would earn "only"

$830,685.97 at the end of it. Instead, the most they can offer are statements such as "Gura only agreed" to a nominal reduced fee at the outset "because of Section 1988." P.Mem. at 3–4.

Moreover, the suggestion that no other legal accomplishment could justify a performance enhancement if this case could not, rests on a solipsistic and myopic understanding of the legal world. For all its importance, apart from issues of standing, this case primarily involved briefing and oral argument as to a single important issue of law in this Court, the U.S. Court of Appeals for the D.C. Circuit, and the Supreme Court. This case thus did not even involve something that is present in even the most basic civil-rights cases—*i.e.*, uncertainty about what the facts will show at the end of the day. Nor did it require most of the calculation, strategic sense, and legal skills (other than brief-writing and oral argument) that are required in paradigmatic complex federal litigation. Contrast this case with, for example, *Laffey* itself, which as described above, was a class action involving thousands of plaintiffs where plaintiff's attorneys achieved extraordinary results and were not awarded fees until 13 years after the litigation commenced. *Laffey* of course provides the basis for the lodestar on which the District relies, and the resultant matrix was itself based upon, not the rates of typical attorneys, but rather upon the rates of the best attorneys in the District of Columbia (weighted largely towards larger firms). Whatever the quality of plaintiff's accomplishment here, it is certainly no more impressive than the accomplishment of the attorneys in *Laffey*. And whatever the quality of plaintiff's attorneys, it is no more impressive than the quality of the attorneys in *Laffey*, who led one of the best employment-discrimination firms in the country.

Further, the single legal issue that is the subject of this case was, according to opposing counsel, "remarkably simple," and "[t]he facts are clear, the issues are clear . . . ." Alan Gura & Robert A. *Levy, The Second Amendment Defends the Right of a Free People*, LEGAL TIMES,

March 17, 2008. While plaintiff in his brief cites to the District's statements in court filings that this case was "complicated," P.Mem. at 9–10, it is plaintiff's view of the case that ultimately prevailed. It stands to reason that the prevailing party should not be able to profit from a view of the case that they successfully opposed.

More fundamentally, plaintiff's counsel exaggerate the extent of their accomplishment by failing to pay even basic lip service to the scholars who preceded them and on which they heavily relied. Plaintiff's counsel did not themselves originate or develop the understanding of the Second Amendment that ultimately carried a bare majority of the Supreme Court. To the contrary, a well-developed secondary literature both contained the arguments and historical sources that plaintiffs relied on to prevail. *See, e.g.,* David B. Kopel, *The Second Amendment In The Nineteenth Century*, 1998 B.Y.U. L. REV. 1359; Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L. J. 637 (1989); Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983). Many of plaintiff's historical sources also were cited in such cases as: *Printz v. United States*, 521 U.S. 898 (1997); *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003); *Sylveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002); and *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

In addition, a voluminous OLC opinion issued nearly two years prior to the filing of their merits brief in the D.C. Circuit concluded that the Second Amendment protects an individual right. *See* UNITED STATES DEP'T OF JUSTICE, OFFICE OF LEGAL COUNSEL, WHETHER THE SECOND AMENDMENT SECURES AN INDIVIDUAL RIGHT (Aug. 24, 2004) (*available online at* http://www.justice.gov/olc/secondamendment2.pdf ). Further, in *Emerson*, the Fifth Circuit concluded, in a detailed opinion, that the Second Amendment provided for an individual right to bear arms, and rejected the view that the Second Amendment provided only collective or States'

rights. The *Emerson* opinion included a detailed review of the historical basis for that opinion.
*Id.* Plaintiff's counsel was hardly starting from scratch. Nor was plaintiff's counsel alone in this
case; indeed his position was supported by significant contributions from *Amici.*

It is fair to say that plaintiff's counsel successfully translated the efforts of others into a
winning litigation position. Such an endeavor certainly took skill, but when done well, most
complex litigation takes great skill, yet only the rarest circumstances (not present here) can
justify an enhancement beyond the *Laffey* rates.

It also bears note that the Supreme Court opinion that ultimately carried the day cited at
least 37 sources that were not in the plaintiff's Supreme Court brief.[8] The point of course is not

---

[8]     J. Tiffany, *A Treatise on Government and Constitutional Law* § 585, p. 394
(1867); Heyman, *Natural Rights and the Second Amendment*, in *The Second Amendment in Law
and History* 179, 193-195 (C. Bogus ed. 2000); N.C. DECLARATION OF RIGHTS § XIV (1776), in
5 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 2787, 2788
(F. Thorpe ed.1909); *A New and Complete Law Dictionary* (Timothy Cunningham 1771); J.
Trusler, *The Distinction Between Words Esteemed Synonymous in the English Language* 37
(1794); *A Compleat Collection of State-Tryals* 185 (1719); T. Wood, *A New Institute of the
Imperial or Civil Law* 282 (1730); *A Collection of All the Acts of Assembly, Now in Force, in the
Colony of Virginia* 596 (1733); J. Ayliffe, *A New Pandect of* Roman *Civil Law* 195 (1734); J.
Trusler, *A Concise View of the Common Law and Statute Law of England* 270 (1781); *Some
Considerations on the Game Laws* 54 (1796); B. Wilson, *The Works of the Honourable James
Wilson* 84 (1804); W. Duer, *Outlines of the Constitutional Jurisprudence of the United States* 31-
32 (1833); R. Burn, *Justice of the Peace and the Parish Officer* 88 (1815); T. Sheridan, *A
Complete Dictionary of the English Language* (1796); *Collected Works of James Wilson* 1142,
and n. x (K. Hall & M. Hall eds.2007) (citing PA. CONST., ART. IX, § 21 (1790)); T. Walker,
*Introduction to American Law* 198 (1837); *Journals of Continental Congress* 349–351 (J.
Fitzpatrick ed.1934); J. Brydall, *Privilegia Magnatud apud Anglos* 14 (1704) (Privilege XXXIII)
J. Bond, *A Compleat Guide to Justices of the Peace* 43 (1707); *An Abridgment of the Public
Statutes in Force and Use Relative to Scotland* (1755); E. de Vattel, *The Law of Nations, or,
Principles of the Law of Nature* 144 (1792); E. Roche, *Proceedings of a Court-Martial, Held at
the Council-Chamber, in the City of Cork* 3 (1798); C. Humphreys, *A Compendium of the
Common Law in force in Kentucky* 482 (1822); G. Sharp, *Tracts, Concerning the Ancient and
Only True Legal Means of National Defence, by a Free Militia* 17-18, 27 (3d ed. 1782); 2 J. de
Lolme, *The Rise and Progress of the English Constitution* 886–887 (1784) (A. Stephens ed.
1838); W. Blizard, *Desultory Reflections on Police* 59-60 (1785); *Documentary History of the
Ratification of the Constitution* 508-509 (M. Jensen ed.1976); *Centinel, Revived, No. XXIX,*
PHILADELPHIA INDEPENDENT GAZETTEER, Sept. 9, 1789; B. Oliver, *The Rights of an American*

