## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
DICK ANTHONY HELLER,            )
                                )
            Plaintiff,          )
                                ) Civil Action No. 03-213 (EGS)
        v.                      )
                                )
DISTRICT OF COLUMBIA, *et al.*, )
                                )
            Defendants.         )
_____)

### MEMORANDUM OPINION

Plaintiff Dick Anthony Heller was the prevailing party in

litigation before the United States Supreme Court, in which that

Court held that the District of Columbia's "ban on handgun

possession in the home violates the Second Amendment, as does

its prohibition against rendering any lawful firearm in the home

operable for the purpose of immediate self-defense." *See*

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

Pending before the Court is plaintiff's motion for attorney fees

and costs pursuant to 42 U.S.C. § 1988 ("§ 1988"). Plaintiff is

seeking an award of $3,126,397.25 in fees and costs. Pl.'s Mot.

at 2. Defendants, by contrast, urge the Court to award no more

than $840,166.24, *see* Defs.' Opp'n at 5,[1] arguing that

_____

[1]    After briefing on plaintiff's fee petition was ripe,
defendants filed a "notice" with the Court in which it argued
that plaintiff should be awarded no more than $657,252.22.  *See*

plaintiff's counsel should not be permitted to "enrich themselves at the expense of taxpayers," particularly during this time of "financial crisis." Defs.' Opp'n at 1. Sensitive to the fact that the fees in this case will be paid by the taxpayers, this Court is left with the difficult task of closely scrutinizing plaintiff's fee petition to determine what is fair, reasonable, and just compensation for the legal services of plaintiff's attorneys. Upon consideration of plaintiff's fee petition, the opposition and reply thereto, defendants' notices and the opposition thereto, the arguments of the parties made during the hearings held on December 13, 2010 and March 23, 2011, the parties' post-hearing briefs and additional supplemental briefing ordered by the Court, the Court hereby

---

Defs.' Notice, Docket No. 71 ¶ 8. Defendants then further revised their position and argued that plaintiff should receive no more than $722,424.78. *See* Defs.' Third Notice, Docket No. 75. Prior to oral argument in this case, defendants filed three "Notice[s] of Intent to Rely on Additional Authority and Arguments" with the Court. *See* Docket Nos. 71, 74, and 75. These filings were made without the consent of plaintiff and without leave of the Court; they were not made in response to new case law, in response to newly discovered evidence, or in response to new arguments raised by plaintiff for the first time in his reply brief. Instead, these "notices" primarily consist of new arguments that could have been made in defendants' opposition brief. Despite the fact that these supplementary pleadings were improperly filed with the Court, the Court has nevertheless considered defendants' late-raised arguments and finds them generally unpersuasive for the reasons articulated by plaintiff. *See* Docket No. 72.

determines that plaintiff's counsel is entitled to fees in the
amount of $1,132,182.00 and expenses in the amount of $4890.27.

## I.    STATUTORY FRAMEWORK

Section 1988 authorizes a district court, in its
discretion, to award a "reasonable attorney's fee" to a
prevailing civil rights litigant.  42 U.S.C. § 1988.  "[A]
'reasonable' fee is a fee that is sufficient to induce a capable
attorney to undertake the representation of a meritorious civil
rights case."  *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (2010);
*see also Blum v. Stenson*, 465 U.S. 886, 897 (1984) ("[A]
reasonable attorney's fee is one that is adequate to attract
competent counsel, but that does not produce windfalls to
attorneys.")(ellipsis, brackets, and internal quotation marks
omitted).

The starting point for determining a reasonable fee is the
"lodestar method," which "is the number of hours reasonably
expended on the litigation multiplied by a reasonable hourly
rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  "[T]he
lodestar method produces an award that roughly approximates the
fee that the prevailing attorney would have received if he or
she had been representing a paying client who was billed by the
hour in a comparable case[.]"  *Perdue*, 130 S. Ct. at 1672.
There is a "strong presumption" that the lodestar figure

represents a reasonable attorney's fee, *id.* at 1673, because "'the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee,'" *id.* at 1667 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566 (1986)).

In calculating a reasonable fee award, the Court must make three separate determinations: (1) what constitutes a "reasonable hourly rate" for the services of plaintiff's counsel; (2) the number of hours that were reasonably expended on the litigation; and (3) whether plaintiff has offered "specific evidence" demonstrating this to be the "rare" case in which a lodestar enhancement is appropriate, and if so, in what amount. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 11 (D.D.C. 2008); *see also Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  The fee applicant, however, "bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates[.]" *Covington*, 57 F.3d at 1107 (citing *Blum*, 465 U.S. at 896 n.11; *Hensley*, 461 U.S. at 437).  Likewise, "the burden of proving that an enhancement is necessary must [also] be borne by the fee applicant." *Perdue*, 130 S. Ct. at 1673.  This Court, therefore, must first determine whether plaintiff has met his burden with respect to rates, hours, and enhancements.  The

Court will then consider plaintiff's request for reasonable expenses.

## II.  PLAINTIFF'S FEE AWARD

### A.  Reasonable Hourly Rate

The first significant issue this Court must decide is the appropriate hourly rate at which each of plaintiff's attorneys should be compensated.  "[A] fee applicant's burden in establishing a reasonable hourly rate entails a showing of at least three elements: [1] the attorneys' billing practices; [2] the attorneys' skill, experience, and reputation; and [3] the prevailing market rates in the relevant community." *Covington*, 57 F.3d at 1107; *see also Blum*, 465 U.S. at 896 n.11 ("[T]he burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.").  After careful consideration of this evidence, "the Court must then exercise its discretion to adjust [the requested rate] upward or downward to arrive at a final fee award that reflects the characteristics of the particular case (and counsel) for which the award is sought." *Falica v. Advance Tenant Servs.*, 384 F. Supp. 2d 75, 78 (D.D.C. 2005) (internal quotation marks omitted) (citing

cases); *see also American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 148 (D.D.C. 2007) (explaining that the district court must assure itself that the rate requested is "commensurate with the attorneys' skill and experience, and with the quality of the attorneys' work")(internal quotation marks omitted).  The Court will begin by addressing the first element of the *Covington* rate inquiry: the billing practices of plaintiff's counsel.

### 1.   Counsel's Billing Practices

With regard to this first factor, "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum*, 465 U.S. at 895-96 n.11).  The attorneys in this case, however, do not have a usual billing rate.  *See* Pl.'s Mot. at 14 ("As is typical among attorneys dedicated largely or exclusively to public interest work, Plaintiff's counsel lack relevant hourly billing practices.").  Specifically, three of plaintiff's attorneys (Mr. Neily, Mr. Levy, and Mr. Healy) are employed by non-profit public interest organizations that do not charge hourly billing rates, and three of his attorneys (Mr. Gura, Ms. Possessky, and Mr. Huff) do not have standard, fixed hourly

rates, as they frequently charge "sub-market rates in order to provide legal services to those who otherwise could not afford them." Pl.'s Mot. at 14-15. Plaintiff's counsel, therefore, is "entitled to an award based on the prevailing market rates." *Covington*, 57 F.3d at 1107 (explaining that attorneys "who either practice privately and for-profit but at reduced rates reflecting non-economic goals or who have no established billing practice" should be compensated based on the prevailing market rate).[2]

---

[2] Following a hearing on plaintiff's fee petition, both parties were given leave by the Court to file a 5-page post-argument brief. In their post-argument brief, defendants - for the first time - challenged counsel's billing practices. *See* Defs.' Supp. Br., Docket No. 77, at 1-2 ("[P]laintiff has not established that lead counsel's two-person law firm can command even USAO Laffey rates in the cases where the firm does not discount rates for public spirited reasons. . . . Plaintiff's failure to show entitlement to USAO Laffey rates necessarily means he is not entitled to a higher rate."). Defendants did not raise this argument in their opposition brief. Indeed, rather than challenge the representations of plaintiff's counsel with respect to their lack of relevant billing practices, defendants initially conceded that plaintiff's counsel lacked a usual billing rate and agreed that they should be compensated at the prevailing market rate for complex federal litigation. *See* Defs.' Opp'n at 6-7 ("Particularly where (as here), attorneys lack a usual billing rate, federal courts most frequently use the 'lodestar' approach, which 'looks to the prevailing market rates in the relevant community.'") (internal citations omitted). Despite this initial concession, the Court has nevertheless considered defendants' late-raised challenge to the billing practices of Mr. Gura, Ms. Possessky, and Mr. Huff. The Court finds this argument unpersuasive, however, and for the reasons articulated below, concludes that an award of fees under the USAO Laffey Matrix is appropriate.

## 2.   Counsel's Experience, Skill & Reputation

"Second, prevailing parties must offer evidence to demonstrate their attorneys' experience, skill, reputation, and the complexity of the case they handled." *Covington*, 57 F.3d at 1108.  This, in turn, requires an attorney to "'produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* (quoting *Blum*, 465 U.S. at 896 n.11).  The D.C. Circuit has noted that "this second element of the reasonable-rate analysis informs the first element of the inquiry," explaining that "'[w]e do not propose . . . that all attorneys be remunerated at the same rate, regardless of their competence, experience, and marketability.  We only aim to provide that their experience, competence, and marketability will be reflected in the rate at which they are in fact remunerated.'" *Id.*  This factor, therefore, is of only limited utility to the Court because – as discussed above – plaintiff's attorneys do not have standard billing rates that reflect their experience, competence, and marketability.

The Court will note, however, the impressive qualifications of plaintiff's counsel.  Indeed, with the exception of one

8

attorney, plaintiff was represented by a team of skilled litigators with significant experience in the for-profit, non-profit, and government sectors at both the trial and appellate level. *See generally* Pl.'s Mot. at 16-20 and the declarations cited therein.

### 3.  Prevailing Market Rate

Given the limited utility of the first and second factors in this case, in order to determine a reasonable hourly rate for plaintiff's counsel, the Court must focus its inquiry upon the third factor: "the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." *Covington*, 57 F.3d at 1107.