that opposing counsels' performance was somehow deficient because they "missed" these sources or did not recognize their importance. It would undoubtedly be the rare Supreme Court case where the Court did not conduct original research outside the scope of the briefs before them. Instead, the point is that counsel did not win this case without help, and thus that they are misguided in portraying their performance here as the rarest of performances justifying a performance enhancement when, according to the Court, such an enhancement is inappropriate in virtually all cases.

        2.      Plaintiff Is Not Entitled to An Enhancement for Delay

        a.      No Delay Enhancement Is Appropriate

Plaintiff unjustifiably seeks an additional enhancement for what they are terming "*Perdue* interest." This additional enhancement amounts to approximately $180 for each hour claimed ($589,627.95 / 3,270.2). Again, plaintiff ignores the Court's admonition that such enhancements are reserved for "extraordinary circumstances" involving "exceptional" and "unanticipated" delay. *Perdue*, 130 S. Ct. at 1675. Indeed, such an enhancement must necessarily be "exceptional" given that delay in payment of attorneys' fees already is compensated for by *either* "basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Id.* (quoting *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)). Plaintiff, however, tries to do *both*, by applying 2010 adjusted rates to all of the years of this litigation *and* by tacking on a 7.25% interest penalty. Plaintiff even coins the term "*Perdue* interest" as a way of

---

Citizen 177 (1832); B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880); J. Ordronaux, *Constitutional Legislation in the United States* 241–242 (1891); J. Dunlap, *The New-York Justice* 8 (1815); W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271-272 (1831); H. Stephen, *Summary of the Criminal Law* 48 (1840); E. Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847); F. Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852).

making seem mundane something that the Court viewed as exceptional and, at most, was unwilling to "rule out." *Id*.

Opposing counsel also do not itemize the precise building blocks of their claim of delay, a defect that alone dooms the claim, given the Supreme Court's emphasis on precision in establishing entitlement to enhancements. *See id*. Moreover, what little glimpse counsel have given into their conception of "exceptional delay" is hardly supportive of their position. For example, they appear to count as unjustified and unanticipated delay such predictable steps as seeking rehearing *en banc* or moving for summary affirmance on a standing issue that the District reasonably believed to have been squarely governed by prior Circuit precedent. P.Mem. at 39. Nor should they have been surprised by requests for extension of briefing deadlines given the novel nature of the issues in this case. These requests also were granted by the Court, as was the referenced order holding the case in abeyance, and thus can hardly be viewed as unjustified. In all, plaintiff's claim went through three levels of judicial review and was resolved by the Supreme Court on the merits in just over five years, hardly "exceptionally" long for a case of this importance that involved serious questions of standing in addition to the overriding merits issue.

Also anomalous, plaintiff admits that the decision to await the *Perdue* decision was proper, yet still inexplicably claims entitlement to over $150,000 in taxpayer funds for the 450-day time period between the staying of this matter pending the decision in *Perdue* and the upcoming conclusion of briefing of this issue. P.Mem. at 40 n.17. *First*, in submitting a patently unreasonable original fee demand of $3.6 million, counsel have only themselves to blame for the fact that they did not receive their fees prior to the Court's decision to grant certiorari in *Perdue*. *Second*, counsel do not even begin to justify how a decision that they admit was legitimate and from which they claim to have benefited—*i.e.*, awaiting *Perdue* before resolving the petition –

can entitle them to still more money from District taxpayers. Instead, plaintiff asserts only that "the law is constantly evolving, and it is predictable that any 617 day delay might foretell changes in the landscape governing this motion." *Id.* This statement means nothing, and plaintiff cannot meet the demanding standard of *Perdue* through wordplay. Moreover, if this Court had resolved the fee petition prior to the decision in *Perdue*, the Supreme Court's decision to hear the case almost certainly would have come while plaintiff's fee petition was on appeal (a likely consequence of plaintiff's sense of entitlement to (at the time) $3.6 million in taxpayer funds). The likely result would then have been a remand to the District Court to evaluate the petition under the new standard, which would have placed the parties squarely in the position they are in now. Plaintiff's claim for a delay enhancement is therefore unjustified under any standard, let alone the exacting and demanding standard imposed by the Court in *Perdue*.

b.      Plaintiff's Counsel Offer No Justification For Their Proposed Interest Rate, and There Is None

Plaintiff's petition verges into caricature with his asserted claim that counsel should receive an interest rate of 7.25%. Plaintiff's justification for a position that would extract an additional $600,000 from District taxpayers consists entirely of the following: "The most appropriate 'standard' rate of *Perdue* interest appears to be the Small Business Administration's basic interest rate for unsecured general purpose 'Section 7(a)' loans." P.Mem. at 40. Literally nothing supports this assertion. Because it is plaintiff's burden to justify the fees requested, counsels' failure even to attempt to do so means they have not established entitlement to the interest they request and it should be denied.