In the District of Columbia, a reasonable hourly rate for complex federal litigation has traditionally been determined through use of a matrix known as the "Laffey Matrix."  The Laffey Matrix, which was developed 25 years ago in *Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C. 1986), *aff'd in part and rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), provides billing rates for attorneys in the Washington, D.C. market with various degrees of legal experience.[3]  The

---

[3]     Specifically, the Laffey Matrix provides billing rates for attorneys with 1-3 years of experience; 4-7 years of experience; 8-10 years of experience; 11-19 years of experience; and 20+ years of experience.  These various "brackets" are intended to correspond to "junior associates" (1-3 years after law school

initial Laffey Matrix was based upon the prevailing market rates

from 1981-1982.  As discussed more fully below, two different

matrices have been used as proof of prevailing market rates in

complex federal litigation in the District of Columbia.  "One

version, which is maintained by the Civil Division of the Office

of the United States Attorney, calculates the matrix rate for

each year by adding the change in the overall cost of living, as

reflected in the United States Consumer Price Index for the

Washington, D.C. area for the prior year, and then rounding that

rate to the nearest multiple of $5.  A second, slightly

different version of the Laffey Matrix . . . calculates the

matrix rates for each year by using the legal services component

of the CPI rather than the general CPI on which the U.S.

Attorney's Office Matrix is based."  *Smith v. District of

Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) (internal

quotation marks and abbreviations omitted).

The Circuit has advised that in order to demonstrate the

prevailing market rate:

> [P]laintiffs may point to such evidence as an updated
> version of the *Laffey* matrix or the U.S. Attorney's
> Office matrix, or their own survey of prevailing
> market rates in the community. . . . To supplement

graduation), "senior associates" (4-7 years), "experienced
federal court litigators" (8-10 and 11-19 years), and "very
experienced federal court litigators" (20 years or more). *See
Laffey*, 572 F. Supp. at 371.

> any matrix that has been offered, plaintiffs may also
> provide surveys to update the matrix; affidavits
> reciting the precise fees that attorneys with similar
> qualifications have received from fee-paying clients
> in comparable cases; and evidence of recent fees
> awarded by the courts or through settlement to
> attorneys with comparable qualifications handling
> similar cases.

*Covington*, 57 F.3d at 1109.  Once the plaintiff has put forward

his evidence, the burden falls upon the government to produce

"equally specific countervailing evidence" which demonstrates

that the plaintiff's proposed hourly rate is "erroneous."  *Id.*

(explaining that the government's burden in rebuttal is not

without demand).

In this case, plaintiff argues for the alternative matrix,

which calculates the rate using the legal services component of

the CPI.  Accordingly, plaintiff requests that Mr. Gura, Mr.

Neily, Mr. Levy, Mr. Healy, and Ms. Possessky be compensated at

a base rate of $589/hour (as each of these attorneys has 11-19

years of experience), and that Mr. Huff be compensated at the

base rate of $361/hour (as he has 4-7 years of experience).[4]

Plaintiff contends that these are the prevailing market rates

for attorneys engaged in complex federal litigation in the

Washington, D.C. area.  As discussed below, plaintiff's

---

[4]    "Years of experience" refers to the years following the
attorney's graduation from law school. *See Laffey*, 572 F. Supp.
at 371.

principal support for his requested rates is a so-called

"updated" version of the Laffey Matrix, which was developed by

Dr. Michael Kavanaugh (the "Updated Laffey Matrix").  In further

support of his requested rates, plaintiff has provided the Court

with the *National Law Journal*'s 2009 law firm rate survey, a

declaration by a legal recruiter familiar with the Washington,

D.C. legal market, the standard billing rates of defense counsel

in this action, and citations to fee awards in other complex

cases.

In response, defendants assert that plaintiff's requested

rates are "unreasonable"; that Dr. Kavanaugh's matrix rests upon

"deficient methodology"; and that the appropriate rate for

compensating plaintiff's counsel should be determined by

reference to the Laffey Matrix maintained by the Civil Division

of the Office of the United States Attorney (the "USAO Laffey

Matrix").  Defs.' Opp'n at 6, 14.  Pursuant to the USAO Laffey

Matrix, defendants contend that plaintiff's counsel should be

compensated at the rates of $420/hour and $275/hour.[5]  It is

defendants' position that "[t]he USAO Laffey Matrix reflects

prevailing market rates for representation in 'complex federal

---

[5]    $420/hour is the rate yielded by the USAO Laffey Matrix for
attorneys with 11-19 years of experience, and $275/hour is the
rate yielded by that matrix for attorneys with 4-7 years of
experience.

litigation,'" and that Dr. Kavanaugh's Updated *Laffey* Matrix "is an inappropriate measure of rates both in this case and more generally." Defs.' Opp'n at 7, 11. In support of this argument, defendants have provided the Court with declarations from economist Dr. Laura Malowane. The Court will explore these arguments and the evidence proffered by each side, in turn, beginning with a discussion of the parties' competing matrices.

As noted above, the USAO *Laffey* Matrix determines hourly rates for attorneys of varying experience levels by taking the hourly rates contained in the original 1982 *Laffey* Matrix and adjusting those rates for inflation based upon changes in the Washington, D.C.-area Consumer Price Index (the "CPI"). *See supra* at 10; *see also* Kavanaugh Decl. dated June 1, 2010, Docket No. 63-2 ¶ 8. Dr. Kavanaugh's Updated *Laffey* Matrix differs from the USAO *Laffey* Matrix in two significant ways. First, Dr. Kavanaugh uses the legal services component of the nationwide CPI (the "Legal Services Index") – as opposed to the general, local CPI – to measure inflation. Kavanaugh Decl. dated June 1, 2010, Docket No. 63-2 ¶ 9. Second, Dr. Kavanaugh "applies the specific legal services index to the more recent survey of rates for the Washington D.C. metropolitan area developed in 1989 in response to the remand decision in *Save Our Cumberland Mountains*." Kavanaugh Decl. dated June 1, 2010, Docket No. 63-2

¶ 9.  As a result of these differences, plaintiff contends that Dr. Kavanaugh's approach yields a more accurate estimate of current market rates than that of the USAO Laffey Matrix.

Plaintiff also directs the Court to Judge Kessler's opinion in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000) ("*Salazar I*"), in which that court found that Dr. Kavanaugh's Updated Laffey Matrix "more accurately reflects the prevailing legal rates for legal services in the D.C. community" than the USAO Laffey Matrix.  *Id.* at 15.  In reaching that conclusion, the *Salazar I* court found that the Updated Laffey Matrix had the "distinct advantage of capturing the more relevant data because it is based on the legal services component of the Consumer Price Index rather than the general CPI on which the U.S. Attorney's Office matrix is based."  *Id.* at 14-15; *see also Smith v. District of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) (Kessler, J.) (concluding that the Updated Laffey Matrix was "more accurate" than the USAO Laffey Matrix).  It should be noted, however, that – unlike this case – the defendants in *Salazar I* and *Smith* did not challenge the use of the Updated Laffey Matrix.

Plaintiff further contends that survey data from the *National Law Journal* corroborates the rates contained in Dr.

Kavanaugh's matrix.  Focusing on Washington, D.C.-based law

firms, plaintiff proffers the following rate data:

|  | Firmwide Avg. Rates | Top Rate | Avg. Partner Rates | Median Partner Rates | Top Assoc. Rates |
|---|---|---|---|---|---|
| Arent Fox |  | $755 |  |  | $485 |
| Dickstein | $520 | $950 | $633 | $630 | $515 |
| Hogan | $540 | $990 | $675 | $660 | $550 |
| McKenna |  | $775 | $471 |  | $470 |
| Patton Boggs | $521 | $990 | $650 | $625 | $540 |
| Venable | $457 | $975 | $556 | $550 | $450 |

Pl.'s Mot. at 29.  Plaintiff asserts that "[w]hile these real

world rates are in line with the rates predicted by Dr.

Kavanaugh's Updated Laffey Matrix, they are not remotely

reflected by the U.S. Attorney's model.  The USAO's predicted

top rate for the absolutely most experienced attorneys in

Washington is exceeded by the average billing rate of lawyers in

at least three firms, and is within ten dollars of a fourth."

Pl.'s Mot. at 29.[6]

     In addition, plaintiff also submitted a declaration from

Robert Podgursky, a legal recruiter at Klein, Landau, Romm &

Schwartz.  In his declaration, Mr. Podgursky states that he has

"reviewed the qualifications of Alan Gura, Clark Neily, Robert

---

[6]     The highest rate yielded by the 2010 USAO Laffey Matrix is
$475, which purportedly reflects the prevailing market rate for
attorneys with 20+ years experience who are engaged in complex
federal litigation.

Levy, Gene Healy, Tom Huff, and Laura Possessky, including their educational background and work experience," and avers that his firm "could place all of these attorneys within top major law firms, where they would command market billing rates . . . [of] $500-900 an hour." Podgursky Decl., Docket No. 63-9 ¶¶ 8-9.

Plaintiff also cites to the fee award in *Miller v. Holzmann*, in which another member of this court approved rates ranging from $625-$750/hour for senior partners at Wilmer Hale. Pl.'s Reply at 5 (citing *Miller*, 575 F. Supp. 2d at 13).

Finally, plaintiff points to the standard billing rates for the attorneys who provided *pro bono* services to the District of Columbia in this litigation. Specifically, a pleading filed by defendants indicates that the historical, 2007-2008 standard billing rates for the attorneys who represented the District of Columbia in this litigation were $640-$800/hour for attorneys with 11-20 years of experience and $480/hour for attorneys with 4-7 years of experience. *See* Docket No. 79, Notice of Filing. Plaintiff asserts that these historic rates provide further support for the reasonableness of his proposed hourly rates - $589/hour and $361/hour. *See* Pl.'s Supp. Br., Docket No. 80.

Defendants respond by urging the Court to reject plaintiff's proposed rates, and instead argue that "[t]he appropriate rate for compensating plaintiff should be

16

established by reference to the [USAO Laffey] Matrix, which is
the presumptive rate in this jurisdiction for complex federal
litigation." Defs.' Opp'n at 6.  Defendants maintain that "most
local court decisions on attorneys' fees have applied the USAO
Laffey matrix, specifically rejecting Kavanaugh's approach."
Defs.' Opp'n at 12 (citing cases); *see also, e.g.*, *Miller*, 575
F. Supp. 2d at 17-18 (noting that "[Dr.] Kavanaugh's alternative
methodology has achieved only limited acceptance in this
District").  In support of this assertion, defendants direct the
Court to Chief Judge Lamberth's opinion in *Miller v. Holzmann*,
in which that court awarded fees at USAO Laffey Matrix rates
based upon its determination that Dr. Kavanaugh's Updated Laffey
Matrix lacked the requisite "geographic specificity" due to its
reliance on the national Legal Services Index.  575 F. Supp. 2d
at 17-18.