The SBA rate for making riskier (and thus, higher interest) loans, moreover, has no evident connection to litigation rather, it appears that counsel simply scoured the U.S. Code for

the highest rate they could find. The lack of any felt need to justify this rate epitomizes the lack of any billing discretion, restraint, or self-awareness that suffuses this petition.

By contrast, interest is authorized on judgments obtained in civil matters in federal court, 28 U.S.C. § 1961, including awards of attorney's fees. *See, e.g., Boehner v. McDermott*, 541 F.Supp.2d 310 (D.D.C. 2008). The rate of such interest is "a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment" and is to be compounded annually. 28 U.S.C. §§ 1961(a), (b).[9] That rate, as of June 25, 2010, was 0.31%.[10] Plaintiff's requested interest rate is thus over 20 times the statutory rate.

Plaintiff also erroneously asserts that he was "entitled to payment" as of June 26, 2008, the date the Supreme Court issued its *Heller* decision. P.Mem. at 41. While the D.C. Circuit has not definitively ruled on the issue, the "majority view" is that post-judgment interest begins to run on the date the court rules that a party is entitled to attorneys' fees. *Boehner*, 541 F. Supp. 2d at 310. In the instant matter, the Court determined that plaintiff was entitled to attorneys' fees by Minute Order of March 23, 2009. The appropriate interest rate on that date was 0.64%.[11] Applying that rate to plaintiff's asserted request, compounded over the 1.25 years since then, results in an interest "adjustment" of $20,204.56. Applying that rate to the USAO *Laffey*-Matrix

---

[9]      "Difference between 'simple interest' and 'compound interest' is that 'simple interest' does not merge with principle and thus does not become part of the base on which future interest is calculated." BLACK'S LAW DICTIONARY 561 (Abridged 6th ed. 1991).

[10]      The Federal Reserve provides a regularly updated website for this (and other) rates: *http://www.federalreserve.gov/releases/h15/current.* A number of federal courts also maintain websites listing the current and historical rates for interest on federal judgments. *See, e.g.*, United States District Court for the Northern District of Texas, http://www.txnd.uscourts.gov/publications/pjrate.html.

[11]      *See* http://www.txnd.uscourts.gov/publications/interest/rate_2005_2009.html.

derived rates with the hour reductions proposed by defendant results in interest of $6,597.97. *See* Appendix.

## II.    THE NUMBER OF HOURS CLAIMED BY PLAINTIFF SHOULD BE REDUCED BECAUSE THEY ARE UNREASONABLE, INADEQUATELY DOCUMENTED, AND, FOR ALMOST HALF OF THE HOURS, NOT EVEN CONTEMPORANEOUSLY DOCUMENTED

In addition to claiming a grossly excessive rate, plaintiff also claims an excessive number of hours. Counsel has the burden to establish through documentation that their claim is only for time reasonably spent. *Covington*, 57 F.3d at 1107; *see also Hensley*, 461 U.S. at 434. Hours that are "excessive, redundant, or otherwise unnecessary" must be excluded. *Role Models*, 353 F.3d at 972 (quoting *Hensley*, 461 U.S. at 434). Similarly, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

Reasonable attorney fees are those reasonably necessary to plaintiff's prevailing on his claims against the party subject to the fee award. "It does not necessarily follow that 'the amount of time *actually* expended is the amount of time *reasonably* expended.'" *Kister v. District of Columbia*, 229 F.R.D. 326, 330 (D.D.C. 2005) (emphasis in original) (quoting *Copeland*, 641 F.2d at 891). "A party is only entitled to compensation for the work that is 'useful and of a type ordinarily necessary to secure the final result obtained from the litigation.'" *Id.* (quoting *Del. Valley*, 478 U.S. at 561 (citing *Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 235 (1985)). However, no fees are to be awarded for time spent litigating issues on which the fee applicant did

not ultimately prevail. *Tequila Centinela S.A. de C.V. v. Barcardi & Co. Ltd.,* 248 F.R.D. 64, 71 (D.D.C. 2008) (citing *Concerned Veterans,* 675 F.2d at 1332–33). An across-the-board percentage reduction is justified when a court determines that the total claim is unreasonable. *Democratic Cent. Comm. v. WMATA*, 12 F.3d 269, 272 (D.C. Cir. 1994); *Ctr. for Biological Diversity v. Norton*, 2005 WL 6127286, *2 (D.D.C. 2005).

"[A]n attorney's usual billing rate is presumptively the reasonable rate . . . ." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum,* 465 U.S. at 896 n. 11). *See also Norden*, 674 F.Supp.2d at 130 ("There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay.") (quoting *Griffin v. Wash. Convention Ctr.*, 172 F.Supp.2d 193, 197 (D.D.C. 2001)).

However, only one of plaintiff's six listed counsel even *has* a "usual billing rate." P.Mem. at 14 ("Plaintiff's counsel lack relevant hourly billing practices."); *cf.* Huff Decl. ¶¶ 3–4 (as of June 2009, standard billing rate was $330 per hour). That attorney's claimed hours represent less than 5% of the total hours requested (153.6 out of 3270.2).[12]

Moreover, contemporaneous time records "should be filed with the motion for attorneys' fees as a matter of course . . . ." *Kennecott Corp. v. EPA*, 804 F.2d 763, 767 (D.C. Cir. 1982) (citing, *inter alia*, *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982) ("[c]asual, after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees. Attorneys who anticipate making a fee

---

[12]      Plaintiff's original motion for attorney fees also claimed some 3.5 hours for Christopher Day, which claim has been waived. *See* P.Mem. at 5 n.4.