Defendants also argue that "the reasoning underlying the
Kavanaugh matrix is deficient and does not justify the requested
departure." Defs.' Opp'n at 14.  In support of this assertion,
defendants have proffered the declaration of Dr. Laura A.
Malowane.[7]  Dr. Malowane maintains that Dr. Kavanaugh's Updated

---

[7]    The declaration of Dr. Malowane that defendants submitted
in this case was originally filed in *Norden v. Clough*, Case No.
05-1232 (D.D.C.) (Collyer, J.).  Dr. Malowane, however,
submitted a supplemental declaration in this case, which states
that her conclusions in the *Norden* case are applicable in this

Laffey Matrix should be rejected for several reasons, including that "[t]he US Legal Index is a nationwide average index and not specific to the Washington, D.C. metropolitan region" and that "[t]he US Legal Index is for flat-fee services rather than hourly rates." Malowane Decl. dated Aug. 11, 2009, Docket No. 64-4 ¶ 12. Based upon these and other purported deficiencies, Dr. Malowane concludes that the USAO Laffey Matrix is more appropriate than the Updated Laffey Matrix for determining attorneys' fees in cases involving complex federal litigation in the Washington, D.C. area. *See* Malowane Decl. dated July 9, 2010, Docket No. 64-4 ¶ 4.

In further support of their argument regarding the unreasonableness of plaintiff's proffered rates, defendants argue that "plaintiffs in this case were represented by an extremely small firm, and as various courts and Dr. Malowane recognize, small firms typically charge less than large firms." Defs.' Opp'n at 16; *see* Malowane Decl. dated Aug. 11, 2009, Docket No. 64-4 ¶¶ 33, 37 (explaining, among other things, that

---

case as well. *See* Malowane Decl. dated July 9, 2010, Docket No. 64-4, ¶ 4 ("My analysis, and subsequent conclusions, in *Norden v. Clough* are not limited to the facts of that specific case. In particular, my conclusion that the USAO Laffey Matrix is more appropriate than the Salazar Matrix for determining attorneys' fees is applicable to many types of cases, including those that involve complex federal litigation within the Washington, DC area."); Malowane Decl. dated July 9, 2010, Docket No. 69-1, ¶ 6 ("The conclusions I reached in the Norden Final Affidavit remain true and correct, and I incorporate and adopt them herein.").

small law firms do not have the same overhead as larger firms
and that, as a result, attorneys at small firms may be able to
offer services at lower fees than those at their larger firm
counterparts; observing that "[i]n general, law firm billing
rates increase with the size of the firm"). Defendants further
contend that "[c]ounsel here simply assume that they should be
paid the same amount as big-firm partners in the private world,
but . . . nothing justifies that assumption. Lawyers at small
firms typically earn less than lawyers at larger firms." Defs.'
Opp'n at 17.

Finally, defendants attack the rate data offered by
plaintiff as unreliable. First, with regard to the *National Law
Journal* survey, defendants argue that "these rates 'are
misleading and should not be used for comparison purposes'
because they 'reflect nominal billing rates and not realized
rates (i.e., the amount actually collected divided by the hours
actually expended on the work).'" Defs.' Opp'n at 18 (quoting
Malowane Decl. ¶ 36). Defendants further maintain that
"[b]ecause small firms typically charge less than large firms, a
survey of the nation's largest firms would therefore be
valueless even if it were otherwise reliable." Defs.' Opp'n at
19. Second, with regard to the standard billing rates of
defense counsel, defendants argue that this data is irrelevant,

19

because, among other reasons: (i) "the rates of large firms are not an appropriate benchmark because lead counsel's firm has only two lawyers, and small firms routinely charge less than big firms"; and (ii) "the standard rates of pro bono counsel [] do not reflect what would have been required to incentivize even a large firm to take this case" because "in Supreme Court litigation, the firms frequently charge significantly lower than their highest rates or use alternative fee arrangements because of the reputational and professional opportunities those cases offer to the firms and the involved lawyers."  Defs.' Opp'n to Pl.'s Supp. Br., Docket No. 81, at 2, 4.

Plaintiff urges the Court to reject these arguments. First, with respect to defendants' claims that the USAO Laffey Matrix is the "presumptive rate" for complex federal litigation in this jurisdiction, Defs.' Opp'n at 6, plaintiff contends that "*Covington* specifically instructs that the U.S. Attorney's matrix is to be afforded the same consideration as any other updated Laffey Matrix or a party's own survey" and argues that it would be "error to refuse consideration of any rate evidence, on the presumptive assumption that the government's matrix is

controlling."  Pl.'s Mot. at 27 (citing *Covington*, 57 F.3d at

1109).[8]  Next, in response to defendants' economic arguments,

plaintiff provided detailed rebuttal declarations from Dr.

Kavanaugh.  *See* Kavanaugh Decl. dated July 25, 2010, Docket No.

67-1, and Kavanaugh Decl. dated Aug. 25, 2010, Docket No. 70-1.[9]

---

[8]    Plaintiff also disputes the characterization of the USAO
Laffey Matrix as "the standard rate," arguing, instead, that the
USAO Laffey Matrix "is nothing more than 'a concession by that
office of what it will deem reasonable when a fee-shifting
statute applies and its opponent prevails and seeks attorneys'
fees.'"  Pl.'s Mot. at 27 (quoting *Adolph Coors Co. v. Truck
Ins. Exch.*, 383 F. Supp. 2d 93, 98 (D.D.C. 2005)).  Despite
plaintiff's argument, courts in this district have nevertheless
referred to the USAO Laffey matrix as "the standard Laffey
Matrix." *American Lands Alliance*, 525 F. Supp. 2d at 149; *see
also* case cited *infra* 30-31.

[9]    Plaintiff also filed a separate motion to strike the
affidavit of Dr. Malowane.  *See* Docket No. 66.  Plaintiff's
principal objection to the affidavit of Dr. Malowane concerns
her reliance on an "undisclosed study called 'Survey of Law Firm
Economics, 2008 Edition'" and "an unpublished study that it
appears she herself has not even reviewed."  Pl.'s Mot. to
Strike at 1; *see also* Pl.'s Reply at 1 ("Contrary to the
Defendants' assertion, Plaintiff has no problem with the Court
considering admissible portions of [the submissions of Dr.
Malowane].  What Plaintiff objects to is the Defendants'
reliance, through Dr. Malowane, on undisclosed (or, what is much
the same thing, untimely and insufficiently disclosed) data that
Plaintiffs have not had an appropriate opportunity to
evaluate.").  Having carefully considered the motion, the
opposition and reply thereto, as well as the supplemental
declarations of Dr. Malowane and Dr. Kavanaugh, the Court finds
that plaintiff has not shouldered the "formidable burden"
necessary to support a motion to strike.  *United States ex. rel.
Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25,
34-35 (D.D.C. 2007) (explaining that motions to strike are
generally viewed with disfavor).  The Court further finds that
the deficiencies identified by plaintiff in his motion to strike

With respect to defendants' critiques regarding plaintiff's reliance on the *National Law Journal* Survey, plaintiff notes that the survey is "routinely cited by courts in this district and others." Pl.'s Reply at 5 (citing cases). Finally, on the issue of the standard billing rates of defense counsel in this case, plaintiff maintains that "the rates charged by the very lawyers who opposed Plaintiff's counsel are certainly relevant in determining how the local market values work of the kind they performed in this case." Pl.'s Reply to Defs.' Supplemental Br., Docket No. 82, at 1.

Having carefully considered the parties' arguments, the Court concludes that plaintiff has failed to provide the Court with sufficient evidence to support the extraordinary rates of $589/hour and $361/hour. Specifically, as explained below, the Court finds that plaintiff has not carried his burden to establish that the rates he is requesting are "the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." *Covington*, 57 F.3d at 1108.

First, with regard to the parties' dispute over the accuracy of their competing matrices, the Court finds that

---

go to the weight to be given to Dr. Malowane's testimony, not its admissibility. Accordingly, plaintiff's motion to strike is **DENIED**.

"[n]either index is perfect." Pl.'s Reply at 6. As plaintiff admits: "The [D.C.] CPI offers geographic specificity but is based almost entirely on goods and services other than legal work, while the Legal Services Index offers specificity as to industry but not geography." Pl.'s Reply at 6. In an effort to determine the prevailing market rate, the Court will use the rates contained in the widely accepted USAO Laffey Matrix as the "starting point" for its analysis. *See Covington*, 57 F.3d at 1109 (explaining that "fee matrices are somewhat crude," and that, as a result, they merely provide courts with "a useful starting point" in determining the prevailing market rate). *See also* cases cited *infra* 30-31. Further, the Court is not persuaded that the additional evidence proffered by plaintiff demonstrates that the rates contained in the Updated Laffey Matrix are in line with the prevailing hourly rates for attorneys engaged in complex federal litigation in the District of Columbia.

As discussed above, in support of the Updated Laffey Matrix rates, plaintiff has provided the Court with (i) survey data from the *National Law Journal*; (ii) the declaration of a legal recruiter familiar with the Washington, D.C. legal market; (iii) a citation to the fee award in *Miller v. Holzmann*; and (iv) the standard billing rates of opposing counsel in this

23

litigation.  Having carefully considered this evidence, the
Court finds that these materials – which are based upon the
rates typically charged by practitioners at the largest law
firms in the District of Columbia - fail to establish that
plaintiff's requested rates are, in fact, the prevailing market
rates for attorneys engaged in complex federal litigation
outside of the "big firm" context.