application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney.")). However, three of the six attorneys here—and two of the three attorneys with the most hours—failed to keep contemporaneous time records. *See* P.Mem. at 5 (counsel Neily, Levy, and Healy "largely reconstructed their time.").[13] In other words, almost *half* the claimed time is unsupported by contemporaneous records. *Cf. In re North (Watson Fee Application)*, 32 F.3d 607, 608–609 (D.C. Cir. Spec. Div. 1994) (where "no contemporaneous records" are maintained, such a "failure is controlling" and it is appropriate to "disallow [the fee] petition in its entirety."); *New York v. Microsoft*, 297 F.Supp.2d 15, 44 (D.D.C. 2003) (after deducting "wholly deficient" entries, further reduced the award by 15% to account for inadequately detailed entries and the use of "reconstructed records" instead of contemporaneous records).[14]

### a. Vague and inadequately documented billing entries

The Circuit has addressed inadequately documented fee requests in a number of ways, generally by reducing the overall fee request by a certain percentage, after deducting entries that were "wholly inadequate." *Michigan v. EPA*, 254 F.3d 1087, 1094–95 (D.C. Cir. 2001) (reducing request by 10%)); *Kennecott v. EPA*, 804 F.2d 763, 767 (D.C. Cir. 1986) (discounting fee request by 15% for poor documentation).

Counsels' entries do not satisfy their burden of establishing the reasonableness of the fee request, because the supporting documentation is not "of sufficient detail and probative value to

---

[13] Plaintiff asserts that attorney Gura expended 1,661 hours here, attorney Levy Neily 808.3 hours, attorney Levy 595.6 hours, attorney Huff 153.6 hours, attorney Healy 33.7 hours, and attorney Possessky 18 hours. *See* P.Mot. at 1.

[14] Plaintiff argues a far more casual approach, insisting that there is no need for "nit-picking at the records . . . ." P.Mem. at 12.

enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended[.]" *Role Models*, 353 F.3d at 970 (D.C. Cir. 2004) (quoting *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (*per curiam*) (emphases omitted)). *Cf.* n.6, *supra*.

> [W]e note numerous instances of documentation and specification that do not adequately describe the legal work for which the client is being billed. This makes it impossible for the court to verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given legal task. [S]uch generic entries are inadequate to meet a fee applicant's "heavy obligation to present well-documented claims.

*Role Models*, 353 F.3d at 971 (citations omitted).

The Court in *Role Models* addressed the effect of inadequate billing detail on recoverability. *Role Models* at 971. The Court found that billing entries for "researching and writing for appellate brief" and for time spent in telephone conferences or meetings "the purposes of which are not provided[,]" failed to meet a fee applicant's "heavy obligation to present well-documented claims." *Id. (quoting Kennecott Corp. v. EPA,* 804 F.2d 763, 767 (D.C. Cir. 1986). The Court also found that entries for "research" and "writing" were similarly defective. *Id. See also Holzmann*, 575 F.Supp.2d at 21 (criticizing "vaguely generic" billing entries in which no mention is made of the subject matter of a meeting or telephone conference).

The Circuit's reasoning is equally applicable to the current request. A review of counsels' time entries reveals that many suffer from these same deficiencies.[15]

For example, Mr. Levy's entries are especially rife with such unhelpful descriptions: June 26, 2002 (2.5 hours, "Review cases"); June 28, 2002 (3 hours, "Review Literature"); June 30, 2002 (2 hours, "Review Literature"); July 3, 2002 (4 hours, "Review Literature"); July 6, 2002

---

[15] These examples are just that—illustrative and not exhaustive. Moreover, because Mr. Gura has claimed the majority of the total hours, most of the relevant examples are from his records.

(3 hours, "Review DC Laws"); July 8, 2002 (3.5 hours, "Review Cases"); August 20, 2002 (4.5 hours, "Review empirical research"); May 19, 2003 (0.6 hours, "Emails w/AG & CN"); June 4, 2003 (0.6 hours, "Emails w/AG & CN"); October 14, 2003 (3 hours, "Prepare w/AG for moot court"). Mr. Levy's entries for June 1–August 30, 2004, claiming some 2.2 hours total, read:

| | | |
|---|---|---|
| 06/01 | 0.1 | Email w/AG, CN & GH |
| 06/02 | 0.2 | Email w/AG, CN & GH |
| 06/08 | 0.1 | Email w/AG |
| 06/09 | 0.1 | Email w/AG |
| 06/13 | 0.1 | Email w/AG, CN & GH |
| 06/14 | 0.1 | Email w/AG, CN & GH |
| 07/20 | 0.1 | Email w/AG, CN & GH |
| 08/18 | 0.1 | Email w/AG, CN & GH |
| 08/20 | 0.1 | Email w/AG |
| 08/26 | 0.1 | Email w/AG, CN & GH |
| 08/27 | 0.1 | Email w/AG, CN & GH |
| 08/30 | 1.0 | Conf w/AG, CN & GH |

Similarly, at the end of 2005, Mr. Levy's entries read:

| | | |
|---|---|---|
| 11/03 | 0.5 | Phone w/AG & CN |
| 11/07 | 0.2 | Email w/AG & CN |
| 11/08 | 0.1 | Email w/AG & CN |
| 11/11 | 0.7 | Review briefing schedule order; emails w/AG & CN |
| 11/17 | 0.1 | Email w/AG & CN |
| 11/18 | 0.3 | Phone w/AG & CN |
| 12/04 | 0.1 | Email w/AG & CN |
| 12/07 | 0.2 | Email w/AG, CN & amici |
| 12/13 | 0.1 | Email w/AG & CN |
| 12/29 | 0.1 | Email w/AG & CN |

Counsel Neily's records are similarly deficient. *See, e.g.*, 2/16/03 (claiming 4.5 hours for "Research cases and secondary literature re: preparing Ps' summary judgment motion"); 4/7/04 (claiming 2.5 hours for "Discuss Seegars docketing error w/ AG, RL and discuss possible correction; begin outlining appeal arguments"); 1/29/06 (claiming 4 hours for "Continue reviewing C Bogus documents"); 4/8/06 (claiming 6 hours for "Research DC/state and immunity from BOR issue"); 5/20/07 (claiming 1.5 hours for "Cross-petition research").