The *National Law Journal* survey, for instance, only
examines the rates of the nation's 250 largest law firms, which
range in size from 392 to 1092 attorneys.  *See* Defs.' Opp'n at
19.  The Court finds this data largely inapposite because none
of plaintiff's attorneys practice at large law firms; indeed,
plaintiff's lead counsel is a principal at a two-partner law
firm.  *See* Malowane Decl. dated Aug. 5, 2010, Docket No. 69-1
¶ 14 (stating that it would be "misleading" to use the rates of
the "largest 250 firms in the nation to determine attorney fees
in this case" because, among other reasons, "small and medium
firms may be able to offer services at lower fees than those at
their larger firm counterparts").  The declaration of legal
recruiter Robert Podgursky similarly focuses upon the market
billing rates at "top major law firms," and his ability to place
plaintiff's counsel at such firms.  Docket No. 63-9, Podgursky
Decl. ¶¶ 8.  The fee award principally relied upon by plaintiff,

*see* Pl.'s Reply at 5, also involves the standard billing rates for senior partners at a "large, international law firm." *Miller*, 575 F. Supp. 2d at 12 (discussing the standard billing rates of senior partners at Wilmer Hale; finding that the relator established that Wilmer Hale's established billing rates were consistent with the rates charged by partners at "other large, D.C. litigation firms"). Finally, although this Court previously recognized that the standard billing rates of defense counsel in this action were potentially relevant to plaintiff's fee petition, *see generally* March 24, 2011 Hearing Transcript, the Court now concludes that this evidence is also of limited utility because, among other things, the law firms that gave *pro bono* assistance to defendants in this case are all large law firms.[10]

---

[10]    Although defendants repeatedly argue that plaintiff is not entitled to look to "big firm" rates in support of his requested rates, *see, e.g.*, Defs.' Supp. Br., Docket No. 81 at 1; Defs.' Post-Hearing Br., Docket No. 77 at 2, the Court finds this argument overly simplistic. Data regarding the rates typically charged by large law firms in the District of Columbia is certainly relevant to the Court's inquiry regarding "the prevailing market rates in the relevant community for attorneys of reasonably comparable skill, experience, and reputation." *Covington*, 57 F.3d at 1108. It is not, however, the only (or most) relevant data. To be clear, therefore, the Court is not troubled by the fact that plaintiff has proffered data regarding the rates of some of the largest law firms in the District of Columbia; instead, the Court is troubled by the fact that plaintiff *only* relies upon the rates of the largest law firms in the District of Columbia when none of plaintiff's attorneys are employed at large law firms.

Ultimately, therefore, this Court is simply not convinced that plaintiff has demonstrated that the high rates he is requesting are the prevailing market rates for attorneys performing complex federal litigation other than those practicing law at the District of Columbia's largest law firms. Indeed, the rate requested by plaintiff for five of his attorneys - $589/hour - is consistent with the average partner rates at large law firms such as Dickstein Shapiro and Venable. *See supra* at 15.

Absent from plaintiff's evidentiary record are the rates typically charged by attorneys at small or boutique law firms in the District of Columbia who perform the type of complex federal litigation at issue in this case.[11]  The Court finds this evidentiary gap significant because "[t]he market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms -- presumably because of their greater resources and investments, such as attorneys,

---

[11]   For instance, in *Miller v. Holzmann*, the relator submitted declarations from senior partners at two "*large, international law firm[s]*" in the District of Columbia to demonstrate that the rates requested by his attorneys from Wilmer Hale were "within the range of prevailing market rates charged *by large law firms* in the District of Columbia for lawyers and paralegals of similar experience and qualifications."  575 F.2d at 12 (emphasis added).

26

librarians, researchers, support staff, information technology, and litigation services." *Wilcox v. Sisson*, No. 02-1455, 2006 U.S. Dist. LEXIS 33404, at *8 (D.D.C. May 25, 2006).  Indeed, as a result of these overhead costs, "[c]ourts have recognized that the size of the firm representing a plaintiff seeking attorney's fees is a factor in determining a reasonable attorney's fee[.]" *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 369-70 (S.D.N.Y. 2005) (citing *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058-59 (2d Cir. 1989)) (declining to award the rates requested by the plaintiff's small-firm practitioners, where the requested rates were "usually reserved for attorneys in larger law firms"); *see also, e.g.*, *Saunders v. Salvation Army*, No. 06-2980, 2007 U.S. Dist. LEXIS 22347, at *12-13 (D.D.C. March 27, 2007) (declining to award large-firm rates to a small non-profit organization; explaining that because "the Center does not incur the same overhead costs that burden a large law firm . . . the rates charged by its attorneys cannot approximate those charged by attorneys in large New York City law firms); *Algie v. RCA Global Communication, Inc.*, 891 F. Supp. 875, 895 (S.D.N.Y. 1994) ("If the movant is represented by a small or medium-size firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain higher compensable rates if represented by a large urban firm,

since such firms typically charge more per hour to cover a higher overhead."), *aff'd*, 60 F.3d 956 (2d Cir. 1995); *see also* Malowane Decl. dated Aug. 5, 2010, Docket No. 69-1 ¶ 14 ("It is well recognized that firms use such factors as firm size to set rates. Small and medium law firms presumably do not have the same overhead as larger firms and, as a result, attorneys at small and medium firms may be able to offer services at lower fees than those at their larger firm counterparts. Similarly, larger multiregional or multinational firms may be able to command higher fees due to, among other reasons, an offering of more services, having a better national or international reputation, or being located in a higher rent and higher profile area of the region. Limiting the comparison, as plaintiff has done, to the largest firms in the nation will not provide an accurate indication of comparable market rates for firms in the Washington, DC area.").[12]

---

[12]    While Dr. Kavanaugh provided detailed declarations in response to the affidavits of Dr. Malowane, the Court finds it significant that he did not dispute Dr. Malowane's assertions regarding the impact that firm size may have on an attorney's hourly rate or her statements regarding the ability of attorneys at small and medium size firms to offer services at lower rates than those attorneys at their larger firm counterparts. *See generally* Kavanaugh Decl. dated Aug. 25, 2010, Docket No. 70-1; Kavanaugh Decl. dated July 25, 2010, Docket No. 67-1; *see also Queen Anne's Conservation Ass'n v. Dep't of State*, Case No. 10-0670, 2011 U.S. Dist. LEXIS 88963, at *14 (D.D.C. Aug. 3, 2011) (declining to use the rates contained in the Updated Laffey

Therefore, in light of the "special caution" courts must exercise when reviewing fee petitions to be paid by the government, *Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 941-42 (D.C. Cir. 1984),[13] and because this Court is charged with "'fixing the prevailing hourly rate in each particular case with a fair degree of accuracy[,]'" *id.* (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C. Cir. 1982)), the Court is unwilling to award the high rates requested by plaintiff absent specific evidence that those rates are, indeed, the prevailing market rates for attorneys engaged in complex federal litigation outside of the District of Columbia's largest law firms.

### 4.   Determination of Reasonable Rate

Having found that plaintiff failed to carry his burden to establish the reasonableness of his requested rates, *Covington*, 57 F.3d at 1107, the Court will exercise its discretion to

---

Matrix where "the declaration offered by Defendants in support of their argument that the 'updated' *Laffey* matrix may not accurately represent prevailing market rates for small firm lawyers in the District of Columbia area . . . [was] largely unrebutted").

[13]   This special caution stems from "the incentive" that a government's "'deep pocket' offers to attorneys to inflate their billing charges and to claim far more as reimbursement then would be sought or could reasonably be recovered from private parties." *Eureka*, 743 F.3d at 941-42.

determine a reasonable hourly rate for plaintiff's counsel.  As discussed above, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," *Perdue*, 130 S. Ct. at 1672; it is a rate that is "adequate to attract competent counsel, but that does not produce windfalls to attorneys."  *Blum*, 465 U.S. at 897 (ellipsis, brackets, and internal quotation marks omitted).

After a careful review of the evidence in this case, the Court concludes – with the exception of one attorney – that plaintiff's counsel should be compensated at the rates produced by the USAO Laffey Matrix.  While the Court readily acknowledges the shortcomings of relying upon a fee matrix, *see supra* at 22 (finding that neither of the parties' proposed matrices were perfect), the rates produced by the USAO Laffey Matrix are frequently awarded to attorneys engaged in complex federal litigation in this district.  *See Miller v. Holzmann*, 575 F. Supp. 2d at 18 n.29 ("Due to its widespread acceptance, this matrix has been aptly described as 'the benchmark for reasonable fees in this Court.'" (citing cases)); *American Lands Alliance*, 525 F. Supp. 2d at 149 (listing "numerous cases in which members of this Court have endorsed the [USAO] Laffey Matrix"); *see also, e.g., Citizens for Responsibility & Ethics v. Dep't of*

*Justice*, No. 10-750, 2011 U.S. Dist. LEXIS 133962, at *4-5
(D.D.C. Nov. 21, 2011) (awarding fees pursuant to the USAO
Laffey Matrix); *Queen Anne's Conservation Ass'n*, 2011 U.S. Dist.
LEXIS 88963, at *14 (same); *Covad Comm008. Co. v. Revonet, Inc.*,
267 F.R.D. 14, 31-32 (D.D.C. 2010) (same); *Friends of Animals v.
Salazar*, 696 F. Supp. 2d 16, 20 (D.D.C. 2010) (same).  The Court
finds the frequency with which the USAO Laffey Matrix rates are
applied to be strong evidence of both their prevalence *and* their
reasonableness.[14]  The Court further finds that the rates
produced by this matrix are consistent with the goals of § 1988.
*See Perdue*, 130 S. Ct. at 1673 ("Section 1988's aim is to
enforce the covered civil rights statutes, not to provide 'a
form of economic relief to improve the financial lot of
attorneys.'").  The Court concludes, therefore, that Mr. Gura,
Mr. Neily, Mr. Levy, Mr. Healy, Ms. Possessky, and Mr. Huff

---

[14]   The Court will also note that the rates yielded by the USAO
Laffey Matrix are roughly 29% less than the rates requested by
plaintiff (i.e., the rates produced by the Updated Laffey
Matrix).  As discussed above, the evidence that plaintiff
proffered in support of his requested rates were based upon the
rates typically charged by the largest law firms in the District
of Columbia.  The reduced rates yielded by the USAO Laffey
Matrix are consistent, therefore, with the reductions that are
frequently made by courts in the Southern District of New York
when small-firm practitioners request compensation at large-firm
rates.  *See* Defs.' Post-Hearing Br. at 2 (explaining that courts
in the Southern District of New York routinely reduce the fees
paid to small firm practitioners by 25-33%).

should be compensated at the applicable USAO matrix rate.
Accordingly, each of these attorneys shall be compensated at a
base rate of $420/hour (as a result of their 11-19 years of
relevant legal experience), with the exception of Mr. Huff, who
shall be compensated at the base rate of $275/hour (as a result
of his 4-7 years of relevant legal experience).