Similarly, the Circuit has chastised an applicant for billing "time spent dealing with individuals whose roles in the case are never explained." *Role Models*, 353 F.3d at 971. The Circuit complained that, because the fee application did not document who the individuals are, or explain the nature of their relationship to the case, the records provided were "manifestly inadequate." *Id.* (citing *In re Donovan*, 877 F.2d at 995).

The instant counsel's records suffer from the same faults. *See, e.g.*, Gura, 12/20/02 ("Review/resp. email re: G. St. Lawrence, J. Oslick, N. Caine"); 3/22/07 ("Conf. w/RL, CN, W. LaPierre, D. Lehman, R. Dowlut, C. Cox, S. Froman"); Levy, 8/29/02 ("Meet w/CN, Nelson Lund, Chuck Cooper").

The referenced entries simply lack the detail necessary for the Court to determine whether the fee request is reasonable.[16] A fixed deduction for general deficiencies, as opposed to an entry-by-entry review, is appropriate when a large number of billing entries are deficient. *Role Models* at 973.

Where, as here, "the time records contain so little information, [the Court] has no basis for concluding that hours that appear to be excessive and redundant are in fact anything other than excessive and redundant." *Role Models*, 353 F.3d at 972 (citing *In re Espy (Townsend Fee Application)*, 346 F.3d 199, 204 (D.C. Cir. 2003)).

---

[16]     The details do not improve over time. For example, in 2006, a block of Mr. Levy's entries read:

| | | |
|---|---|---|
| 12/12 | 0.4 | Emails re cert |
| 12/19 | 0.1 | Email re "carry" |
| 12/20 | 0.1 | Email re fee |
| 12/21 | 0.1 | Email re fee |
| 12/23 | 0.1 | Email re fee |

The Levy entries for 2007 contain many more listings similarly lacking in any meaningful detail (*see, e.g.*, May 15–July 15).

Throughout counsel's submission there are numerous entries that lack sufficient detail to allow the Court to determine that the work performed was reasonable and necessary. These defects justify at a minimum a reduction in any fees awarded by at least 15%. *See Holzmann*, 575 F.Supp.2d at 36 ("The relevant question is not *whether* the lodestar should be reduced due to counsel's impenetrable narratives, but by *how much*.") (emphasis in original) (applying 10% "across-the-board reduction").

### b. Block-billing

"One disfavored practice is submitting time records that 'lump together multiple tasks, making it impossible to review their reasonableness.'" *Doe v. Rumsfeld*, 501 F.Supp.2d 186, 192 (quoting *Role Models,* 353 F.3d at 971). *See also Holzmann*, 575 F.Supp.2d at 37 (block-billing "make[s] it impossible for the court to determine, with any degree of exactitude, the amount of time billed for a discrete activity") (quoting *In re Olson*, 884 F.2d at 1428–29); *Cobell*, 407 F.Supp.2d at 160. In *Cobell,* the Court refused to "undertake the futile task of separating plaintiff's block entries into their constituent tasks and apportioning a random amount to each." *Id.*

Here, a number of counsel's entries suffer from this defect. For example, Mr. Gura's entry for May 1, 2003, claims 6.3 hours for "Email RL/CN/GH re: consolidation/recusal, finalize and file opp/motion, declarations, and update clients." Similarly, his entry for May 19, 2003, claims 5 hours for "Emails RL/CN re: declarations, strategy on responsive pleading to consolidation issues, research and draft pleading" and the entry for March 31, 2004, claims 5 hours for "Review District Court Opinion and order, judgment and update clients/counsel, formulate appellate strategy." The entry for August 13, 2006, claims 7 hours for "Email RL/CN

standing, new arg. on appeal and two versions of reply brief fragments, revise and draft brief" while the entry for August 19, 2006, claims 4.5 hours for "Finalize brief, review all RL/CN and correspond."

Counsel Neily's entries frequently suffer from the same problems. *See, e.g.*, 6/16/02 (6 hours claimed for "Finish Kates article and review G Reynolds and R Barnett *Gun Crazy* re: empirical evidence concerning gun regs/gun bans and international data"); 6/23/02 (7 hours claimed for "Review and analyze cases in 1,2,3,4,6,7,8,10,11 Circuits re: 2Am holdings; begin review of state app ct rulings on 2Am and analogous provisions"); 6/30/02 (5 hours claimed for "Review DC Code re: CPWOL restriction on indoor carry/licensing; check other jurs for similar gun lock/safe-storage requirements; research overbreadth claim for DC machine gun definition"); 4/13/03 (2.5 hours claimed for "With preparation of response to M/consol; review notes re: history/timing of the two case filing (Parker and Seegars); draft declaration reflecting same re: resisting consolidation motion"); 2/13/05 (5.5 hours claimed for "Continue researching DC Cir standing cases re: distinguishing Parker from Seegars; review DCT transcripts re personal threats of prosecution to Ps"); 1/15/06 (6 hours claimed for "Continue researching major collective/states/milita rights theorists and law review literature").

Block-billing defects, like those found here, warrant a reduction to the lodestar, which is incorporated in the 15% reduction previously claimed for inadequately detailed entries *supra*. *See Holzmann*, 575 F.Supp.2d at 38.


*c. Uncompensable items*

Several of counsels' entries claim time for tasks that are not reimbursable. For instance, attorney Gura listed "Reading Legal Times and contacting NPR, 0.3 hours" for 12/16 &

12/26/02, but it is axiomatic that, in this Circuit, "the government cannot be charged for time spent in discussions with the press." *Role Models*, 353 F.3d at 972 (citing *American Petroleum*, 72 F.3d at 913).