The Court is not, however, convinced that Mr. Levy is
entitled to the applicable USAO Laffey Matrix rate.  Unlike the
other attorneys in this case, Mr. Levy has no litigation
experience.  While Mr. Levy's declaration reflects an impressive
career, the Court is not persuaded, *see supra* note 3, that an
individual with no litigation experience can command a rate
reserved for "'experienced federal court litigators.'"  *See
supra* at 9 n.4 (quoting *Laffey*, 572 F. Supp. at 371).  The
Court, therefore, will exercise its discretion to reduce the
USAO Laffey Matrix rate applicable to Mr. Levy by 25%.  *See
Falica*, 384 F. Supp. 2d at 75 (explaining that a Court must
adjust the requested rate "upward or downward to arrive at a
final fee award that reflects the characteristics of the
particular case (and counsel) for which the award is sought").
Accordingly, Mr. Levy will be compensated at the base rate of
$ 315/hour.

B.    **Number of Hours**

Next, the Court must determine "the number of hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 433.  To enable the Court to make this determination, the party seeking an award of fees must submit evidence supporting the hours worked and the rates claimed.  *Id.*  "A 'fee application need not present the exact number of minutes spent[,] nor the precise activity to which each hour was devoted[,] nor the specific attainments of each attorney." *Miller*, 575 F. Supp. 2d at 21 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982)).  The petition must, however, "be sufficiently detailed to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Concerned Veterans*, 675 F.2d at 1327.  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

In this case, plaintiff's counsel claim 3,270.2 hours of work over six years.  In support of this request, plaintiff submitted detailed billing records for each of his attorneys, and requests the following number of billable hours:  Mr. Gura: 1,661 hours; Mr. Neily: 808.3 hours; Mr. Levy: 595.6 hours; Mr. Huff: 153.6 hours; Mr. Healy: 33.7 hours; and Ms. Possessky: 18

hours.  Pl.'s Mot. at 5.  Plaintiff asserts that the hours
billed by his counsel are documented and "eminently reasonable,"
explaining that "[t]he total hours sought by counsel for
litigating a case of this magnitude and complexity – less than
3,300 – is extremely low, reflecting careful billing judgment
and, to Defendants' benefit, the relatively high efficiency
nature of counsel's practice."  Pl.'s Mot. at 9, 11.

Defendants dispute this contention and raise a number of
challenges to the billing records of plaintiff's counsel.  In
particular, defendants contend that the number of hours expended
by plaintiff's counsel should be reduced because of
(i) reconstructed timesheets; (ii) vague and inadequately
documented billing entries; (iii) block billing; (iv)
uncompensable items; (v) excessive hours; (vi) unsuccessful
claims; and (vii) lack of billing judgment.  Defs.' Opp'n at 28-
40.  Due to these purported deficiencies, defendants request
that certain entries be discounted or excluded in their entirety
and further argue for two across-the-board reductions.  The
Court will discuss defendants' objections in turn.

### 1. Reconstructed Timesheets

The first defect identified by defendants is reconstructed
timesheets.  Specifically, defendants note that three of
plaintiff's six attorneys – including two of its top billers –

failed to keep contemporaneous time records, and, instead, provided the Court with reconstructed timesheets. *See* Defs.' Opp'n at 30; *see also* Pl.'s Mot. at 5 (noting that Mr. Neily, Mr. Levy, and Mr. Healy "largely reconstructed their time"). Plaintiff has provided the Court with no explanation for this defect nor explained to the Court how his attorneys reconstructed their time.[15]  The Court finds this defect deeply troubling.

The D.C. Circuit has clearly stated that "[a]ttorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." *Concerned Veterans*, 675 F.2d at 1327.  The Circuit has further warned that "[c]asual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees." *Id.; see also Kennecott Corp. v. Envtl. Prot. Agency*, 804 F.2d 763, 767 (D.C. Cir. 1986) ("[C]ontemporaneous time charges should be filed with the motion for attorneys' fees as a matter of course, and certainly should be provided once legitimate questions are raised by the opposing party.").

---

[15]  The Court will note, however, that during oral argument Mr. Neily explained that he reconstructed his timesheets using e-mails to co-counsel. *See* Dec. 13, 2010 Hearing Tr. at 90:4-19. The Court has been provided with no such explanation as to either Mr. Levy or Mr. Healy.

While the Court does not find a complete disallowance of
fees to be warranted in this case, *cf. In re North*, 32 F.3d 607,
608-09 (D.C. Cir. Spec. Div. 1994), the Court nevertheless
concludes that it is appropriate to reduce the number of hours
requested by Mr. Neily, Mr. Levy, and Mr. Healy by 10% in order
to account for any inaccuracies or overbilling that may have
occurred as a result of these attorneys' unacceptable
timekeeping practices.

### 2. Vague and Inadequately Documented Billing Entries

Defendants next argue that plaintiff's fee award should be
reduced by 15% as a result of purportedly vague and inadequately
documented billing entries.  For the reasons discussed below,
the Court declines to impose the requested across-the-board
reduction.  Instead, the Court finds that the number of billable
hours attributable to Mr. Levy should be reduced by 25% as a
result of the vague and inadequate descriptions contained in his
timesheets.

Defendants identify numerous areas in which plaintiff's
billing records are purportedly vague or undetailed.  *See* Defs.'
Opp'n at 30-34.  In particular, focusing upon the billing
records of Mr. Levy and Mr. Neily, defendants argue that
"[c]ounsels' entries do not satisfy their burden of establishing
the reasonableness of the fee request, because the supporting

documentation is not 'of sufficient detail and probative value
to enable the court to determine with a high degree of certainty
that such hours were actually and reasonably expended[.]'"
Defs.' Opp'n at 30-31 (quoting *Role Models v. Brownlee*, 353 F.3d
962, 970 (D.C. Cir. 2004)).  Plaintiff, in turn, accuses
defendants of "flyspecking," Pl.'s Reply at 13, and asserts that
"the Plaintiff's billing records in this case make clear how
much time was spent on which activities for what purpose, and
thus – 'when viewed by an individual with knowledge of the case,
and in light of the surrounding entries,' – provide ample
support for the total hours claimed."  Pl.'s Reply at 14
(internal citation omitted).

     Having carefully reviewed the billing records of
plaintiff's counsel, the Court finds those records – with the
exception of the reconstructed timesheets of Mr. Levy – to be
sufficiently detailed to allow the Court to "make an independent
determination whether or not the hours claimed are justified."
*Concerned Veterans*, 675 F.2d at 1327.  The Court therefore
concludes that an across-the-board reduction of 15% is
unwarranted.

     With respect to the billing records submitted by Mr. Levy,
however, the Court finds that these records contain a large
number of extremely vague entries.  For example:

```
06/26    2.5 Review cases
06/28    3.0 Review literature
06/30    2.0 Review literature
07/03    4.0 Review literature
07/06    3.0 Review DC laws
07/08    3.5 Review cases
07/11    3.0 Review cases
08/15    0.5 Email w/[Clark Neily] (CN)
12/09    0.5 Phone w/Alan Gura (AG)
12/11    1.0 Email w/AG
12/26    0.1 Email w/AG
01/06    0.2 Email w/AG
01/08    0.1 Email w/AG
01/23    0.5 Emails w/AG & CN
```

Pl.'s Ex. 4, Docket No. 63-13 at 1.  While extremely detailed

billing entries are not required in this Circuit, the Court

finds that many of Mr. Levy's entries fail to provide the Court

with the minimum level of detail needed for meaningful analysis.

*See, e.g.*, *Role Models*, 353 F.3d at 971 (explaining that

"generic entries" in which attorneys "billed simply for

'research' and 'writing,' or for time spent in teleconferences

or meetings . . . the purposes of which are not provided" are

"inadequate to meet a fee applicant's heavy obligation to

present well-documented claims") (internal quotation marks

omitted); *Michigan v. Envtl. Prot. Agency*, 254 F.3d 1087, 1095

(D.C. Cir. 2001) ("There are, in particular, numerous entries

concerning meetings and conferences that, although they include

information concerning the identities of the individuals

involved, are nevertheless devoid of any descriptive rationale

for their occurrence.  Therefore, as we have done in similar

circumstances in the past, after all other deductions have been taken we will make a further deduction of 10% of the remaining billings."); *Miller*, 575 F. Supp. 2d at 36 (finding that counsel's time records were "simply rife with ambiguous and nugatory entries" such as "reviewing and analyzing issues re strategy" and "preparing for trial," and concluding that the ambiguity of counsel's time entries warranted an across-the-board reduction of 10%). Accordingly, and in lieu of an across-the-board reduction, the Court concludes that the number of billable hours attributable to Mr. Levy should be reduced by 25%.

### 3. Block Billing

Third, defendants argue that plaintiff's fee petition should be reduced due to purported block-billing. *See* Defs.' Opp'n at 34-35. The Court disagrees.

Although some of counsel's entries do, in fact, "lump together multiple tasks," *Role Models*, 353 F.3d at 971, the Court nevertheless concludes that a reduction on this basis is not warranted given (i) the infrequency with which such entries occur, as well as (ii) the overall reasonableness of the time requested in the few instances in which multiple tasks were grouped together. *See, e.g., Smith*, 466 F. Supp. 2d at 158

(declining to reduce a fee petition for block-billing where "the use of such entries in [the] case was not unduly excessive").

### 4. Non-compensable Items

Defendants also identify several entries that are purportedly non-compensable. *See* Defs.' Opp'n at 35-36. Specifically, defendants object to the time spent by plaintiff's counsel on the following activities: (i) "time spent in discussion with the press"; (ii) time spent recruiting potential plaintiffs; (iii) time spent drafting the motion to recuse *Seegar's* counsel and in opposition to consolidation (on which defendants took no position); (iv) time spent "correct[ing] [an] appendix because of counsel error"; (v) time spent attending a symposium; (vi) time spent in discussion with the NRA regarding pending legislation; and (vii) time spent preparing a response to the District's petition for rehearing at the Circuit. Defs.' Opp'n at 35-36 (internal quotation marks omitted).