Additionally, the District should not have to pay for the time opposing counsel spent recruiting potential plaintiffs. *See*, *e.g.*, Gura, 12/26/02 ("Email re: plaintiff selection and screening" 0.3 hours); Levy, 7/25/02 ("Meeting w/potential Ps & discuss" 3.5 hours).[17] *Role Models*, 353 F.3d at 973 ("The government should not have to pay for administrative matters relating to the formal relationship between [plaintiff] and its attorneys.").

Similarly, the District should not have to pay for:

1. The motion to recuse Seegars counsel and in opposition to consolidation (on which the District took no position): 83 hours (Gura, 39.9 (4/15-7/9/03); Neilly, 21.3 (4/4-5/22/03); Levy, 21.8 (4/3-7/9/03)). *See* Rezneck Decl. ¶ 17.

2. Correction of appendix because of counsel error: 0.5 hours (Gura (6/5-6/6/06)).

3. Attending symposium: 3.0 hours (Gura (10/17/07)).

4. Discussions with NRA to dissuade support of mooting legislation: 4.4 hours (Levy (3/20-4/1/07)).

5. Time spent preparing a response to the District's petition for rehearing at the Circuit: 8.2 hours (Gura, 3.6 hours; Neily 3 hours; Levy 1.6 hours).

*d. Excessive Hours*

---

[17]     *See also* http://en.wikipedia.org/wiki/Robert_A._Levy ("In 2002, Levy began recruiting plaintiffs for a planned Second Amendment lawsuit against the District of Columbia. [H]e teamed up with Clark M. Neily III of the Institute for Justice and began finding and vetting District residents who had a legitimate and appealing reason for wanting a gun for self defense at home.") (last visited June 28, 2010).

There are a number of entries that evidence excessive effort on individual tasks. For instance:

1. Attendance at Supreme Court to hear decision announcement: 11.5 hours (Gura, 4 (6/26/08); Neilly 3.5 (6/26/08); Levy 4.0 (6/26/08)). *See* Rezneck Decl. ¶ 22.

Moreover, "[t]ravel time is supposed to be compensated at half the attorney's hourly rate." *Rumsfeld*, 501 F.Supp.2d at 193 (citing *Cooper v. United States R.R. Retirement Bd.*, 24 F.3d 1414, 1417 (D.C. Cir. 1994)); *Holzmann*, 575 F.Supp.2d at 30 (same).

Thus, the 77 hours listed for travel to and from Washington (Levy, (12/6-12/7/06, 9/17–9/18/07, 11/13-11/16/07, 12/13-12/14/07, 3/6-3/7/08, 3/13-3/19/08, 6/22-6/27/08) should be compensated at no more than half the attorney's hourly rate.

2. Unopposed motion to add Mayor to caption: 2 hours (Gura (11/10/05)).

3. Response to amicus McGill for time to participate in oral argument: 3.2 hours (Gura (10/30-10/31/05)).

4. Research and draft Circuit brief: 133 hours for counsel Gura alone (1/4/06–5/16/06). *See* Rezneck Decl. ¶ 18.

5. Preparation for argument and moot court at Circuit: 55.3 hours for counsel Gura alone (9/26/06–12/06/06). *See* Rezneck Decl. ¶ 19.

Similarly, Mr. Gura asserts over 300 hours for preparation of the Supreme Court briefs (11/24/07–2/3/08), and almost 100 hours in preparation for oral argument (2/5/08–3/17/08). The District avers that this time is excessive. *See* Rezneck Decl. ¶¶ 20–21. While counsel scored an impressive, indeed precedential, victory at the Supreme Court, the District should not have to pay for counsel's over-preparation, which (together with the victory) will continue to benefit them over the course of their careers. *See Role Models*, 353 F.3d at 973 (fee-shifting statutes

"should not be used to require the government to fund the enhancement of an attorney's versatility or capability.") (quoting *Miller v. Alamo*, 983 F.2d 856, 862 (8th Cir. 1993)).

Case law suggests that the total hours claimed as excessive should be reduced by 50%. *See, e.g., Salazar*, 123 F.Supp.2d at 16.

### e. Unsuccessful Claims

"[N]o compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail." *Copeland*, 641 F.2d at 891–92 (D.C. Cir. 1980) (*en banc*) (footnote omitted). *See also Hensley*, 461 U.S. at 440 ("the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee."); *Thomas v. NFL Players Ass'n*, 273 F.3d 1124, 1128 (D.C. Cir. 2001) (quoting same)).

Here, the following items should be excluded:

1. Cross-petition for *cert*. and reply: 102.8 hours (Gura, 56.3 hours (5/18-9/10/07, including 1.1 hours on standing, 3/11-3/12/07); Neilly, 27.3 hours (5/20-5/21/07, 7/20-9/7/07, 10/13-10/22/07); Levy, 19.2 hours ((7/20-7/25/07, 8/11-9/9/07, 10/19-10/22/07)). *See* Rezneck Decl. ¶ 11.

2. Ninth Amendment: 2.5 hours (Gura, 12/20-12/30/02). *See* Rezneck Decl. ¶ 12.

Similarly, counsel expended many hours on unsuccessful motions, which hours should also be excluded. *See, e.g., Board of Trustees of the Hotel & Restaurant Employees Local 25 v. JPR, Inc.*, 136 F.3d 794, 800 (D.C. Cir. 1998) ("The weaker the apparent need for a particular activity, the higher the evidentiary hurdle a claimant must cross in order to demonstrate that it was in fact performed in a reasonable effort to pursue the litigation.").

3. Opposition to the District's motion to extend time (D.D.C.): 13.2 hours (Gura (4/8–4/14/03). *See* Rezneck Decl. ¶ 13.