As a threshold matter, the Court will note that with the exception of one issue (communications with the press), defendants have failed to provide the Court with any legal reasoning or authority to explain why these entries are non-compensable. Instead, defendants simply request that the entries be struck from the fee calculation. *See* Defs.' Opp'n at 36. Plaintiff, in turn, provides a similarly generalized

40

response, arguing that "[t]he tasks nit-picked by Defendants were all reasonably pursued by counsel" and that it would be "needlessly tedious to address each and every item on Defendants' target list." Pl.'s Reply at 16. Despite the parties' sparse briefing on these issues, the Court has nevertheless closely reviewed the specific entries to which defendants object, and, for the reasons discussed below, concludes that the following entries are non-compensable: (i) time spent correcting an appendix because of counsel error; (ii) time spent in discussion with the NRA regarding pending legislation; (iii) time spent attending a symposium; and (iv) time spent preparing a response to the District's petition for rehearing by the Circuit. The time allocated to these activities will therefore be struck from plaintiff's fee petition. The Court declines, however, to strike the remaining activities identified by defendants.

First, although defendants are correct that "the government cannot be charged for time spent in discussions with the press," *Role Models*, 363 F.3d at 973, plaintiff's billing records do not reflect any such discussions. Indeed, defendants' opposition brief misstates what is contained in plaintiff's billing records. Specifically, defendants' opposition brief states that "attorney Gura listed 'Reading Legal Times and contacting NPR,

0.3 hours' for 12/16 & 12/26/02." Defs.' Opp'n at 35-36. Mr.
Gura's billing records, however, contain only the following
entries for the dates in dispute: "Review Legal Times article,
0.2 hours" for 12/16/02 and "Email to R. Levy re: NPR, 0.1
hours" for 12/26/02. Pl.'s Ex. 2, Docket No. 63-11 at 1.
Because counsel's billing records do not contain the conduct
complained of by defendants, the Court finds this objection
misplaced.

Next, defendants object to the 3.8 hours plaintiff's
counsel purportedly spent "recruiting potential plaintiffs."
Defs.' Opp'n at 36. Defendants cite no authority, however, for
the proposition that such limited time is not compensable,
particularly in the context of public impact litigation. The
Court therefore declines to strike this time from the petition.
*Cf. Tax Analysts v. IRS*, No. 94-923, 1996 U.S. Dist. LEXIS
22115, at *5 n.3 (D.D.C. May 30, 1996) (rejecting the
government's argument that fees incurred before the complaint
was filed are not compensable).

Defendants' third objection relates to the time that
plaintiff's counsel spent drafting "the motion to recuse *Seegars*
counsel and in opposition to consolidation (on which the
District took no position)." Defs.' Opp'n at 36. It is unclear
to the Court why defendants believe this time is not

compensable.  As plaintiff explains in his reply brief, "even if Defendants took no position on the motion to consolidate this case with *Seegars v. District of Columbia*, this Court agreed with counsel that the consolidation motion should be denied lest it make the case unmanageable."  Pl.'s Reply at 16.  The Court, therefore, also declines to strike this time from the fee petition.

The Court agrees with defendants, however, that four of the requested tasks were inappropriately billed to the District. First, the Court finds that the .5 hour that Mr. Gura spent "correcting an appendix because of counsel error" is not compensable.  *See, e.g.*, *Summers v. Howard Univ.*, No. 98-2692, 2006 U.S. Dist. LEXIS 95853, at *33 (D.D.C. March 20, 2006) (disallowing the time that counsel spent correcting errors to a pleading that was previously filed); *Brown v. Pro Football*, 839 F. Supp. 905, 917 (D.D.C. 1993) (same).  The Court further finds that the 4.4 hours that Mr. Levy spent "in discussion with the NRA regarding pending legislation" was not properly billed to the District.  *Cf*. *In re Theodore B. Olson*, 884 F.2d 1415, 1429 (D.C. Cir. 1989) (disallowing fees associated with lobbying efforts).  Nor was the three hours that Mr. Gura spent attending a symposium on "2[nd] Amendment jurisprudence."  *See* Pl.'s Ex. 2, Docket No. 63-11 at 47.  Finally, in view of Rule 35(e) of the

Federal Rules of Appellate Procedure, which specifically prohibits the filing of a response to a petition for *en banc* consideration (absent court order), the Court concludes that counsel's time spent preparing such a response – which was never requested by nor filed with the Circuit Court - is not compensable. *Cf. Martini v. Fannie Mae*, 977 F. Supp. 482, 488 (D.D.C. 1997) (striking time from a fee petition that was spent on a motion that was not filed). The Court will therefore deduct the time billed for those activities from plaintiff's petition.

### 5.   **Excessive Hours**

Defendants further allege that there are "a number of entries that evidence excessive effort on individual tasks," and argue that the hours claimed for these tasks should be reduced by 50%. Defs.' Opp'n at 36-38. Some of the excessive hours highlighted by defendant include the 133 hours that Mr. Gura spent researching and drafting plaintiff's submissions to the D.C. Circuit, as well as the 300 hours that Mr. Gura subsequently spent preparing plaintiff's Supreme Court briefs. *See* Defs.' Opp'n at 37.[16] Having carefully reviewed the disputed

---

[16]   In their opposition brief, defendants argued that the 400 hours that Mr. Gura spent drafting plaintiff's Supreme Court briefs and preparing for oral argument before the Supreme Court should also be reduced by half. *See* Defs.' Opp'n at 37 ("While counsel scored an impressive, indeed precedential, victory at

entries, the Court finds defendants' claims of "excessive
effort" largely unpersuasive.  Defs.' Opp'n at 37.  As the D.C.
Circuit has previously counseled: "It is neither practical nor
desirable to expect the trial court judge to [review] each paper
. . . to decide, for example, whether a particular motion could
have been done in 9.6 hours instead of 14.3 hours." *Copeland*,
641 F.2d at 903; *see also, e.g.*, *Concerned Veterans*, 675 F.2d at
1337-38 ("Neither broadly based, ill-aimed attacks, nor nit-
picking claims by the Government should be countenanced.").

The Court nevertheless finds one set of entries in Mr.
Gura's timesheets troubling.  Specifically, Mr. Gura attributes
25.5 hours to "revis[ing]/draft[ing] p. 1 appellants' brief."
*See* Pl.'s Ex. 2, Docket No. 63-11 at 19.  Those particular
entries by Mr. Gura appear extremely unreasonable, and the Court
will deduct 80% from them.

The Court also finds that Mr. Levy billed an excessive
amount of travel time.  As this Court has previously held,

---

the Supreme Court, the District should not have to pay for
counsel's over-preparation . . . .").  The Court will note,
however, that defendants subsequently revised their position.
*See* Notice dated Dec. 7, 2010, Docket No. 75 ("While the
District continues to believe that plaintiff has not met his
burden to show the reasonable necessity of this amount of time,
it believes that the proposed reduction is unnecessary in light
of separate deductions that the District has requested for
inadequately detailed billing (15%) and lack of billing judgment
(10%).").

"[t]ravel [] time is supposed to be compensated at half the attorney's hourly rate." *Doe v. Rumsfeld*, 501 F. Supp. 2d 186, 193 (D.D.C. 2007); *Blackman v. District of Columbia*, 397 F. Supp. 2d 12, 15 (D.D.C. 2005) ("In this circuit, travel time generally is compensated at no more than half the attorney's appropriate hourly rate."); *see also Miller*, 575 F. Supp. 2d at 30 (following *Doe* and *Blackman* and compensating counsel's travel time at half his standard billing rate).  The 77 hours that Mr. Levy spent traveling to and from Washington, D.C., therefore, will be compensated at half his hourly rate.

### 6.   Unsuccessful Claims

Arguing that "'no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail,'" Defs.' Opp'n at 38 (quoting *Copeland*, 641 F.2d at 891-92), defendants next contend that plaintiff should not be compensated for the time his counsel spent on the following activities: (i) drafting his cross-petition for certiorari; (ii) researching the Ninth Amendment; and (iii) working on various procedural motions on which he was unsuccessful (such as oppositions to motions for extension of time).[17]  *See* Defs.' Opp'n at 38-39.  Plaintiff, by contrast,

---

[17]    Specifically, defendants identify four motions on which plaintiff did not succeed – (i) two motions for extensions of time that plaintiff opposed; (ii) a motion for amicus

contends that he "fully prevailed on all [of] his claims, and all time sought is thus compensable." Pl.'s Reply at 14. Plaintiff further responds that defendants "fundamentally misconceive the law" on the issue of compensability, explaining that "the test for whether time is compensable is whether it was 'reasonably expended' in the litigation" and has "nothing to do with whether [the] particular activity is successful or opposed." Pl.'s Reply at 14-15 (citing *Hensley*, 461 U.S. at 434).

In *Copeland* – a case relied upon by both parties – the D.C. Circuit explained as follows:

> [I]t sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories. No reduction in fee is appropriate where the issue was all part and parcel of one matter, but only when the claims asserted are truly fractionable.

641 F.2d at 892 n.18 (internal quotation marks and citations omitted); *see also Miller*, 575 F. Supp. 2d at 33 (discussing *Copeland* and concluding that "even efforts directed to non-prevailing issues may be expended in pursuit of a successful resolution of the case") (internal quotation marks omitted).

---

participation that plaintiff opposed; and (iii) a motion to lift the stay of the Circuit mandate.

This Court, therefore, must determine if the purportedly unsuccessful claims identified by defendants – the cross-petition for certiorari, Ninth Amendment research, and work on various procedural motions – are "truly fractionable" from the underlying issue on which plaintiff ultimately prevailed (i.e., the unconstitutionality of the District's gun laws).

Having carefully considered defendants' objections and plaintiff's response thereto, the Court concludes that plaintiff's counsel should be compensated for the time they spent researching the Ninth Amendment as well as the time they spent working on the various procedural motions identified by defendants, but not for the time spent working on the cross-petition for certiorari.