4. Opposition to amicus participation: 9.4 hours (Gura (7/25-18/14/03)). *See* Rezneck Decl. ¶ 14.

5. Opposition to the District's motion to extend time to file petition: 14.1 hours (Gura, 8.4 (7/16-7/19/07); Neilly, 2.5 (7/16-7/17/07); Levy, 3.2 (7/16-7/17/07)). *See* Rezneck Decl. ¶ 15.

6. Motion to lift stay of the Circuit's mandate: 23.7 hours (Gura, 16.7 (9/8-9/24/07); Neilly 5.5 (9/8-9/24/07); Huff, 1.5 (9/25/07)). *See* Rezneck Decl. ¶ 16.


### *f. Lack of Billing Judgment*

Attorneys seeking to recover fees and costs pursuant to 42 U.S.C. § 1988 must exercise "billing judgment," such that the attorney only charges hours to one's adversary through the Court which the attorney would properly bill to his own client. *Hensley*, 461 U.S. at 434; *Holzmann*, *supra* at * 14.

Attorneys who claim to have exercised billing judgment should *specifically identify* any hours that were excluded from a fee petition and indicate the tasks to which those hours were devoted. *Concerned Veterans*, 675 F.2d at 1327–28, 1334–35; *Cook v. Block*, 609 F.Supp. 1036, 1041 (D.D.C. 1985). The fee petitioner may establish his exercise of billing judgment by detailing in a declaration explaining the fee petition the various reductions and exclusions of charges made in the billing judgment exercise. *See Kaseman v. District of Columbia*, 329 F. Supp.2d 20, 27 (D.D.C. 2004); *Biological Diversity, supra*, at *1. The petitioner may also demonstrate the use of billing judgment by reflecting the times and activities for which no

recovery is sought and designating each such item as "No Charge" in his billing documentation. *Palmer v. Rice,* 2005 WL 1662130, * 8 (D.D.C. 2005).

Counsel has failed to meet this burden, despite being reminded of it by the District in the previous round of briefing. The record does not reflect the use of billing judgment here, aside from two conclusory invocations of the term. *See, e.g.*, P.Mem. at 2, 9.

If the fee petitioner fails to exercise billing judgment, it falls to the Court to exercise billing judgment for the petitioner. *See Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999); *see also Biological Diversity*, *supra*, at * 1 ("Courts must review fee applications to ensure that taxpayers only reimburse prevailing parties reasonable fees and expenses that contributed to the results achieved, and that appropriate deductions are made for excessive or duplicative hours.") (internal citations omitted).

The District urges the Court to reduce any award here by 10% to reflect counsel's failure to document the asserted exercise of billing judgment.


   *g. Expenses.*

Counsel seek some $13,215.30 in expenses. "[C]osts are not allowed if they cannot be attached to the advancement of a specific claim, or they are so general that they could be placed under the cost umbrella of overhead or office expense." *Holzmann*, *supra* at 55 (citation omitted).

Here, at least two entries of the asserted expenses are so vaguely described as to prevent the Court from determining whether they were reasonably incurred. Counsel requests $3,250 in legal fees for an attorney "for initial research into the case" and $4,400 in legal fees "for assistance with the reply brief filed before the D.C. Circuit." Levy Decl. ¶ 5.

The vagueness of the descriptions of these charges warrants a 40% reduction (*i.e.*, reimbursement in the amount of $4,590 in total for these two items). *See Holzmann*, *supra*, at 58 (applying 40% across-the-board reduction in compensable expenses due to "generic and ambiguous" descriptions).

## III. Conclusion

While opposing counsels' performance in this litigation was certainly of above-average quality, they have failed to overcome the "strong presumption" against adjustments; their evidence consists almost solely of the self-serving declarations of counsel. "Absent amplifying details, this 'evidence' consists of nothing more than superlative-laden platitudes." *Holzmann*, *supra*, at 51 (citing *Delaware Valley*, 478 U.S. at 565–66) (footnote omitted).[18]

After deduction of noncompensable items, a fixed percentage reduction in the overall award is appropriate given the number of deficient entries described herein. *See Role Models*, 353 F.3d at 973 (citing *Copeland*, 641 F.2d at 903 (trial court may reduce improperly documented award "by a reasonable amount without performing an item-by-item accounting.")).

> Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights. But unjustified enhancements that serve only to enrich attorneys are not consistent with the statute's aim. In many cases, attorney's fees awarded under § 1988 are not paid by the individuals responsible for the constitutional or statutory violations on which the judgment is based. Instead, the fees are paid in effect by state and local taxpayers, and because state and local governments have limited budgets, money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services

*Perdue*, 130 S.Ct. 1677–78 (footnote and citation omitted).

---

[18]     *Cf. King*, 950 F.2d at 779 ("Without in any way denigrating the *bona fides* of these lawyers, we cannot blink the fact that they are obviously self-interested.").

Plaintiff helpfully encapsulates the deficient spirit of his motion by concluding the petition with the following: "Plaintiffs' [sic] counsel have not only earned the right to their fees and costs under existing law, but it is in the public interest that they be fairly compensated lest the word go out to the bar that civil rights practice requires independent wealth or vows of poverty in additional to generosity of spirit." P.Mem. at 42. This statement betrays first a fundamentally misguided understanding of "poverty" and public interest work more generally. Under the District's proposed fee award, opposing counsel will walk away with $830,865.97, career opportunities that most lawyers only dream of having, and other intangible career benefits. This is not "poverty," and $950/hour is far from necessary to incentivize competent counsel to take cases in the public interest, much less cases that involve only briefing and oral argument, based almost exclusively on the scholarship of others.

Plaintiff's fee petition would be grossly excessive under any circumstances, but in a time of financial crisis, attempts to invoke the public interest to justify a fee award of over $3 million is perverse at best. Instead, the "public interest" falls squarely on the shoulders of the District and its residents whose essential services are threatened by shrinking budgets, not the wallets of plaintiff's counsel, which will be more than adequately filled under the fee proposed by the District.