Specifically, the Court first finds that plaintiff may seek reimbursement for the 2.5 hours his counsel spent researching the Ninth Amendment.  Although plaintiff did not ultimately prevail on a Ninth Amendment theory, the Court is not persuaded that the minimal amount of research spent on this issue should be stricken from the fee petition.  *See* Pl.'s Reply Br. at 16 ("[I]t was not optional for counsel to research the Ninth Amendment and unenumerated rights issues.  It was important to understand the interplay between Second Amendment rights and any independent rights of self-defense.").

Nor is the Court persuaded that the time that plaintiff's counsel spent working on the various procedural motions identified by defendants should be stricken.  To the contrary, the Court finds that plaintiff's counsel reasonably expended time on these motions during the course of litigation on which plaintiff was ultimately successful.  *See, e.g.*, *Air Transp. Ass'n of Can. v. FAA*, 156 F.3d 1329, 1335 (D.C. Cir. 1998) ("[A] litigant who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.") (internal quotation marks omitted).

The Court is not, however, so persuaded with respect to the time spent on plaintiff's cross-petition for certiorari.  The cross-petition, which challenged the D.C. Circuit's determination that each of the plaintiffs other than Mr. Heller lacked standing to challenge the District's gun laws – was neither successful nor a "necessary step to [Mr. Heller]'s ultimate victory."  *Id.*  The Court therefore concludes that the District should not be billed for the 102.8 hours that plaintiff's counsel spent drafting the unsuccessful cross-petition and reply brief.  Accordingly, the Court will deduct the following time, which was spent by plaintiff's counsel on

the cross-petition and reply: 56.3 hours from Mr. Gura, 27.3 hours from Mr. Neily, and 19.2 hours from Mr. Levy.

### 7.  Billing Judgment

Finally, defendants argue that plaintiff's petition should be reduced by 10% for his counsel's failure to exercise proper billing judgment.  In support of this claim, defendants argue that plaintiff's counsel failed to "specifically identify any hours that were excluded from [the] fee petition and indicate the tasks to which those hours were devoted."  Defs.' Opp'n at 39-40.  The Court concludes that a reduction on this basis is unwarranted.

While it is true that plaintiff failed to submit a separate declaration identifying the exact number of hours that were excluded from his fee petition, plaintiff's counsel aver that,

> None of [plaintiff's counsels'] records fully reflects the time actually required to competently conduct the representation: some hours were inadvertently omitted from our records, or overlooked in the process of reconstructing timesheets; other tasks were not recorded because the associated hours do not qualify as billable, e.g., responding to and working with media, training clients to do the same, lobbying against legislative interference, responding to inquiries about the matter, and generally engaging the court of public opinion on the important issues raised by the case.

Pl.'s Mot. at 5.  It is clear, therefore, that plaintiff's counsel did, in fact, exercise billing judgment.

Ultimately, therefore, although it is desirable – and,
indeed, advisable – for a fee applicant to submit a separate
declaration explaining the various reductions and exclusions of
charges that were made in the billing-judgment exercise, the
Court concludes that an across-the-board reduction is not
warranted based upon plaintiff's failure to do so.  *See, e.g.*,
*District of Columbia v. Jeppsen*, 686 F. Supp. 2d 37, 39 (D.D.C.
2010) ("Failing to specify hours which were written off is not a
fatal deficiency . . . so long as the Court can discern that the
time claimed was necessary and reasonable and that any
nonproductive time was excluded from the request.")(internal
quotation marks omitted); *Cook v. Block*, 609 F. Supp. 1036, 1041
(D.D.C. 1985) (concluding that the failure of counsel to include
nonbillable time was not a basis upon which to reduce the number
of hours claimed).

### 8.   Determination of Reasonable Number of Hours

In sum, for the reasons set forth above, the Court
concludes that the following number of hours were properly
billed to defendants: Mr. Gura: 1577.2 hours;[18] Mr. Neily: 700.2

---

[18]   Mr. Gura's time was calculated as follows: 1661 hours (time
requested by plaintiff) – 56.3 hours (time spent on unsuccessful
cross-petition for writ of certiorari and reply) – .5 hours
(time spent correcting an appendix due to counsel's error) – 3
hours (time spent attending a symposium) – 3.6 hours (time spent
preparing an unfiled response to defendants' request for

hours;[19] Mr. Levy: 397.7 hours;[20] Mr. Huff: 153.6 hours;[21] Mr.

Healy: 30.3 hours;[22] and Ms. Possessky: 18 hours.[23]

### C.   Lodestar Enhancement

Finally, the Court must determine if any enhancement of the

lodestar rate is appropriate in this case.   Plaintiff contends

that it is, arguing that his attorneys are entitled to fee

adjustments for "superior performance" and "excessive delay in

payment."   Pl.'s Mot. at 31.   Specifically, plaintiff is

requesting a fee enhancement amounting to a roughly $200

increase to the hourly rates for the "11-19 year" experience

---

rehearing en banc) = 1597.6 hours – 20.4 (80% of the 25.5 hours
billed for revising the page of the appellate brief) = 1577.2.

[19]   Mr. Neily's time was calculated as follows: 808.3 hours
(time requested by plaintiff) – 27.3 hours (time spent on
unsuccessful cross-petition for writ of certiorari and reply) –
3 hours (time spent preparing an unfiled response to defendants'
request for rehearing en banc) = 778 hours – 77.8 (10% reduction
for reconstructed timesheets) = 700.2 hours

[20]   Mr. Levy's time was calculated as follows: 77 hours of
travel time; and 518.6 (remaining time requested by plaintiff) –
19.2 hours (time spent on unsuccessful cross-petition for writ
of certiorari and reply) – 1.6 hours (time spent preparing an
unfiled response to defendants' request for rehearing en banc) –
4.4 hours (time spent discussing pending legislation with the
NRA) = 493.4 – 123.4 (25% reduction for vague billing entries) –
49.3 (10% reduction for reconstructed timesheets) = 320.7 hours.

[21]   The time calculated by plaintiff.

[22]   Mr. Healy's time was calculated as follows: 33.7 hours
(time requested by plaintiff) – 3.4 (10% reduction for
reconstructed timesheets) = 30.3 hours.

[23]   The time calculated by plaintiff.

range and a roughly $140 increase for the "4-7 year" experience
range. (Plaintiff - applying the enhancement to the Updated
Laffey Matrix - requests that his attorneys receive $790/hour
for those in the "11-19 year" experience range (up from
$589/hour) and $400/hour for the "4-7 year" experience range
(from $361/hour). Pl.'s Mot. at 35.) In addition, plaintiff is
also seeking three years of "excessive-delay" interest in the
amount of $589,627.95. Pl.'s Mot. at 38-41.[24] Defendants urge
the Court to reject these requested enhancements, arguing, among
other things, that "[p]laintiff offers no coherent basis for
claiming the 'rare' entitlement to a performance enhancement,
let alone an enhancement that would increase opposing counsels'
rate to $789/hour[.]" Defs.' Opp'n at 20. Defendants further
contend that an enhancement for "excessive delay" is
inappropriate, asserting that there is nothing "'exceptional'"
or "'unanticipated'" about the delay in this case. Defs.' Opp'n
at 24-26 (quoting *Perdue*, 130 S. Ct. at 1675). For the reasons
discussed below, the Court concludes that plaintiff has not
overcome the "strong presumption" in favor of the lodestar rate,
*Perdue*, 130 S. Ct. at 1673, and therefore declines to enhance
the fee of plaintiff's counsel as requested.

---

[24]    According to defendants, "[t]his additional enhancement
amounts to approximately $180 for each hour claimed
($589,627.95/3,270.2)." Defs.' Opp'n at 24.

1.  **Legal Framework**

In *Perdue*, the Supreme Court reaffirmed that an attorney's fee based upon the lodestar rate may be increased "due to superior performance and results" in "extraordinary cases." 130 S. Ct. at 1669; *see also id.* at 1673 (rejecting "any contention that a fee determined by the lodestar method may not be enhanced in any situation"; explaining that "[t]he lodestar method was never intended to be conclusive in all circumstances").  The Court also reiterated, however, that "there is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* at 1669.

Despite this strict standard, the *Perdue* Court identified three "rare" and "exceptional" circumstances that could potentially support a fee enhancement.  First, the Supreme Court indicated that an enhancement might be appropriate "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Id.* at 1674.  The Court explained that "[t]his may

occur if the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or perhaps only a few similar factors." *Id.* (citing *Salazar*, 123 F. Supp. 2d at 8 and *Laffey*, 572 F. Supp. at 354). Next, the Supreme Court counseled that an enhancement might be appropriate "if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted." *Id.* Third, the Supreme Court recognized that an enhancement might be appropriate if there are "extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees." *Id.* at 1675. The Court also emphasized, however, that the fee applicant must provide "specific evidence that the lodestar fee would not have been 'adequate to attract competent counsel.'" *Id.* at 1674.

### 2.  The Requested Enhancements

Plaintiff argues that two of the three "rare" and "exceptional" circumstances identified in *Perdue* are applicable here.  Specifically, plaintiff contends that the lodestar rate should be enhanced (i) because the method used to determine the prevailing market rate does not adequately measure the superior attorney performance of his counsel; and (ii) in response to the excessive delay in payment.  *See* Pl.'s Mot. at 1 ("*Perdue*

confirms beyond all doubt that this case qualifies for two of three authorized upward fee adjustments: a matrix adjustment to market rates, and an interest adjustment for excessive delay in payment."). The Court will explore these requests in turn.