For the reasons stated herein, and as shown in the Appendix, the Court should, at a minimum, reduce plaintiff's request and grant plaintiff's Motion in an amount no greater than $830,685.97 in fees and interest, and $9,480.27 in expenses.

DATE: July 9, 2010          Respectfully submitted,

                            PETER J. NICKLES
                            Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Ellen A. Efros_____
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886

_____/s/ Robert Utiger_____
ROBERT UTIGER, D.C. Bar No. 437130
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6532
robert.utiger@dc.gov

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
andy.saindon@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
SHELLY PARKER, *et al.*                             )
                                                    )
                            Plaintiffs,             )
                                                    )
            v.                                      )          Civil Action No.03-0213 (EGS)
                                                    )
DISTRICT OF COLUMBIA, *et al.*,                     )
                                                    )
                            Defendants.             )
_____)

ORDER

Upon consideration of plaintiff Heller's Motion for Attorney Fees and Costs, the Memoranda of Points and Authorities in Support thereof and in Opposition thereto, the entire record herein, and it appearing that the relief should be granted in part and denied in part, it is hereby:

ORDERED, that plaintiff Heller's Motion for Attorney Fees and Costs be, and hereby is, GRANTED in part and DENIED in part, and it is

FURTHER ORDERED, that plaintiff Heller is awarded $824,088.00 in fees, plus $6,597.97 in interest, per 28 U.S.C. § 1961, calculated from March 23, 2009, and $9,480.27 in costs.

SO ORDERED.


DATE: _____          _____
                                      EMMET G. SULLIVAN
                                      United States District Judge

**Appendix**

**1. Fees**

**Attorney Gura (1995 graduate):**
Total Hours claimed:             1,661
Rate claimed:                    $790/hr
Amount claimed:                  $1,312,190.00

USAO *Laffey* rate:     $420/hr
Uncompensable items (p. 23–24)              47.9 hours
Excessive hours (pp. 24–25)          409.2 hours (reducing 50% = 204.6 hours)
Unsuccessful claims/motions (pp. 25–26)     119.2 hours
Adjusted time: 1289.3 hours (= 1,661 – 47.9 – 204.6 – 119.2)
        Deduction for vague time entries & block-billing:   15%
        Deduction for lack of evidence of billing judgment   10%
Adjusted hours:        967 (= 1289.3 – 25%)
Adjusted claim:        $406,140.00 (967 X $420/hr)

**Attorney Neily (1994 graduate):**
Total Hours claimed:             808.3
Rate claimed:                    $790/hr
Amount claimed:                  $638,557.00

USAO *Laffey* rate:     $420/hr
Uncompensable items (p. 23–24)              24.3 hours
Excessive hours (pp. 24–25)          3.5 hours (reducing 50% = 1.75 hours)
Unsuccessful claims/motions (pp. 25–26)     35.3 hours
Adjusted time: 747 hours (= 808.3 – 24.3 – 1.75 – 35.3)
        Deduction for vague time entries & block-billing:   15%
        Deduction for lack of evidence of billing judgment   10%
Adjusted hours:        560.3 (= 747 – 25%)
Adjusted claim:        $235,326.00 (560.3 X $420/hr)

**Attorney Levy (1994 graduate):**
Total Hours claimed:             595.6
Rate claimed:                    $790/hr
Amount claimed:                  $470,254.00

USAO *Laffey* rate: $420/hr (–25% for lack of litigation experience (*see* p. 11) =
        $315.00/hr).
Uncompensable items (p. 23–24)              31.3 hours
Excessive hours (pp. 24–25)          (4 + 77) hours (reducing 50% = 40.5 hours)
Unsuccessful claims/motions (pp. 25–26)     22.4 hours
Adjusted time: 501.2 hours (= 595.4 – 31.3 – 40.5 – 22.4)
        Deduction for vague time entries & block-billing:   15%

Deduction for lack of evidence of billing judgment   10%
Adjusted hours:        375.9 (= 501.2 – 25%)
Adjusted claim:        $118,408.50 (375.9 X $315/hr)

## Attorney Huff (2006 graduate):

Total Hours claimed:        153.6
Rate claimed:              $400/hr
Amount claimed:            $61,440.00

USAO *Laffey* rate:      $275/hr
Unsuccessful claims/motions (pp. 17–18)     1.5 hours
Adjusted time: 152.1 hours (= 153.6 – 1.5)
Adjusted claim:        $41,827.50 (152.1 X $275/hr)

## Attorney Healy (1999 graduate):

Total Hours claimed:        33.7
Rate claimed:              $790/hr
Amount claimed:            $26,623.00

USAO *Laffey* rate:      $420/hr
        Deduction for vague entries & "reconstructed" records:     25%
Adjusted hours:        25.3 (= 33.7 – 25%)
Adjusted claim:        $10,626 (25.3 X $420/hr)

## Attorney Possessky (1995 graduate):

Total Hours claimed:        28
Rate claimed:              $790/hr
Amount claimed:            $14,220

USAO *Laffey* rate:      $420/hr
Adjusted claim:        $11,760 (28 X $420/hr)


**Total Adjusted Base Claim for Attorney's Fees:  $824,088.00**


**Interest (0.64%, compounded annually since Mar. 23, 2009) = $6,597.97**


**Total Adjusted Claim for Attorneys' Fees and Interest: $830,685.97**

**2. Expenses**

| | | |
|---|---|---|
| As claimed: | Travel expenses: | $3,544.00 |
| | Photocopy/printing expenses: | $765.44 |
| | Postage: | $212.36 |
| | Teleconferencing: | $244.00 |
| | Messenger fees: | $124.47 |
| | Outside Legal Services: | $7,650.00 |
| Total as claimed: | | $12,540.27 |

Reduction for vagueness (*see* p. 28): $7,650.00 – 40% = $4,590.00

**Total Adjusted Claim for Expenses:        $9,480.27**