### i.   Adjustment for Superior Attorney Performance

Plaintiff first argues that an adjustment is necessary in order to compensate plaintiff's counsel for their superior attorney performance. In support of this enhancement, plaintiff principally argues that the rates produced even by the Updated Laffey Matrix - $589/hour and $361/hour - do not adequately reflect the "true market value" of plaintiff's counsel as demonstrated by their "exceptional" performance. *See* Pl.'s Mot. at 32 (explaining that "the precise matrix looked to by the Court is unimportant" because "[i]f the performance is exceptional, its value will not be captured by any matrix"). Plaintiff contends that "[t]he exceptional nature of the work performed by [his] counsel should be self-evident," explaining that "[c]ounsel were required to scrutinize a great range of complex material, synthesize coherent and persuasive arguments, and anticipate, dissect, and respond to the opposition's analyses - all within the art of litigation as practiced at the highest level." Pl.'s Mot. at 33. Plaintiff further asserts that the results achieved by his attorneys provide additional

56

evidence that their performance "was indeed exceptional," arguing that "[t]his case will stand as a landmark foundational precedent in American constitutional law."  Pl.'s Mot. at 34-35. Finally, plaintiff maintains that "significant enhancements [may] apply where, as here, the controversial or otherwise particularly challenging nature of the issue made the case unattractive to many lawyers."  Pl.'s Mot. at 34-35.  For those reasons, plaintiff argues that neither the USAO Laffey Matrix nor the Updated Laffey Matrix reflects "the rates needed to attract this type of performance," and therefore requests that – "[c]onsistent with established rates" – his attorneys be compensated at the rates of $790/hour for the 11-19 year experience range and $400/hour for the 4-7 year experience range.  Pl.'s Mot. at 35.[25]

Defendants, in response, urge the Court to reject this requested enhancement for several reasons.  First, defendants assert that plaintiff has failed to provide the Court with "'specific proof linking the attorney's ability'" to the

---

[25]    In further support of these rates, plaintiff relies upon Mr. Podgursky's declaration.  Mr. Podgursky avers that plaintiff's requested rates of $790/hour for the 11-19 year experience range and $400/hour for the 4-7 experience range are "fair rates, but comfortably below the highs."  Pl.'s Mot. at 35 (citing Podgursky Decl. ¶ 9); see also Pl.'s Mot. at 36-38 (chart containing partner and associate "high" rates at major law firms).

enhanced rates that he is requesting.  Defs.' Opp'n at 20
(quoting *Perdue*, 130 S. Ct. at 1674).  Next, defendants argue
that plaintiff has failed to offer "'specific evidence that the
lodestar fee would not have been adequate to attract competent
counsel.'"  Defs.' Opp'n at 20 (quoting *Perdue*, 130 S. Ct. at
1674).  Finally, defendants argue that "plaintiff's counsel
exaggerate the extent of their accomplishment by failing to pay
even basic lip service to the scholars who preceded them and on
which they heavily relied."  Defs.' Opp'n at 22.

Having carefully considered plaintiff's request and
defendants' objections thereto, the Court concludes that the
evidence before the Court simply does not support the
significant enhancement urged by plaintiff.

First, the Court finds that plaintiff has failed to put
forth "specific proof linking [his] attorney[s'] abilit[ies]"
with the extraordinarily high enhancement he is requesting.
*Perdue*, 130 S. Ct. at 1674.  The Court is simply not persuaded
that counsel's entitlement to those high rates is "self-
evident."  Pl.'s Mot. at 33.  Therefore, in the absence of more
specific evidence on this issue, the Court finds that the
lodestar rates of $420/hour and $275/hour – which are the
prevailing rates for attorneys engaged in complex federal
litigation in the District of Columbia – adequately reflect the

"true market value" of the exemplary work of plaintiff's counsel in this action. *See generally Blum*, 465 U.S. at 899 ("The 'quality of representation' . . . generally is reflected in the reasonable hourly rate.  It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'"); *see also Miller*, 575 F. Supp 2d at 51 ("[Plaintiff]'s evidence that counsel's established billing rates do not adequately reflect the quality of their performance is simply too paltry to overcome the 'strong presumption' against fee enhancements for quality of representation.  Absent amplifying details, this 'evidence' consists of nothing more than superlative-laden platitudes." (internal citation omitted)).

Nor has plaintiff provided the Court with "specific evidence that the lodestar fee would not have been 'adequate to attract competent counsel.'"  *Perdue*, 130 S. Ct. at 1674.  Although plaintiff is correct that more than 25 years passed before someone decided to challenge the District's handgun ban, the Court is simply not persuaded – based upon the record before it – that the lack of earlier litigation on this issue was the

result of "insufficient" financial incentives or an inability to retain counsel. *See* Pl.'s Reply at 10.

Finally, the Court is not persuaded that plaintiff's success in this action was attributable to the superior lawyering of his counsel. As plaintiff is well aware, "superior results are relevant [to a request for a fee enhancement] only to the extent it can be shown that they are the result of superior attorney performance." *See Perdue*, 130 S. Ct. at 1674. In this case, the Court finds that the lawyering on both sides was excellent. The Court therefore concludes that plaintiff has failed to present this Court with the specific evidence necessary to overcome the "strong presumption" that the lodestar figure is reasonable. *Id.* at 1673.

### ii. Adjustment for Unanticipated Delay

Next, plaintiff asserts that his counsel are entitled to an enhancement for unanticipated delay, arguing that this case involved a "great deal of 'unanticipated delay,' much of it 'unjustifiably caused by the defense[.]'" Pl.'s Mot. at 38. As a result of this unanticipated delay, plaintiff maintains that, in addition to being compensated at current rates,[26] his counsel

---

[26]    As plaintiff recognizes, the traditional method for compensating a party for delay in payment is through payment at the current market rate. *See* Pl.'s Mot. at 8 ("The easiest, most readily accepted practice accounting for compensation delay

is entitled to three years of unanticipated delay-interest, compounded at an annual rate of 7.25%, for a total of $589,627.95 in unanticipated delay-interest charges.  Pl.'s Mot. at 8.  In response, defendants argue, among other things, that plaintiff's delay-enhancement must be rejected as "a transparent attempt at double recovery."  Defs.' Opp'n at 4.  Defendants further assert that plaintiff improperly characterizes "as unjustified and unanticipated delay such predictable steps as seeking rehearing *en banc* or moving for summary affirmance on a standing issue that the District reasonably believed to have been squarely governed by prior Circuit precedent."  Defs.' Opp'n at 25.  This Court agrees and finds that plaintiff's request for an enhancement due to unanticipated delay lacks merit.

Simply put, the Court is not persuaded that the District's vigorous defense of a gun control law that it "viewed as [both] critical to [the] exercise of its police powers [and] for the protection of public safety," Defs.' Mot. for Protective Order, Docket No. 58 at 1, can be characterized as dilatory tactics that resulted in unanticipated delay.  Instead, the Court concludes that any prejudice to plaintiff's counsel that

is to award counsel their fees for all hours at the current rate. . . .").

resulted from delay in payment is remedied by the fact that plaintiff's fee award is based upon 2010-2011 rates. *See, e.g.*, *Perdue*, 130 S. Ct. at 1675 ("An attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'") (quoting *Missouri* v. *Jenkins*, 491 U.S. 274, 282 (1989)) (internal citations omitted).  The Court therefore finds that an enhancement for unanticipated delay is unwarranted.

### D.   Fee Calculation

In sum, for the reasons set forth above, the Court concludes that plaintiff's counsel is entitled to the following fees, totaling $1,132,182.00:

- Alan Gura: 1577.2 hours x $420/hour = $662,424.00

- Clark Neily: 700.2 hours x $420/hour = $294,084.00

- Robert Levy: 320.7 hours x $315/hour = $101,020.50; and 77 hours x $157.50/hour = $12,127.50

- Thomas Huff: 153.6 hours x $275/hour = $42,240.00

- Gene Healy: 30.3 hours x $420/hour = $12,726.00

- Laura Possessky: 18 hours x $420/hour = $7,560.00

62

**III. EXPENSES**

In a § 1983 civil rights action, where, as here, the
plaintiff is the prevailing party, he is also entitled to seek
reasonable expenses.  Plaintiff, therefore, seeks reimbursement
of the following expenses and costs to Mr. Levy: (i) travel
expenses: $3,544.00; (ii) photocopy/printing expenses: $765.44;
(iii) teleconferencing: $244.00; (iv) postage: $212.36;
(v) messenger fees: $124.47; and (v) outside legal services:
$7,650.00, for a total of $12,540.27.[27]  *See* Pl.'s Mot. at 6.  Of
these expenses, defendants only object to the expenses for
"outside legal services," which it characterizes as "vaguely
described."  Defs.' Opp'n. at 40.

In support of his request for "outside legal services,"
plaintiff submits the declaration of attorney Robert Levy.  In
his declaration, Mr. Levy states that he seeks to recover
"$3,250 for legal fees paid to attorney Stephen Halbrook, for
initial research into [the] case, and $4,400 for legal fees paid
to attorney Don Kates for assistance with the reply brief filed
before the D.C. Circuit."  Levy Decl. ¶ 7.  No further
documentation in support of these "expenses" was filed with the
Court.

---

[27]   Although plaintiff states in his petition that he is
seeking $13,215.30 in costs reimbursable to Mr. Levy, the
expenses detailed above only total to $12,540.27.

The Court is aware of no authority allowing an attorney to claim the "outside legal services" of other attorneys as a reasonable expense of litigation, nor has counsel provided the Court with any such authority.  *See generally Miller*, 601 F. Supp. 2d at 58 (noting that reasonable expenses can include "'out-of-pocket litigation expenses for postage, photocopying, telephone calls, facsimile transmissions, messengers, local travel, Westlaw, [&] transcripts'" (quoting *Salazar I*, 123 F. Supp 2d at 16-17)).[28]  The Court will further note that no billing records or other detailed documentation have been submitted in support of these sums.  Without such documentation, the Court is unable to independently assess the reasonableness of the requested expenses.  Having received no response from plaintiff on the issue, the Court concludes that Mr. Levy is not entitled to reimbursement for his undocumented claims of "outside legal services."

The Court finds, therefore, that Mr. Levy is entitled to

---

[28]   The cases cited by plaintiff in support of his expenses, *see* Pl.'s Mot. at 42, are not to the contrary. *See Sexcius v. District of Columbia*, 839 F. Supp. 919, 927 (D.D.C. 1993) ("Reasonable photocopying, postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable 'attorney's fee.'"); *Palmer v. Barry*, 704 F. Supp. 296, 298 (D.D.C. 1989) (granting a request for reimbursement of travel expenses; denying without prejudice request for reimbursement of photocopying expenses where supporting documentation was not provided to the court).

reimbursement in the amount of $4,890.27 for his reasonable expenses.

## IV.   CONCLUSION

For the reasons set forth above, the Court concludes that plaintiff's counsel is entitled to fees in the amount of $1,132,182.00 and expenses in the amount of $4,890.27.  A separate Order accompanies this Memorandum Opinion.

**SIGNED:**          **Emmet G. Sullivan**
                     **United States District Court Judge**
                     **December 29, 2011**